## Case No. 16,816.

### Ex parte VALLANDIGHAM.

[5 West. Law Month. 37.] 1

Circuit Court, S. D. Ohio. May 16, 1863.

HABEAS CORPUS—ISSUANCE OF WRIT—ARREST OF CITIZENS BY MILITARY AUTHORITY—POWERS OF DEPARTMENTAL COMMANDER—CIVIL WAR.

[1. The writ of habeas corpus is not grantable as of course, but will only issue upon a sufficient showing; and a refusal to issue the writ is justifiable if the court is satisfied that the petitioner would not be discharged upon a hearing after its return.]

[2. The commander of a military department, as the agent and representative of the president, in a time of civil war, when the very existence of the government is threatened, has authority, under the constitutional provision making the president the commander in chief of the army and navy, even in a locality where martial law is not in force, to arrest citizens, not in the military or naval forces, for mischievous acts of disloyalty which impede or endanger the military operations of the government. Such arrests are justifiable on the ground of military necessity; and of the existence of that necessity, the commanding general, as the agent of the president, is the exclusive judge, and the courts have no authority by writ of habeas corpus to inquire into it.]

[3. The civil courts have no jurisdiction, upon application for writ of habeas corpus, to determine whether a military commission by which the prisoner was tried was legally constituted, and had jurisdiction of the case.]

2[This was a petition for a writ of habeas corpus by Clement L. Vallandigham, a citizen of Ohio, alleging that he was unlawfully arrested at his home in Dayton, Ohio, on the night of the 5th of May, 1863, by a detachment of soldiers of the army of the United States, acting under the orders of Ambrose E. Burnside, a major general in the army of the United States, and brought to the city of Cincinnati, where he has been subjected to trial before a military commission, and is still detained in custody. The circumstances under which the arrest of the petitioner was made, were as follows:

[General Burnside, being in command of the military department of the Ohio, which included the state of Ohio, on April 13, 1863, issued the following general order, known as "General Order No. 38":

["Headquarters Dept. of the Ohio. Cincinnati, O., April 13, 1863. General Orders No. 38. The commanding general publishes,

1 [The arguments of the attorneys in this case, together with the matter contained in the statement and in the note at the end of the case, were taken from the volume published in 1863 by Rickey & Carroll, Cincinnati, Ohio, and which contains a full account of the whole proceeding.]

2 [From pamphlet report by Rickey & Carroll, Cincinnati, Ohio, 1863.]

for the information of all concerned, found within our lines, who commit acts for the benefit of the enemies of our country, will be tried as spies or traitors, and, if convicted, will suffer death. This order includes the following class of persons: Carriers of secret mails. Writers of letters sent by secret mails. Secret recruiting officers within the lines. Persons who have entered into an agreement to pass our lines for the purpose of joining the enemy. Persons found concealed within our lines, belonging to the service of the enemy, and, in fact, all persons found improperly within our lines, who could give private information to the enemy. All persons within our lines who harbor, protect, conceal, feed, clothe, or in any way aid the enemies of our country. The habit of declaring sympathies for the enemy will not be allowed in this department. Persons committing such offences will be at once arrested, with a view to being tried as above stated, or sent beyond our lines into the lines of their friends. It must be distinctly understood that treason, expressed or implied, will not be tolerated in this department. All officers and soldiers are strictly charged with the execution of this order.

["By command of Major General Burnside.          Lewis Richmond,

["Asst. Adjutant General.

["Official: D. R. Larned,

["Captain and Assistant Adjutant General."

[The charges upon which Mr. Vallandigham was arrested and tried before the military commission were based upon the alleged violation of this order. The charge and specifications in full were as follows:

[Charge.

["Publicly expressing in violation of general orders No. 38, from headquarters department of the Ohio, sympathy for those in arms against the government of the United States, and declaring disloyal sentiments and opinions with the object and purpose of weakening the power of the government in its efforts to suppress an unlawful rebellion."

[Specifications.

["In this, that the said Clement L. Vallandigham, a citizen of the state of Ohio, on, or about, the first day of May, 1863, at Mount Vernon, Knox county, Ohio, did publicly address a large meeting of citizens, and did utter sentiments in words, or in effect, as follows, declaring the present war 'a wicked, cruel and unnecessary war;' 'a war not being waged for the preservation of the Union;' 'a war for the purpose of crushing out liberty and erecting a despotism;' 'a war for the freedom of the blacks and the enslavement of the whites;' stating 'that if the administration had so wished, the war could have been honorably terminated months ago;' that 'peace might have been honorably obtained by listening to the proposed intermediation of France;' that 'propositions by which the Northern states could be won back, and the South guaranteed their rights under the constitution, had been rejected the day before the late battle of Fredericksburg, by Lincoln and his minions,' meaning thereby the president of the United States and those under him in authority; charging 'that the government of the United States was about to appoint military marshals in every district, to restrain the people of their liberties, to deprive them of their rights and privileges;' characterizing general orders No. 38, from headquarters department of the Ohio, as 'a base usurpation of arbitrary authority,' inviting his hearers to resist the same, by saying, 'the sooner the people inform the minions of usurped power that they will not submit to such restrictions upon their liberties, the better;' declaring 'that he was at all times, and upon all occasions, resolved to do what he could to defeat the attempts now being made to build up a monarchy upon the ruins of our free government;' asserting 'that he firmly believed, as he said six months ago, that the men in power are attempting to establish a despotism in this country, more cruel and more oppressive than ever existed before.' All of which opinions and sentiments he well knew did aid, comfort, and encourage those in arms against the government, and could but induce in his hearers a distrust of their own government, sympathy for those in arms against it, and a disposition to resist the laws of the land."

[Against his arrest and trial by the military commission Mr. Vallandigham, on May 7, 1863, filed the following protest:

[Protest of Mr. Vallandigham.

["Arrested without due 'process of law,' without warrant from any judicial officer, and now in a military prison, I have been served with a 'charge and specifications,' as in a court-martial or military commission. I am not in either 'the land or naval forces of the United States, nor in the militia in the actual service of the United States,' and therefore am not triable for any cause, by any such court, but am subject, by the express terms of the constitution, to arrest only by due process of law, judicial warrant, regularly issued upon affidavit, and by some officer or court of competent jurisdiction for the trial of citizens, and am now entitled to be tried on an indictment or presentment of a grand jury of such court, to speedy and public trial by an impartial jury of the state of Ohio, to be confronted with witnesses against me, to have compulsory process for witnesses in my behalf, the assistance of counsel for my defense, and evidence and argument according to the common law and the ways of judicial courts. And all these I here demand as my right as a citizen of the United States, and under the constitution of the United States. But the alleged 'offence' is not known

to the constitution of the United States, nor to any law thereof. It is words spoken to the people of Ohio in an open and public political meeting, lawfully and peacefully assembled, under the constitution and upon full notice. It is words or criticism of the public policy of the public servants of the people, by which policy it was alleged that the welfare of the country was not promoted. It was an appeal to the people to change that policy, not by force, but by free elections and the ballot box. It is not pretended that I counselled disobedience to the constitution, or resistance to laws and lawful authority. I never have. Beyond this protest, I have nothing further to submit.                    C. L. Vallandigham.

["Cincinnati, Ohio, May 7, 1863."

[Upon the presentation of the petition for the writ of habeas corpus, the court declined to issue the writ except upon a sufficient showing that it ought to issue. It therefore directed that General Burnside be notified of the pendency of the petition, in order that he might appear to oppose the granting of the writ. Having been notified accordingly, General Burnside submitted to the court the following statement in writing:

[Statement of Major General Burnside.

["Headquarters Department of the Ohio. Cincinnati, O., May 11, 1863. To the Honorable the Circuit Court of the United States within and for the Southern District of Ohio: The undersigned, commanding the department of the Ohio, having received notice from the clerk of said court that an application for the allowance of a writ of habeas corpus will be made this morning before your honors, on behalf of Clement L. Vallandigham, now a prisoner in my custody, asks leave to submit to the court the following statement:

["If I were to indulge in wholesale criticisms of the policy of the government, it would demoralize the army under my command, and every friend of his country would call me a traitor. If the officers or soldiers were to indulge in such criticisms, it would weaken the army to the extent of their influence; and, if this criticism were universal in the army, it would cause it to be broken to pieces, the government to be divided, our homes to be invaded, and anarchy to reign. My duty to my government forbids me to indulge in such criticisms; officers and soldiers are not allowed so to indulge, and this course will be sustained by all honest men. Now, I will go further. We are in a state of civil war. One of the states of this department is at this moment invaded, and three others have been threatened. I command the department, and it is my duty to my country, and to this army, to keep it in the best possible condition; to see that it is fed, clad, armed, and, as far as possible, to see that it is encouraged. If it is my duty and the duty of the troops to avoid say-

ing anything that would weaken the army by preventing a single recruit from joining the ranks, by bringing the laws of congress into disrepute, or by causing dissatisfaction in the ranks, it is equally the duty of every citizen in the department to avoid the same evil. If it is my duty to prevent the propagation of this evil in the army, or in a portion of my department, it is equally my duty, in all portions of it; and it is my duty to use all the force in my power to stop it. If I were to find a man from the enemy's country distributing in my camps speeches of their public men that tended to demoralize the troops, or to destroy their confidence in the constituted authorities of the government, I would have him tried, and hung if found guilty, and all the rules of modern warfare would sustain me. Why should such speeches from our own public men be allowed? The press and public men, in a great emergency like the present, should avoid the use of party epithets and bitter invectives, and discourage the organization of secret political societies, which are always undignified and disgraceful to a free people, but now they are absolutely wrong and injurious; they create dissensions and discord, which just now amount to treason. The simple names 'patriot' and 'traitor' are comprehensive enough. As I before said, we are in a state of civil war, and an emergency is upon us which requires the operations of some power that moves more quickly than the civil. There never was a war carried on successfully without the exercise of that power. It is said that the speeches which are condemned have been made in the presence of large bodies of citizens, who, if they thought them wrong, would have then and there condemned them. That is no argument. These citizens do not realize the effect upon the army of our country, who are its defenders. They have never been in the field; never faced the enemies of their country; never undergone the privations of our soldiers in the field; and, besides, they have been in the habit of hearing their public men speak, and, as a general thing, of approving of what they say. They must not use license, and plead that they are exercising liberty. In this department it cannot be done. I shall use all the power I have to break down such license, and I am sure I will be sustained in this course by all honest men. At all events, I will have the consciousness, before God, of having done my duty to my country, and when I am swerved from the performance of that duty by any pressure, public or private, or by any prejudice, I will no longer be a man or a patriot.

["I again assert, that every power I possess on earth, or that is given me from above, will be used in defense of my government, on all occasions, at all times, and in all places within this department. There is no party, no community, no state govern-

ment, no state legislative body, no corporation or body of men that have the power to inaugurate a war policy that has the validity of law and power, but the constituted authorities of the government of the United States; and I am determined to support their policy. If the people do not approve that policy, they can change the constitutional authorities of that government, at the proper time and by the proper method. Let them freely discuss the policy in a proper tone, but my duty requires me to stop license and intemperate discussion, which tends to weaken the authority of the government and army; whilst the latter is in the presence of the enemy, it is cowardly so to weaken it. This license could not be used in our camps. The man would be torn in pieces who would attempt it. There is no fear of the people losing their liberties; we all know that to be the cry of demagogues, and none but the ignorant will listen to it; all intelligent men know that our people are too far advanced in the scale of religion, civilization, education, and freedom, to allow any power on earth to interfere with their liberties; but this same advancement in these great characteristics of our people teaches them to make all necessary sacrifices for their country when an emergency requires. They will support the constituted authorities of the government, whether they agree with them or not. Indeed, the army itself is a part of the people, and is so thoroughly educated in the love of civil liberty, which is the best guarantee for the permanence of our republican institutions, that it would itself be the first to oppose any attempt to continue the exercise of military authority after the establishment of peace by the overthrow of the Rebellion. No man on earth can lead our citizen soldiery to the establishment of a military despotism, and no man living would have the folly to attempt it. To do so would be to seal his own doom. On this point there can be no ground for apprehension on the part of the people. It is said that we can have peace if we lay down our arms. All sensible men know this to be untrue. Were it so, ought we to be so cowardly as to lay them down until the authority of the government is acknowledged? I beg to call upon the fathers, mothers, brothers, sisters, sons, daughters, relatives, friends, and neighbors of the soldiers in the field to aid me in stopping this license and intemperate discussion, which is discouraging our armies, weakening the hands of the government, and thereby strengthening the enemy. If we use our honest efforts, God will bless us with a glorious peace and a united country. Men of every shade of opinion have the same vital interest in the suppression of this Rebellion; for, should we fail in the task, the dread horrors of a ruined and distracted nation will fall alike on all, whether patriots or traitors.

["These are substantially my reasons for issuing general order No. 38; my reasons for the determination to enforce it, and also my reasons for the arrest of Hon. C. L. Vallandigham for a supposed violation of that order, for which he has been tried. The result of that trial is now in my hands. In enforcing this order I can be unanimously sustained by the people, or I can be opposed by factious, bad men. In the former event, quietness will prevail; in the latter event, the responsibility and retribution will attach to the men who resist the authority and the neighborhoods that allow it.

["A. E. Burnside, Major General,
["Commanding Department of the Ohio."

[Opening Argument of Hon. George E. Pugh.

[May it please your honor: I insist on my motion for a writ of habeas corpus, notwithstanding the defense attempted by General Burnside. And here I must be allowed to complain of the hardship to which Mr. Vallandigham has been subjected by the court on this occasion. The statement we have just heard, is, in effect, a return to the writ; it avows the caption and detention of the prisoner in manner and form as alleged by the petition; it proclaims the fact that he has been tried by a military commission, and for an offense unknown to the laws of the land; and yet, without having the body of the petitioner in court, so as to prevent the execution, possibly, of an illegal sentence, without any writ or order compelling General Burnside to stay the execution of such a sentence until your honor can determine this application, I am now required to proceed in the discharge of my duty as an advocate.

[Here LEAVITT, District Judge, observed that it was the settled practice of the court to give notice to the defendant, in cases of military arrest, before issuing a writ of habeas corpus; and that Judge Swayne had so announced, in a case from Champaign county, at the last term.

[Mr. Pugh. His honor may have intended that as a rule in future; but, inasmuch as the question was not then argued at the bar, I wish to be heard in opposition to the establishment of any such rule. I know that the practice of the court has been otherwise. I know that your honor granted me a writ of habeas corpus, at chambers, without any notice to General Mitchel, the defendant, less than two years ago; and that, sitting here, at October term, 1861, your honor commanded him to show cause why he should not be attached for contempt in disobeying the writ. And I feel confident that no decision or authority can be found, in America or in England, to countenance the rule which Judge Swayne has suggested. The petitioner is clearly entitled, if need be, to call upon the supreme court of the United States to review the proceedings of this court; and how can he do that effectually, according to the doctrine of Kaine's Case, 14 How. [55 U. S.] 103,

until a writ has been issued, or, at least, some determination made of record? And furthermore, as all authorities agree, the writ of habeas corpus is a writ of right; by which I do not mean that a petitioner can sue it out of the clerk's office, as he may a writ of summons or of subpœna, but that whenever, by his own showing or that of others, on affidavit, it appears that he is unlawfully imprisoned, the court has no choice, no latitude, no right even of postponement.

[LEAVITT, District Judge, observed that the granting or refusing of the writ was a matter of judicial discretion.

[Mr. Pugh. Of judicial discretion, assuredly; but that means a discretion guided by the principles of the law, not by considerations of convenience or favor.

[LEAVITT, District Judge. Certainly.

[Mr. Pugh. The doctrine is well announced by Mr. Justice Wilmot in his opinion to the house of lords, May 9, 1758: "A writ which issues upon a probable cause, verified by affidavit, is as much a writ of right as a writ which issues of course." Wilm. Op., 82. In the same opinion (pages 83, 84) the learned judge declares that writs of habeas corpus, mandamus, prohibition, supplicavit, and the writ of homine replegiando, are all writs of right; "but," he adds, "a proper case must be laid before the court, by affidavit, before the parties praying such writs may be entitled to them." And he continues: "They are the birthright of the people, subject to such provisions as the law has established for granting them. Those provisions are not a check upon justice, but a wise and provident direction of it." Anterior to the Revolution of 1688, in England, judges were appointed by the crown, and held their offices only during its pleasure. The consequence was, and naturally, that while the writ of habeas corpus could be obtained, in term time, on application to the court of king's bench, individual judges would not grant it in vacation, or delayed, under various pretexts, to hear and determine upon the case of imprisonment. To remedy these evils, and thus render the writ effectual in every case, the famous act or statute of 31 Car. II. c. 2, was proposed and adopted. "It is a very common mistake," observes Dr. Hallam, "and that not only among foreigners, but many from whom some knowledge of our constitutional laws might be expected, to suppose that this statute of Car. II. enlarged in a great degree our liberties, and forms a sort of epoch in their history. But, though a very beneficial enactment, and eminently remedial in many cases of illegal imprisonment, it introduced no new principle, nor conferred any right upon the subject. From the earliest records of the English law, no freeman could be detained in prison except upon a criminal charge, or conviction, or for a civil debt. In the former case, it was always in his power to demand of the court of king's bench a writ of habeas corpus ad

subjiciendum, directed to the person detaining him in custody, by which he was enjoined to bring up the body of the prisoner with the warrant of commitment, that the court might judge of its sufficiency, and remand the party, admit him to bail, or discharge him, according to the nature of the charge. This writ issued of right, and could not be refused by the court. It was not to bestow an immunity from arbitrary imprisonment, which is abundantly provided in Magna Charta, if indeed it were not much more ancient, that the statute of Car. II. was enacted; but to cut off the abuses by which the government's lust of power and the servile subtlety of crown lawyers had impaired so fundamental a privilege." Const. Hist. Eng. c. 8. This appears, also, from the language of the court in Bushell's Case, Vaughan, 135, decided nine years before the statute. Bushell and eleven others were the jury which acquitted Penn and Mead, at the Old Bailey sessions, upon an indictment for holding an unlawful assembly; Penn having attempted to preach in Great Church street, and Mead having accompanied him. The recorder of London was so exasperated at this verdict that he fined all the jurymen; sentencing Bushell, as foreman, to pay forty marks, and to be imprisoned in Newgate until they had been paid. Bushell sued out a writ of habeas corpus from the court of common pleas, and was thereupon discharged from imprisonment. The court said: "The writ of habeas corpus is now the most usual remedy by which a man is restored again to his liberty if he have been, against law, deprived of it. Therefore, the writ commands the day and the cause of the caption and the detaining of the prisoner to be certified upon the return; which, if not done, the court cannot possibly judge whether the cause of the commitment and detainer be according to law, or against it. Therefore, the cause of the imprisonment ought, by the return, to appear as specifically and certainly to the judges of the return as it did appear to the court or person authorized to commit."

[One peculiar excellence of the habeas corpus act, so called, was that it required the courts of Westminster in term time, and every judge in vacation, to grant the writ immediately, without excuse or evasion, and immediately proceed to examine and decide upon the cause of imprisonment. Another excellence was that, being the united act of king, lords, and commons, it could not be repealed, or superseded, or suspended in any manner, without the consent of all. Afterward, to be sure, James II. asserted, and attempted to exercise, what was called a "dispensing" power,—a power, namely, to dispense with the operation of an act of parliament in the case of particular individuals. But this arbitrary assumption was rebuked, and forever put to rest, by the famous Case of the Seven Bishops, 4 State Tr. 304, and cost King James the throne of his ancestors. The dec-

laration of rights, adopted, as a solemn covenant, when William and Mary were called to the place from which James had been expelled, condemns the "dispensing power" in every shape and form; since which time, for now almost two hundred years, the writ of habeas corpus never has been refused, or successfully evaded, or trifled with, in England, except in pursuance of an act of parliament suspending its privilege for a limited period, and in particular cases. Case of Watson, 9 Adol. & E. 731; Crowley's Case, 2 Swanst. 70–72; Rex v. Hobhouse, 2 Chit. 207. Even the privilege of parliament affords no protection against an attachment for disobeying the writ. Rex v. Earl Ferrers, 1 Burrows, 631.

[Our act of congress, entitled "An act to establish the judicial courts of the United States," approved September 24, 1789 [1 Stat. 73], declares: "Sec. 14. That all the before-mentioned courts of the United States shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeably to the principles and usages of law. And that either of the justices of the supreme court, as well as judges of the district courts, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment: provided, that writs of habeas corpus shall, in no case, extend to prisoners in gaol, unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." 1 Stat. 81, 82. This act was construed by the supreme court of the United States in the case of Ex parte Watkins, 3 Pet. [28 U. S.] 193. Marshall, C. J.: "No law of the United States prescribes the case in which this great writ (habeas corpus) shall be issued, nor the power of the court over the party brought up by it. The term is used in the constitution as one which, was well understood; and the judicial act authorizes this court, and all the courts of the United States, and the judges thereof, to issue the writ for the purpose of inquiring into the cause of commitment. This general reference to a power which we are required to exercise, without any precise definition of that power, imposes on us the necessity of making some inquiries into its use according to that law which is, in a considerable degree, incorporated into our own. The writ of habeas corpus is a high prerogative writ, known to the common law, the great object of which is the liberation of those who may be imprisoned without sufficient cause. It is in the nature of a writ to examine the legality of the commitment. The English judges, being originally under the influence of the crown, neglected to issue this writ where the government entertained suspicions which could not be sustained by evidence; and the writ, when issued, was sometimes disregarded or evaded, and great individual oppression was suffered in consequence of delays in bringing prisoners to trial. To remedy this evil, the celebrated habeas corpus act of 31 Car. II. was enacted, for the purpose of securing the benefit for which the writ was given. This statute may be referred to as describing the cases in which relief is, in England, afforded by this writ to a person detained in custody. It enforces the common law."

[Mr. Pugh then read from 3 Bl. Comm. pp. 136–138, the several provisions of the act of 31 Car. II. c. 2, known as the "Habeas Corpus Act."

[And then, sir, we have an act of the congress lately in session, entitled "An act relating to habeas corpus and regulating judicial proceedings in certain cases," approved March 3, 1863 [12 Stat. 755]: "Section 1. That, during the present Rebellion, the president of the United States, whenever, in his judgment, the public safety may require it, is authorized to suspend the privilege of the writ of habeas corpus, in any case, throughout the United States, or any part thereof. And whenever and wherever the said privilege shall be suspended, as aforesaid, no military or other officer shall be compelled, in answer to any writ of habeas corpus, to return the body of any person or persons detained by him by authority of the president; but, upon the certificate under oath, of the officer having charge of any one so detained by him, as a prisoner, under authority of the president, further proceedings under the writ of habeas corpus shall be suspended by the judge or court having issued the said writ, so long as said suspension by the president shall remain in force, and said Rebellion continue." This act does not apply, in terms, to the present case; and for the obvious reason that the president of the United States, in whom (solely) the discretion of suspending the privilege of the writ of habeas corpus now resides, has not found it necessary to adopt a measure so unusual and extreme. He cannot exercise the authority thus conferred by a delegation of it to others: he must employ his own judgment, and in view of all the responsibilities of his great office. I take it for granted, also, that he will not decide a matter of such importance by writing a private letter, or sending a telegraphic dispatch: he ought to give notice by a formal proclamation, or in some manner equally authentic; so that all may be advised of the emergency, and govern themselves accordingly. For that is the true object of an executive proclamation. 12 Coke, 76. But, even then, as we have seen, the writ must be issued: it is the privilege of the writ only, that is, the right to be discharged or admitted to bail, which the president may suspend, and not the right of demanding the writ. And the officer, military or civil, hold-

ing a prisoner by the president's immediate authority, must so certify under oath, as a return to the writ when issued; and, thereupon, proceedings are to be stayed, but the writ is not to be dismissed, and far less, in the first instance, wholly denied. If the oath should be a false one, the officer would be liable to an indictment for perjury, and, of course, would be convicted. If this be the law, as clearly it is, when the privilege of the writ has been duly suspended, why must a prisoner languish in illegal confinement, day after day, and week after week, under peril of his life by a military sentence, at a time when the public safety does not, in the opinion of the president of the United States, require any obstruction of the ordinary course of justice? Respectfully, therefore, but none the less firmly, in the discharge of my duty as an advocate, I deny the right of this court to establish any rule of practice, in regard to the writ of habeas corpus, at all variant from the practice of the courts of England in modern times. That subject has been passed upon, adjudicated, and conclusively determined by the supreme court of the United States as the tribunal of last resort.

[The real question, and the only question, at present, is whether, upon the allegations of his petition, admitting them to be true, Clement L. Vallandigham is lawfully or unlawfully imprisoned. I repeat, sir, that General Burnside does not deny those allegations or any of them. On the contrary, in the statement which has been read, he says: "These are substantially my reasons for issuing general order No. 38, my reasons for the determination to enforce it, and, also, my reasons for the arrest of the Hon. C. L. Vallandigham for a supposed violation of that order, for which he has been tried. The result of that trial is now in my hands." The case before us, then, is the case of a citizen exempted from military arrest and jurisdiction, but who has, nevertheless, been arbitrarily and violently subjected to them. Can this be, sir, according to the constitution of the United States? General Burnside assumes, throughout the statement which has been read, that he is charged, personally, and above all other citizens, with the maintenance of the federal authority in this neighborhood,—an assumption which, with proper respect to him, is most erroneous and unwarrantable. His duties, as a major general in the army, are undoubtedly extensive: far be it from me to speak lightly of them, or to detract, in any manner, from their importance. But they do not include many subjects to which, in this statement, he has invited our attention; and they cannot excuse him for what he has done, and what he avows that he has done, in the case of the petitioner. And, first, that we may have a distinct view of his duties, as well as of our own duties, I will read the preamble and enacting clause in virtue of which the fed-

eral government exists: "We, the people of the United States, in order to form a more perfect union, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this constitution for the United States of America." There can be no Union except as intended by that compact. The people have not agreed to any other; and, without their consent, it is impossible that any other should be legitimately established. The justice to be administered in this court, and in all other tribunals, military and civil, must be such as the constitution requires. Domestic tranquility is a condition greatly to be envied; but it must be secured by observing the constitution in letter and in spirit. General Burnside admonishes us of a certain "quietness" which might prevail as the consequence of enforcing his military order: I answer him that quietness attained by the sacrifice of our ancestral rights, by the destruction of our constitutional privileges, is worse than the worst degree of confusion and violence. Touch not the liberty of the citizen; and we, in Ohio, at least, will be unanimous. We may not concur as to the causes which induced so mighty a rebellion; we may differ as to the best methods of subduing or of mitigating it; we may quarrel as partisans, or even as factionists; but we will, nevertheless, with one accord, sustain the general in the darkest hour of his despondency as well as in the day of triumph,—sustain him by our counsels, by all our means, and, if necessary, at the expense of our lives. But we cannot give him our liberties. That sacrifice would be of no advantage to him, and it would render us and our posterity forever miserable. It is not necessary to the common defense; it would not—it cannot—promote the common welfare. I know that General Burnside affects to scorn these and all similar suggestions. "There is no fear," he asserts, "of the people losing their liberties,"—but I will read his argument at large: "There is no fear of the people losing their liberties: we all know that to be the cry of demagogues, and none but the ignorant will listen to it; all intelligent men know that our people are too far advanced in the scale of religion, civilization, education, and freedom, to allow any power on earth to interfere with their liberties; but this same advancement in these great characteristics of our people teaches them to make all necessary sacrifices for their country, when an emergency requires." I not only fear, but I am well assured by the examples of history, that our liberties cannot survive a patient submission to arbitrary power. It is not the "cry" of demagogues; it is the voice of wisdom in all ages; it speaks to us from the tombs of an hundred republics, once happy, and proud, and confident of perpetuity. It is the watchword of patriots, and

the testament of martyrs; it should be the first lesson of youth, the last injunction of the aged to their children. "Eternal vigilance is the price of liberty!" We can have it for no less, and upon no other terms. "Religion, civilization, education!" These do not supply the place of liberty at all; nor have they been found sufficient to preserve it. Other nations, living under despotic forms of government, are quite as religious, and quite as thoroughly civilized, as we are; some of them are much better educated. The rude Roman was free; the Roman of the highest civilization became an abject slave:

"[Sævior armis,
Luxuria incubuit, victumque ulciscitur orbem."

[I will not intrust my sacred birthright to any man—let him be ever so great or good—upon his promise that, by and by, when he shall have conquered an enemy, or put down a rebellion, he will give it back to me. He may take it without my consent; he may be so strong that I cannot resist; these are misfortunes which I may not be able to avoid: but no words of flattery, no power on earth, can deceive me, or compel me, into any measure of compliance. Better the sharpest pangs of death; or, sharper than death, a life of exile, and poverty and constant hardship! Give me the crust of bread and the cup of water, with liberty, rather than the amplest luxury with servitude. Give me, instead of this genial climate, this fertile soil, this prosperous community, under an arbitrary government, the bleakest Arctic or Antarctic region, the almost insufferable winter, the night of one half-year in duration, the day which can hardly be called a day; but give me, withal, the consciousness—the proud, the noble, the priceless, the inexpressible consciousness—of being a free man! Whenever General Burnside speaks, therefore, of the government of the United States, I respond that such a government exists only, and only can exist, in virtue of the constitution. To that my allegiance and his allegiance are both due; by that I will stand firmly, and at all hazards; and in the name of that, uttering its very language, I now address him: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition the government for a redress of grievances." General Burnside holds an office created by act of congress alone,—an office which congress may, at any time, abolish. His title, his rank, his emoluments, his distinction above his fellow citizens, are all derived from that source. I take it to be absolutely certain, therefore, that he can make no "law" which congress could not make. He cannot abridge the freedom of speech, or of the press, or the right of the people to assemble and to consider of their grievances. And yet, sir, of what does he accuse Mr. Vallandigham? Let the specifica-

tion of Captain Cutts answer: Of having addressed a public assembly of the electors of Ohio, at Mount Vernon, in Knox county, on the first day of this month. Nothing more; nothing whatsoever. It was an assembly of the people to deliberate upon their grievances, and to advise with each other in what way those grievances could be redressed. Into that forum—the holiest of holy in our political system—has General Burnside intruded his military dictation. Need I say more? What avails a right of the people to assemble, or to consult of their public affairs, if, when assembled, and that peaceably, they have no freedom of speech?

[General Burnside appears to think, because he cannot behave with contempt or disrespect toward the president of the United States, that a similar restraint applies to every citizen. He forgets, possibly, that the president, as commander in chief of the army, is his superior in military rank; at all events, that is the reason governing his case. The president is protected, as against him, by the very words of the sixth article of war: "Any officer or soldier who shall behave himself with contempt or disrespect toward his commanding officer, shall be punished, according to the nature of his offense, by the judgment of a court-martial." And so in respect of words written or spoken: "Art. 5. Any officer or soldier who shall use contemptuous or disrespectful words against the president of the United States, against the vice-president thereof, against the congress of the United States, or against the chief magistrate or legislature of any of the United States in which he may be quartered, if a commissioned officer, shall be cashiered, or otherwise punished as a court-martial shall direct; if a non-commissioned officer, or soldier, he shall suffer such punishment as shall be inflicted on him by the sentence of a court-martial." The general argues entirely, in the statement which has been read, from the premises of his own example. He commences by that: "If I were to indulge in wholesale criticisms of the policy of the government, it would demoralize the army under my command, and every friend of his country would call me a traitor. If the officers or soldiers were to indulge in such criticisms, it would weaken the army to the extent of their influence; and if this criticism were universal in the army, it would cause it to be broken to pieces, the government to be divided, our homes to be invaded, and anarchy to reign. My duty to my government forbids me to indulge in such criticisms; officers and soldiers are not allowed to so indulge, and this course will be sustained by all honest men." Assuredly so; and, therefore, such conduct as he reprobates cannot be tolerated on the part of soldiers and military officers. But General Burnside has overlooked an essential fact in this connection. The articles of war comprise a code for the regulation of soldiers and officers exclusively: that is declared by the first sec-

tion of the act of congress which ordains them, approved April 10, 1806 [2 Stat. 359]. It must be remembered, also; that those articles constitute an express contract between the government of the United States as one party, and each soldier and each officer as the other party; and are, in law, obligatory as a contract. This cannot be doubted after reading the famous opinion of Lord Loughborough, C. J., in Grant v. Gould, 2 H. Bl. 69. The soldier is enlisted by his own agreement; he has the articles read to him at that time, and he distinctly swears that he will obey them. Article 10. The officer—every officer—must sign the articles before entering upon his duties. Article 1. But neither as a statutory regulation, nor as a matter of contract, are citizens of the United States, other than those engaged in the military or the naval service, excluded from the privilege of speaking ever so disrespectfully, or contemptuously, of men in public station. It is, with them, entirely a matter of taste, or of individual discretion. I know of but a single excepted case: it is when the citizen has been called into the actual service of the United States as one of the militia of the state in which he resides. Then, sir, and for a reason too obvious to require any especial argument, his privilege as a mere citizen is temporarily suspended, and he becomes amenable to the articles of war until discharged from such service. The constitution expressly authorizes the congress of the United States to ordain this as a part of the law of the land; and it is ordained by congress, accordingly, in the 97th article: "The officers and soldiers of any troops, whether militia or others, being mustered and in pay of the United States, shall, at all times, and in all places, when joined or acting in conjunction with the regular forces of the United States, be governed by these rules and articles of war, and shall be subject to be tried by courts-martial in like manner with the officers and soldiers in the regular forces; save, only, that such courts-martial shall be composed entirely of militia officers." I cannot here, without abandoning the line of my argument, especially observe the language employed by congress in this article; and much that I would say has occurred to others, probably, upon hearing it. Beyond the terms of exception thus defined by statute, and in obedience to the constitution of the United States (article 1, § 8, cls. 15, 16),[3] the right of the American people to deliberate upon and freely to speak of what General Burnside calls the "policy of the government" at all times—whether of peace or of

---

[3] ["To provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions. To provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States; reserving to the states, respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by congress."]

war, of safety or of peril, of ease or of difficulty—is a right supreme, and absolute, and unquestionable. They can exhort each other to impeach the president or any executive officer; to impeach any magistrate of judicial authority; to condemn congressmen and legislators of every description. They can, at pleasure, indulge in criticism, by "wholesale" or otherwise, not only upon "the policy" adopted or proposed by their servants, military as well as civil, but upon the conduct of those servants, in each and every particular, upon their actions, their words, their probable motives, their public characters. And, in speaking of such subjects, any citizen addressing his fellow citizens, by their consent, in a peaceable assembly, may use invective, or sarcasm, or ridicule, or passionate apostrophe or appeal, or—what is, ordinarily, much better—plain, solid, unostentatious argument. There is no style of rhetoric to be prescribed for the people. They are the masters of every style, and of every art and form of utterance. General Burnside suggests that "the press and public men, in a great emergency like the present, should avoid the use of party epithets and bitter invectives." I esteem that as excellent advice on all occasions; but, unfortunately, the general and I must both succumb, with what grace we can, to the choice or fancy of the people. They will render his advice or my advice effectual, if they approve it, by not reading such papers and not listening to such orators as habitually violate or trifle with decorum. There is no other way; there can be no censorship, civil or military, in this regard. That would inevitably, and at once, destroy the liberty of speech and of the press: that presupposes an incapacity of the people to distinguish right from wrong, truth from falsehood, reason from intemperance, or decency from outrage. And, if we cannot confide in the good sense of the people as to these things, how can we confide in them at all? I know that much is written and spoken every day, and in the most public manner, at which honorable men feel indignant, or, at least, annoyed. But does it really affect the people at large? Does it alienate them from the government under which they live? Does it induce them to think less dearly of their kinsmen, their friends, their neighbors, in military service; or to be unmindful of the toils of any soldier in camp, or on the march, or of his sufferings in the awful day of battle? Does it palsy the ministering hand? Does it prevent the sympathizing tear? O, sir, no, no! General Burnside errs, and errs greatly, in supposing that. Our people are often excited by some false or foul word; but, by and by, assertion meets contradiction, violence encounters violence; and so, at length, slowly perhaps, but certainly, will justice achieve her victory and conclude the contest.

[I regret very much to learn by one paragraph in his statement, that General Burnside cannot appreciate the force of what all

the great politicians of this country, in every generation, and with no distinction of parties, have unhesitatingly accepted as the fundamental doctrine of our system: "It is said," he observes, "that the speeches which are condemned, have been in the presence of large bodies of citizens, who, if they thought them wrong, would have then and there condemned them. That is no argument." I crave the general's pardon. That is an argument: it is the whole argument, and it is perfectly conclusive. Let us hear what he can say in opposition: "These citizens do not realize the effect upon the army of our country, who are its defenders. They have never been in the field; never faced the enemies of their country; never undergone the privations of soldiers in the field; and, besides, they have been in the habit of hearing their public men speak, and, as a general thing, of approving of what they say." It is generally true that the majority of those who attend a public meeting approve the greater part of what is there said: they agreed substantially, if not entirely, before they came—and they came because they agreed. As to the speaker,—in addition to the fact that much of what is said, in any meeting, is not objectionable,—it should be remembered that his hearers have known him personally, or by reputation, for years; that they have probably voted for him, or, at all events, sustained him; that they admire his character and cherish his good name. He knows all this; and knows, therefore, that he must speak to them upon the confidence of honorable men. This obligation is not as rigidly observed as it should be; but I can say, as well of my opponents as of my friends, in Ohio, that the consciousness of being trusted by their fellow partisans, together with a real desire to be worthy of such affection, is quite sufficient, ordinarily, to insure an honest, candid, and reasonably temperate discussion of political questions. I do not say that I agree with the conclusions of every speaker; but I say that he has declared what he honestly believes, and what a large majority of his hearers believed, or wished to believe, at all events, before they heard him. I can say, furthermore, that although it is not usual for an audience to contradict the speaker, they are apt to lose interest in him, and to depart summarily, when they discover that he is inimical to the cause of the country, to its essential glory, to the perpetuity of its free institutions. But, perhaps, I have not yet sufficiently answered General Burnside's objection. I ask him, then, whether he means to argue that citizens who have not experienced military service—"never been in the field, never faced the enemies of their country, never undergone the privations of our soldiers"—are, on that account, so devoid of intelligence, so spiritless in patriotism, that they cannot be trusted to discharge their duties at home, as citizens, in the

way to which they and their fathers before them, for almost a century, have been accustomed? If so, what becomes of his other assertion, in a later paragraph, "that our people are too far advanced in the scale of religion, civilization, education, and freedom, to allow any power on earth to interfere with their liberties." O! but the effect on the soldiers. Well, sir, let us inquire into that. The soldiers have been citizens; they have been in the habit of attending public meetings, and of listening to public speakers. They are not children, but grown men, —stalwart, sensible, and gallant men,—with their hearts in the right place, and with arms ready to strike whenever and wherever the cause of their country demands. The general assures us of more, even, than this. "No man on earth," he says, "can lead our citizen soldiery to the establishment of a military despotism." And are these the men to be discouraged, and, especially, to feel weary in heart or limb,—unable to cope with an enemy in the field,—because Mr. Vallandigham, or any other public speaker, may have said something, at Mount Vernon or elsewhere, with which they do not agree? The soldiers have not chosen me for their eulogist; but I will say, of my own accord, that they are no such tender plants as General Burnside imagines. They know, exactly, for what they went into the field; they are not alarmed, nor dissatisfied, nor discouraged, because their fellow citizens, at home, attend public meetings, and listen to public speeches, as heretofore; they have no serious misgiving as to the estimation in which they are holden by the people of the Northern and Northwestern states without any distinction of sects, parties, or factions. Let the officers, and especially those of highest degree, observe their military duties; let them see to it, as General Burnside has well said, and as, I doubt not, he has well done, so far as his authority extends, that the soldiers are "fed, clad, and armed," and kept "in the best possible condition" for service. Allow them to vote as they please; allow them to read whatever newspapers they like; cease any attempt to use them for a partisan advantage; I do not accuse General Burnside of this,—but others, and too many, have been guilty of the grossest tyranny in regard to it. Protect the soldier against the greed of jobbers and knavish contractors,—against dealers in shoddy, in rotten leather, in Belgian muskets, in filthy bread and meat,—against all the hideous cormorants which darken the sky and overshadow the land in times of military preparation. Let the party in administration discharge these duties; and my word for it, sir, that the volunteers from Ohio, from Indiana, from Illinois, from every other state, will do and dare as much, at least, as the best and bravest soldiers in the world can accomplish. [One more commentary on the statement of General Burnside, and it shall be as brief as possible. Undoubtedly, as he observes,

a great responsibility attaches to public men and to the conductors of the public press; but their responsibility is toward the people, and not toward him. "They must not," he declares, "they must not use license, and plead that they are exercising liberty." But every definition of "liberty" excludes the idea of his censorship; so that the distinction which he has attempted neither expresses nor admits of any imaginable difference. I might say more, and much more, of this extraordinary statement; but, having disposed of its principal suggestions, I leave the rest unanswered.

[The "charge" against Mr. Vallandigham, as defined by Captain Cutts, the judge advocate, is this: "Publicly expressing, in violation of general orders No. 38, from headquarters department of the Ohio, his sympathy for those in arms against the government of the United States, declaring disloyal sentiments and opinions, with the object and purpose of weakening the power of the government in its efforts to suppress an unlawful rebellion." But the "charge" is only a conclusion supposed, or invented, by the judge advocate, from the premises of fact alleged in the specification. I have merely to say, therefore, that it assumes, as indisputable, an authority at "headquarters department of the Ohio" to enact a law abridging the freedom of speech; and this in palpable defiance of the constitution of the United States. Let us proceed, however, to the language of the specification: "In this, that the said Clement L. Vallandigham, a citizen of the state of Ohio, on or about the first day of May, 1863, at Mount Vernon, Knox county, Ohio, did publicly address a large meeting of citizens, and did utter sentiments in words, or in effect, as follows." One or the other—"in words, or in effect"—as the judge advocate, at his pleasure, may regard equivalents. And here follows no connected form of speech, but merely disjointed phrases and sentences, taken from the context of a public address, and with no relation to what preceded, or accompanied, or otherwise explained or mitigated them. Is that the style of accusation by which, in this country, or in any civilized country, a man is put in peril of his life or his liberty? Is that the way in which my learned friend, the district attorney of the United States, would think of indicting a prisoner? But I will read the sentences which, "in words, or in effect," are so eminently disloyal. Mr. Vallandigham, as we are told, declared "the present war" to be "a wicked, cruel, and unnecessary war." And so President Lincoln, by one of his proclamations, declares it "unnecessary" as well as injurious; and is not every "unnecessary" war both cruel and wicked? I do not say on which side, or to which of the two parties, a condemnation thus grievous should be wholly, or for the most part, applied; I will speak to that question, if at all, when I have not in charge the interests of

an imprisoned client. But Mr. Vallandigham said, in addition, that it is "a war not being waged for the preservation of the Union." Observe those words carefully; they do not mean that "the preservation of the Union" is not the avowed object, nor even that the administration may not so intend, but only that the war is "not being waged" in such a manner as to accomplish the object. Again, as we are told, he declared it to be "a war for the purpose of crushing out liberty and erecting a despotism." Well, if the proceedings in his case, in virtue of general orders No. 38, are to become a precedent for other cases, and to be sustained by judicial authority, that declaration will prove to be substantially true. But he said, also, that it is "a war for the freedom of the blacks, and the enslavement of the whites." We know that President Lincoln has, by two proclamations, dated September 22, 1862, and January 1, 1863, undertaken, "as a fit and necessary war measure," to emancipate millions of black slaves; whether he intends, if possible, to enslave white men, will be ascertained when he shall have acted on this particular case. Mr. Vallandigham said, furthermore, as the judge advocate assures us, "that, if the administration had so wished, the war could have been honorably terminated months ago." That allegation may be true; I have no means, except from what is alleged subsequently, of deciding whether it be true or false. Nor do I find myself much enlightened by the next sentence imputed to Mr. Vallandigham: that "peace might have been honorably obtained by listening to the proposed intermediation of France." I do not know what terms, if any, the emperor of the French suggested; but they would have to be very advantageous, as well as unmistakably honorable, before I would consent to his interference, or the interference of any other monarch, with the affairs of our distracted republic. And yet, if Mr. Vallandigham thinks otherwise, he has the same right to declare and to maintain his opinion as I have to maintain or to declare mine. But he made another accusation, and of much more serious importance: he said "that propositions by which the Southern states could be won back, and the South be guaranteed their rights under the constitution, had been rejected, the day before the late battle at Fredericksburg, by Lincoln and his minions,"—"meaning thereby," as the judge advocate kindly informs us, "the president of the United States and those under him in authority." I never heard that it was actionable, at common law, to say of one man, orally, that he was the minion of another; and, far less, that it could be a matter of state prosecution. As to the rest, the accusation is one of fact,—positive, distinct, with addition of time and circumstances. Is it true, or is it false? Sir, I do not know; but I do know that that is a vital question to the American people. Was it for making such an accusation that Mr.

Vallandigham has been arrested; and is it by imprisoning him, or otherwise stopping his mouth, that Mr. Lincoln would answer to such an accusation in the face of his countrymen, of the civilized world, of the tribunal of God and of history? As to General Burnside, whose personal sincerity in these proceedings, as well as at the battle of Fredericksburg, I do not intend to question, what living man is more interested to have the truth, or the falsehood, of that accusation publicly ascertained?

[The next sentence imputed to Mr. Vallandigham, by the specification, is this: "That the government of the United States were about to appoint military marshals, in every district, to restrain the people of their liberties, to deprive them of their rights and privileges." That refers to the appointment of a provost marshal in each congressional district, as provided in the act of March 3, 1863, commonly called the "Conscription Act." I have no time, at present, to argue whether the act be, or be not, open to such interpretation; but I have to say this: Mr. Vallandigham not only voted against it, while a representative in the congress of the United States, but characterized it more severely, more harshly, more bitterly, in a speech delivered to the house of representatives, on the 23d day of February, 1863. Did the house regard his words, on that occasion, as words, which, by the dictionary of General Burnside, "must now amount to treason"? He was not expelled; he was not censured; he was not even accused of having overstepped the limits of his privilege as a representative: but when he returned to his constituents (for every representative in congress, although chosen by the people of a district, represents the whole state) he is not allowed, in giving them an account of his stewardship, to repeat such language as he uttered, without any objection, in the hearing of the president, of the cabinet, of the two houses of congress, of the general commanding the whole army, of the army of the Rappahannock almost immediately at hand. Then, sir, as we are told, Mr. Vallandigham spoke of general order No. 38, headquarters department of the Ohio, as "a base usurpation of arbitrary authority." Well, except the first adjective, which is a flower of speech, in reference to which, considering his own style of rhetoric, in the charge and specification before us, I should hardly have expected any complaint on the part of the judge advocate, those words are literally true. It is authority usurped, because it is contrary to the constitution and laws of the land; and that it is arbitrary, ex vi termini, appears from the whole tenor of General Burnside's statement. But Mr. Vallandigham invited his "'hearers to resist the same." Ah! and how? By telling them to take up arms against it? to fall into ranks for the purpose of obstructing its execution? by committing any act of violence or disorder whatsoever?

O, no, sir! but "by saying" that "the sooner the people inform the minions of usurped power that they will not submit to such restrictions upon their liberties the better." To give this information by their resolutions in primary meetings, by the voices of their favorite orators, by their votes in the ballot box. Nothing else is alleged; nothing else is pretended; nothing else could reasonably have been imagined. I quote the remaining sentences: "Declaring 'that he was, at all times, and upon all occasions, resolved to do what he could to defeat the attempts now being made to build up a monarchy upon the ruins of our free government.' Asserting 'that he firmly believed, as he said six months ago, that the men in power are attempting to establish a despotism in this country, more cruel and more oppressive than ever existed before.'" These are obviously conclusions of the speaker—correctly or incorrectly drawn—from premises of which little, very little indeed, is narrated by the specification. I do not undertake to say, and I cannot say, at present, whether such conclusions are correct or incorrect; but what are they—and, in asking this question, I would lay my hand, if possible, upon the heart of every freeman —what are they but the impassioned appeals of a sincere, conscientious, honorable, and, if you please, over-vigilant citizen? Granted— if you will have it so—that he is in error, and greatly in error: I do not ask you to approve his conclusions, or in any manner to accept his opinions; but I do ask you, in all truthfulness, whether these words bear any taint of treason or disloyalty? They were intended, most evidently, to arouse the people to a sense of the vast peril in which all of us now stand; and, although they are startling, and seem very bitter, should we not err upon the side of jealousy rather than upon the side of laxity and too much confidence in our rulers, at a time when, month by month, day by day, the Union of our fathers, the constitution by which that Union was ordained, and the liberty of which the constitution and the Union were intended as perpetual guarantees, are fading into a dim, a broken, and a most sorrowful vision?

[Mr. Judge Advocate appears to have felt the difficulty of sustaining his "charge" upon the words, simply, as quoted in his specification. He has added to them, therefore, this remarkable conclusion: "All of which opinions and sentiments he well knew did aid, comfort, and encourage those in arms against the government, and could but induce in his hearers a distrust of their own government, and sympathy for those in arms against it, and a disposition to resist the laws of the land." Here is what lawyers would call the scienter of an offense,—the imputation, that is, of guilty knowledge. But, clearly, unless the words themselves, simply as spoken, have the effect of aiding, comforting, and encouraging those in arms against the government, and of inducing such

as hear them, at any time, not only to distrust the government, but, also, to sympathize with those in arms against it, or, at all events, to resist the laws of the land, no guilt ever existed, and there could be, of course, no knowledge of any such guilt. Now, as to those in arms, not one of them attended the meeting at Mount Vernon, or would have known of Mr. Vallandigham's speech on that occasion, but for the arrest and imprisonment which ensued. In the next place, although his language may have induced (as he had the perfect right, if he could, to induce) all his hearers to distrust the persons who are now administering the government of the United States, and to seize the first constitutional opportunity of putting oher persons into their places, I cannot, for the life of me, discover one syllable directed against the government as such, and far less—that being necessary, also, by the terms of the judge advocate's conclusion—inducing the slightest degree of sympathy for those who, anterior to the transactions of which Mr. Vallandigham spoke,—and without any regard to the grievances which he enumerated, but wholly for excuses of their own, and manifestly against his wishes, had openly and formidably arrayed themselves in rebellion. And so, even admitting general order No. 38 to be, as certainly it is not, a part of the law of the land, no resistance whatsoever was suggested except by the ordeal of a peaceable election. The burden of complaint, therefore, as to Mr. Vallandigham, is, that he opposes, whether for a good reason or a bad one, the prosecution of this war; that he is greatly dissatisfied with the manner in which it has been conducted; that he believes, with or without sufficient evidence, that it might have been brought to an "honorable" conclusion—"by which the Southern states could be won back"—months ago; and that, consequently, he is in favor of electing other men than those present in office to administer our public affairs. That is all; standing upon the very words quoted in Captain Cutt's specification—garbled even as they are—I repeat sir, that is all. And for the supposed offense of entertaining such opinions, and of declaring them to an audience of his fellow citizens, by their request, at Mount Vernon, has Mr. Vallandigham experienced the tender mercy of general orders No. 38; the outer and inner doors of his dwelling house have been violently battered and broken, between midnight and day dawning, by a multitude of soldiers, without any warrant or even color of legal process; his person has been seized by overpowering numbers, in the presence of his terrified family, and secretly hurried to this city, and here confined in a military prison, in order to his trial by a "commission" of army officers, and according to some hitherto unknown course of judicial procedure. And this, America, is thy boasted freedom! Verily, to accept the consolation of General Burnside, thou needst have no "fear" of losing it.

[Since what time, I would inquire, has it become an offense of such magnitude for any citizen to propose the cessation of a war which he believes to be unnecessary and injurious? I am not advised of any alteration of our federal constitution since the 22d of February, 1848, when the general assembly of Ohio adopted resolutions denouncing President Polk for his prosecution of the war against Mexico, and calling upon congress to withhold further supplies of money and of men. I will read those resolutions as they appear in the statute book (46 Loc. Laws, p. 299): "That the state of Ohio repudiates, as a libel upon the constitution of the United States, the degrading and pernicious dogma which asserts that when the nation is once involved in a war with a foreign country, no matter by what means or for what ends, it is the prerogative of the president to determine the purposes for which it shall thenceforth be carried on, and the measure of its duration. That congress does possess, and may exercise, the right to interfere with this kingly attribute when asserted or claimed by the president; and that it can never be the duty of the representatives of the states and of the people tamely and submissively to bow to the dictates of executive will, and humbly to subserve its behests by transcribing into the form of legal enactments the imperious requisitions of the president for supplies of money and of men. That when an administration shall have become so reckless of the moral sentiment of the nation that, lured by the lust of personal or even of national aggrandizement, it avowedly prosecutes and procrastinates a war for the purpose of wringing from a reluctant adversary, already prostrate and in the dust, the whole or any portion of his rightful territory, it becomes the imperative duty of congress, upon the failure for that purpose of all other constitutional means, to put a stop to the effusion of blood by withholding all supplies for the further prosecution of the war; and doubly imperative does that duty become when, as in the case of the present contest with Mexico, the war was begun for questionable objects, by a most palpable executive usurpation of power, and, more especially, when the acquisition of the coveted territory would most fearfully threaten the disruption of the Union itself." War existed then, as it exists now; the same bitterness of crimination and recrimination prevailed; designs at once arbitrary and unconstitutional were imputed to those in power by their political opponents, and were answered, as at present, by charges of treason, disloyalty, and so forth. But no man was arrested, or even called to account for his opinions, by the civil, and, far less, by the military power.

[How is it possible—I would ask General Burnside, or his counsel, in view as well of

the statement which has been read as of the order (No. 38) therein mentioned—how is it possible that words, merely as such, should "amount" to treason? The crime requires an overt act; and not only must the particular act be charged in the indictment, but it must be proven, as charged, by the concurrent oath of two witnesses. Jefferies told the jury in Sidney's Case, 3 State Tr. 817, that writing a letter was an overt act, "sufficient to prove a man guilty of high treason," for that to write is to act,—"scribere est agere,"—but even he had not the audacity to pretend that words spoken would, by themselves, be sufficient. Sir Matthew Hale, discoursing upon the statute of treason (25 Edw. III.), says: "Regularly, words, unless they are committed to writing, are not an overt act within this statute; and the reason given is because they are easily subject to be mistaken, or misapplied, or misrepeated, or misunderstood by the hearers. And this appears by those several acts of parliament which were temporary only, or made some words of a high nature to be but felony. The statute of 3 Hen. VII. c. 14, makes conspiring the king's death to be felony; which it would not have done if the bare conspiring, without an overt act, had been treason." 1 Hale, P. C. 11, 112. Again: "Words may expound an overt act to make good an indictment of treason of compassing the king's death; which overt act possibly, of itself, may be indifferent, and unapplicable to such an intent. And, therefore, in the indictment of treason, they may be joined with such an overt act, to make the same applicable, and expositive of such a compassing." Id. 115. To this effect, only, is the instruction of Lord Chief Justice Holt to the jury in the Case of King, 4 State Tr. 593. I read now from the Institutes of Sir Edward Coke: "Divers latter acts of parliament have ordained that compassing, by bare words or sayings, should be high treason; but all they are either repealed or expired. And it is commonly said that bare words may make an heretick, but not a traytor without an overt act. And the wisdome of the makers of this law (25 Edw. III.) would not make words only to be treason; seeing such variety amongst the witnesses are, about the same, as few of them agree together." 3 Inst. 14. And he glorifies the statute of 1 Mary, Sess. 1, c. 1, as declaring the true intent of the statute of 25 Edw. III. on this subject: that there must be an overt act, and not merely words,—per apertum factum, non per apertum dictum. Sir William Blackstone says: "How far mere words spoken by an individual, and not relative to any treasonable act or design then in agitation, shall amount to treason, has been formerly matter of doubt. We have two instances, in the reign of Edward the Fourth, of persons executed for treasonable words; the one a citizen of London, who said he would make his son heir of the Crown, being the sign of the house in which he lived; the other a gentleman whose favorite buck the king killed in hunting, whereupon he wished it, horns and all, in the king's belly. These were esteemed hard cases; and the Chief Justice Markham rather chose to leave his place than assent to the latter judgment. But now it seems clearly to be agreed that, by the common law and the statute of Edw. III. words spoken amount only to a high misdemeanor, and no treason. For they may be spoken in heat, without any intention, or be mistaken, perverted, or misremembered by the hearers; their meaning depends always on their connection with other words and things; they may signify differently even according to the tone of voice with which they are delivered, and sometimes silence itself is more expressive than any discourse. As, therefore, there can be nothing more equivocal and ambiguous than words, it would, indeed, be unreasonable to make them amount to high treason. And, accordingly, in 4 Car. I., on a reference to all the judges, concerning some very atrocious words spoken by one Pyne, they certified to the king that, though the words were as wicked as might be, yet they were no treason; for, unless it be by some particular statute, no words will be treason." 4 Bl. Comm. 80. And Sir Michael Foster, agreeing to the same doctrine, thus comments on two statutes of Queen Anne's time (4 Anne, c. 3, and 6 Anne, c. 7) for the punishment of such as "maliciously and directly, by preaching, teaching, or advised speaking," should deny her royal title: "1. The positions condemned by them had as direct a tendency to involve these nations in the miseries of an intestine war, to incite her majesty's subjects to withdraw their allegiance from her, and to deprive her of her crown and royal dignity, as any general doctrine and declaration, not relative to actions or designs, could possibly have; and yet, in the case of bare words, positions of this dangerous tendency, though maintained maliciously, advisedly, and directly, and even in the solemnities of preaching and teaching, are not considered as overt acts of treason. 2. In no case can a man be argued into the penalties of the acts by inferences and conclusions drawn from what he hath affirmed. The criminal position must be directly maintained, to bring him within the compass of these acts. 3. Nor will every rash, hasty, or unguarded expression, owing, perhaps, to natural warmth, or thrown out in the heat of disputation, render any person criminal within these acts; the criminal doctrine must be maintained maliciously and advisedly. Such caution did the legislature use in framing these statutes, made in the zeal of the times —a most laudable zeal it was—for purposes of no less importance than the security of her then majesty's person and government, and of the succession to the crown in his present majesty's royal house—a caution formerly used in similar cases, and not unworthy of imitation in framing future acts of the like kind, if any such shall be thought necessary, and which may serve as a faithful monitor in the conduct of prosecutions for words or writings supposed to be treasonable, but not relative to

any treasonable measure then on foot, or intended to be taken." Fost. High Treason, c. 1, § 7. Sidney was prosecuted upon the clause of the English statute (25 Edw. III.) which defines compassing of the king's death; and, as appears from the language of Hale, Coke, and Blackstone, already quoted, it was only in cases arising upon that clause—few as the cases are, and of no authority—that even the worst judges, in the very worst times, pretended to regard the speaking of words as an overt act of treason.

[Our federal constitution (article 3, § 3) employs this plain language: "Treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort. No person shall be convicted of treason, unless on the testimony of two witnesses to the same overt act, or on confession in open court." Two definitions are intended here, and both taken from the English statute: First, levying war; second, adhering to public enemies, giving them aid and comfort. As to the latter, it has no reference to any rebellion or insurrection; but only applies in a time of war with some other nation. So it was decided by this court in Chenoweth's Case [unreported], at April term, 1862, after examining all the authorities, English and American, and ascertaining them to be unanimous on the subject. At present, therefore, treason cannot be committed against the United States in any other manner than by "levying war" against them. U. S. v. Hoxie [Case No. 15,407]. I do not allege that each conspirator must have joined the warlike array; but I do allege that no prisoner can be convicted, or even charged, except by proving, or charging, what the law denominates an "overt" act. And what are such acts, in legal contemplation, Mr. Justice Foster has clearly defined in his Discourse of High Treason (chapter 2, § 8): "The joining with rebels in an act of rebellion, or with enemies in acts of hostility, will make a man a traitor; in the one case, within the clause of levying war; in the other, within that of adhering to the king's enemies." "Furnishing rebels or enemies with money, arms, ammunition, or other necessaries, will, prima facie, make a man a traitor. But if enemies or rebels come with a superior force, and exact contributions, or live upon the country at free quarter, submission in these cases is not criminal." "And the bare sending money or provisions, except in the case just excepted, or sending intelligence to rebels or enemies, which, in most cases, is the most effectual aid that can be given them, will make a man a traitor, though the money or intelligence should happen to be intercepted. For the party, in sending, did all he could: the treason was complete on his part, though it had not the effect he intended." As to this, however, the learned author next intimates some degree of uncertainty; inasmuch as in all the reported cases, before his time, the prisoners had been charged, also, with compassing the queen's death. Again, same chapter (sections 9–11): "An assembly armed and arrayed in a warlike manner, for any treasonable purpose, is bellum levatum,"—war levied,—"though not bellum percussum. Listing and marching are sufficient overt acts, without coming to a battle or action. So, cruising on the king's subjects, under a French commission, France being then at war with us, was holden to be adhering to the king's enemies, though no other act of hostility was laid or proved. Attacking the king's forces, in opposition to his authority, upon a march, or in quarters, is levying war against the king. But, if, upon a sudden quarrel, from some affront given or taken, the neighborhood should rise and drive the forces out of their quarters, that would be a great misdemeanor, and, if death should ensue, it may be felony in the assailants; but it will not be treason, because there was no intention against the king's person or government. Holding a castle or fort against the king or his forces, if actual force be used in order to keep possession, is levying war. But a bare detainer, as suppose by shutting the gates against the king or his forces, without any other force from within, Lord Hale conceiveth (1 P. C. 146), will not amount to treason. But, if this be done in confederacy with enemies, or rebels, that circumstance will make it treason; in the one case, under the clause of adhering to the king's enemies; in the other, under that of levying war. So, if a person, having the custody of a castle or fort, deliver it up to the rebels, or enemies, by treachery and in combination with them, this is high treason within the act: in the former case, it is levying war; in the latter, it is adhering to the king's enemies." Once more, in the same chapter (section 13): "In prosecutions for these treasons, as well as for that of compassing the death of the king, an overt act of the treason must, as I have already observed, be charged in the indictment, and proved." No act of less degree than those just enumerated, and no act which does not immediately relate to an assemblage of men, in warlike array, for the purpose of subverting the government, or, by such means, resisting its authority, can amount to the levying of war. So said the supreme court of the United States in the Case of Bollman, 4 Cranch [8 U. S.] 126: "However flagitious may be the crime of conspiring to subvert, by force, the government of our country, such conspiracy is not treason. To conspire to levy war, and actually to levy war, are distinct offenses. The first must be brought into open action by the assemblage of men for a purpose treasonable in itself, or the fact of levying war cannot have been committed. So far has this principle been carried that, in a case reported by Ventris, and mentioned in some modern treatises on criminal law, it has been determined that the actual enlistment of men to serve against the government does not amount to levying

war. It is true that, in that case, the soldiers enlisted were to serve without the realm, but they were enlisted within it; and, if the enlistment for a treasonable purpose could amount to levying war, then war had been actually levied. It is not the intention of the court to say that no individual can be guilty of this crime who has not appeared in arms against his country. On the contrary, if war be actually levied,—that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose,—all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors. But there must be an actual assembling of men for the treasonable purpose to constitute a levying of war." Again: "To complete the crime of levying war against the United States, there must be an actual assemblage of men for the purpose of executing a treasonable design. In the case now before the court, a design to overturn the government of the United States in New Orleans, by force, would have been unquestionably a design which, if carried into execution, would have been treason; and the assemblage of a body of men for the purpose of carrying it into execution would amount to levying of war against the United States. But no conspiracy for this object, no enlisting of men to effect it, would be an actual levying of war." [Ex parte Bollman], 4 Cranch [8 U. S.] 127. Mr. Chief Justice Marshall, who delivered this opinion, explained it, afterward, upon the trial of Aaron Burr, before the circuit court, at Richmond, August 31, 1807: "Some gentlemen have argued as if the supreme court had adopted the whole doctrine of the English books on the subject of accessories to treason. But, certainly such is not the fact. Those only who perform a part, and who are leagued in the conspiracy, are declared to be traitors. To complete the definition, both circumstances must concur. They must perform a part, which will furnish the overt act, and they must be leagued in the conspiracy. The person who comes within this description, in the opinion of the court, levies war." 2 Burr, Tr. p. 406 [Case No. 14,693]. And he proceeded, at length, to demonstrate that even "the advising or procurement" of treason, unless the party had also joined the warlike array, or done some overt act in pursuance of the conspiracy, would not amount to levying war. 2 Burr, Tr. 436–439 [Case No. 14,693]. How superfluous, then, is that portion of general orders No. 33 which denounces the penalty of death for an overt act of treason! The same penalty has been denounced by the constitution of the United States, and by the laws of congress in pursuance of it; only, instead of a military arrest, of charges and specifications, of a trial by captains, lieutenants, or other officers, and upon rules of evidence which are in effect no rules at all, the party accused must be ar-

rested by a warrant in due form, upon probable cause supported by oath or affirmation—must be indicted by a grand jury of the district in which the crime is supposed to have been committed—must be tried in the circuit court of the United States for that district, by a petit jury of his countrymen, and according to the rule of evidence which the constitution itself has prescribed: For so the constitution (article 3, §§ 2, cl. 3) expressly requires: "The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed; but when not committed within any state, the trial shall be at such place or places as the congress may, by law, have directed."

[As to the residue of general orders No. 38, including "the habit of declaring sympathies for the enemy," if such a "habit" ever existed in this community or neighborhood, I must say, once for all, that the acts or utterances intended to be embraced, whatever their moral complexion, or how objectionable soever in any respect, do not and can not amount to treason. The constitution of the United States forbids that as plainly as language can be written. And the constitution is full of wisdom in this regard. It does not even intrust to congress the definition of a crime so perilous, so easily imputed, so apt to be imputed in times of great disorder. It even restrains congress in prescribing the measure of punishment.[4] The bloody experience of their English ancestors, commencing with the civil war between the adherents of Stephen and those of the Empress Matilda, before the middle of the twelfth century, and extending thence, with brief intermissions, almost to the epoch of American Independence, had sufficiently admonished the people of the eleven states which consented to the establishment of a Union consecrated to civil and religious liberty, that they must incorporate in its organical law, as things unalterable and unavoidable, in any circumstances, as well the provisions of the statute defining treason (25 Edw. III.), as the provisions of Magna Charta and of the habeas corpus act. I call upon the writers of the Federalist to bear me witness of this: "As treason may be committed against the United States, the authority of the United States ought to be enabled to punish it; but, as new-fangled and artificial treasons have been the great engines by which violent factions, the natural offspring of free governments, have usually wreaked their alternate malignity on each other, the convention have, with great judgment, opposed a barrier to this peculiar danger by inserting a constitional definition of the crime, fixing the proof necessary for conviction of it, and restraining the congress, even in punishing it, from ex-

---

4 ["Congress shall have power to declare the punishment of treason; but no attainder of treason shall work corruption of blood, or forfeiture, except during the life of the person attainted."].

tending the consequences of guilt beyond the person of its author." Federalist, No. 43, written by Madison. Such admonition, also, the sages of the common law had previously, and most heartily, delivered. Lord Chief Justice Hale, after speaking of the diversities of judicial opinion before the statute of 25 Edw. III., and the consequent unhappy condition of the people, says: "Now, although the crime of high treason is the greatest crime against faith, duty, and human society, and brings with it the greatest and most fatal dangers to the government, peace and happiness of a kingdom or state, and therefore is deservedly branded with the highest ignominy, and subjected to the greatest penalties that the law can inflict; yet, by these instances, and more of this kind that might be given, it appears: First, how necessary it was that there should be some fixed and settled boundary for this great crime of treason, and of what great importance the statute of 25 Edw. III., was in order to that end. Second, how dangerous it is to depart from the letter of that statute, and to multiply and enhance crimes into treason by ambiguous and general words, as accroaching of royal power, subverting of fundamental laws, and the like. And, third, how dangerous it is by construction and analogy to make treasons where the letter of the law has not done it. For such a method admits of no limits or bounds, but runs as far as the wit and invention of accusers, and the odiousness and detestation of persons accused, will carry men." 1 Hale, P. C. 86, 87. And Lord Chief Justice Coke tells us (3 Inst. 2) that the parliament which enacted the statute was called, on that account, the "Blessed Parliament,"—"Benedictum Parliamentum." But, sir, what becomes of our safeguards—what avails the experience of seven hundred years —where is that constitution which declares itself to be the supreme law of the land—if a major general commanding the department of the Ohio, or any other officer, civil or military, can create and multiply definitions of treason at his pleasure? The ancient Ruminalis put forth new leaves when all men supposed it to be dying; [5] whether the tree of American liberty will be able to supply the place of that splendid foliage which has been stripped from its branches, and scattered beneath our feet, by this rude blast of arbitrary and unlimited authority, is a question hereafter to be determined. That question does not concern my distinguished client any more than it concerns every other citizen. The partisans in power to-day will be the partisans in opposition to-morrow; then military command will be shifted from those who oppress to those who have been oppressed; and

[5] ["Eodem anno (A. U. C. 811) Ruminalem arborem in comitio, quæ octingentos et quadraginta ante annos Remi Romulique infantiam texerat, mortuis ramalibus et arescente trunco deminutam prodigii loco habitum est, donec in novos fetus revivesceret." Tacitus: Ann. lib. XIII. 58.]

so, with the mutations of political fortune, must the personal rights and rights of property, and even the lives, of all be in constant hazard. I pray that my learned friends upon the other side will consider this in time; that they will use their influence not only with the defendant, but with those to whom at present he is amenable, to revoke—ere it be too late— the dreadful fiat of tyranny, of hopeless confusion, of ultimate anarchy, which has been sounded in our midst.

\*     \*     \*     \*     \*     \*

[The rights of individual citizens, as declared in the first eight amendments to the constitution of the United States, had not only been secured, but were perfectly understood, at the time when the thirteen colonies of North America revolted from British dominion. They were rights which every colonist had brought with him, as inalienable, to the shores and wildernesses of the Western hemisphere. The federal constitution being only a delegation of specific powers by the people of the several states, and not the creation of an unlimited government, its authors deemed a bill of rights unnecessary and superfluous. But, with that jealousy which ought ever to distinguish freemen, our ancestors required the addition of ten amendments; and these were added, at the first session of the First congress, without any opposition.

[Two other of those amendments I proceed next to consider: "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger; nor shall any person be subject, for the same offense, to be twice put in jeopardy of life or limb; nor shall be compelled, in any criminal case, to be a witness against himself; nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation." Article 5. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state or district wherein the crime shall have been committed (which district shall have been previously ascertained by law) and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." Article 6. These two articles (amendments) were added only from abundant caution; for, as we have seen, the original text of the constitution (article 3, § 2, cl. 3), expressly declares: "The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed," etc. But the judgment in cases of impeachment extends no further than to a removal from office, and, if necessary, a disqualification to hold any other office: so that, in effect, as the con-

stitution originally was, no man's life or limb, or even his liberty, could have been legally endangered except by the verdict of a jury, and the sentence of a court upon that verdict. Nevertheless, and, as I have said, from abundance of caution, these other declarations of rights were added by amendment: I. No man shall be put on his defense for any capital or infamous crime except by the indictment or presentment of a grand jury of the district wherein such crime is supposed to have been committed. This, too, is the result of a long and very memorable struggle in the experience of our English ancestors. It takes away the power of prosecuting for treason, felony, and such like offenses, by information of the attorney general, or at the relation of any private individual. That was the process by means of which the court of the star chamber inflicted such oppression and misery; and it was for their servile habit of employing that process, at the expense of the privileges of the people, that two infamous lawyers, Empson and Dudley, were doomed to death. II. No man shall twice be put on trial, "in jeopardy of life or limb, for the same offense." By this, therefore, as at common law, a verdict of acquittal is conclusive; it cannot be set aside by the judges, nor altered, reviewed, or questioned in any manner. But such is not the rule of military law. The sentence of a court-martial, whether it be of acquittal or of conviction, may be disregarded, wholly or in part, by the commanding officer. It has no validity without his confirmation. He can order a prisoner once acquitted to be again tried, upon the same charge and specification, by the court which acquitted him, or by a court composed of other officers. A military sentence, therefore, is the sentence of the military commander; the proceedings of the court-martial being only intended to inform his judgment or conscience, and so enable him to decide upon the particular case. III. No man shall be compelled to be a witness against himself in any criminal prosecution. IV. No man shall be deprived of his life, liberty, or property, except by due process of law. This repeats the twenty-ninth chapter of Magna Charta, as expounded by Lord Coke (2 Inst. 50), and, after him, by all the writers, English and American, upon constitutional construction: "Nisi per Legem Terræ. The words 'law of the land' import due process of law,—that is, by indictment or presentment, of good and lawful men where such deeds be done in due manner, or by writ originall of the common law." Again: "Without being brought in to answer, but by due process of the common law." "No man be put to answer without presentment before justice, or thing of record, or by due process, or by writ originall according to the old law of the land." V. No man's property shall be taken upon the excuse or pretense of a public necessity, without compensating him for its loss or deterioration. The sixth article of amendment, which I have quoted also, prescribes the essential requisites

of a trial upon indictment or presentment: 1. It must be a public trial as well as a speedy one. 2. It must be by an impartial jury of the state and the district wherein the crime is alleged to have been committed. 3. The prisoner must be informed of the nature and cause of the accusation,—that is to say, of what crime he has been accused, and of the particular transaction, with time, place and material circumstances, which is supposed to constitute that crime. 4. He must be confronted, or brought face to face, while they are testifying, with the witnesses against him. 5. He must have, on demand, such a writ as will compel any person, anywhere within the jurisdiction of the United States, to attend the trial and give testimony in his favor. 6. He must have, as a matter of absolute right, the assistance of counsel learned in the law. These, except the third, fourth, and fifth, are not the rules of procedure in military tribunals. It is at the discretion of the commanding officer when a prisoner shall be arraigned for trial; and, at his discretion, also, or that of the court-martial, whether a trial shall be public or secret. Counsel are not allowed to address the court in defense of a prisoner, or upon any question of evidence; they are not even allowed to be present except by indulgence or special favor.

[The greatest objection yet remains; a trial by court-martial is not a trial by jury, nor its equivalent. The court may consist of thirteen officers, or it may consist of only five; and those officers are chosen by the military commander without any regard to the question of their residence in the state or district wherein the crime is alleged to have been committed. The prisoner has no peremptory challenge. But, sir, why do I waste time on so plain a distinction? Every man knows that trial by jury is a form peculiar to the common law; and that it has no equivalent in any other form of procedure, or in any other system of jurisprudence.

[I have already explained the cases of exception allowed by these two articles,—"cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger,"—as well as the reason which dictated such exceptions. I might say, in addition, that the rules and articles of war do not assume to punish, as a crime, any act which is declared to be criminal by the ordinary law of the land. They define what are known as military offenses, or offenses in violation of discipline and the good order of the service. Even an officer or a soldier cannot be tried by court-martial for a crime against the laws of his country: he must be delivered to the civil magistrate and tried by a court of civil judicature. So the thirty-third article of war distinctly provides: "When any commissioned officer or soldier shall be accused of a capital crime, or of having used violence or committed any offense against the person or property of any citizen of any of the United States, such as is pun-

ishable by the known laws of the land, the commanding officer and officers of every regiment, troop, or company, to which the person or persons accused shall belong, are hereby required, upon application duly made by or in behalf of the party or parties injured, to use their utmost endeavors to deliver over such accused person or persons to the civil magistrate, and, likewise, to be aiding and assisting to the officers of justice in apprehending and securing the person or persons so accused, in order to bring him or them to trial. If any commanding officer or officers shall wilfully neglect, or refuse upon the application aforesaid, to deliver over such accused person or persons to the civil magistrates, or to be aiding and assisting to the officers of justice in apprehending such person or persons, the officer or officers so offending shall be cashiered." Instead of which General Burnside has undertaken to extend the jurisdiction of a court-martial over citizens not in military service, and to arrest, accuse, try, and condemn them for offenses alike unknown to the articles of war and to the ordinary laws of the land. That all the proceedings of the court are void; that every officer who participates in them, including the members of the court and the judge advocate, and, also, the provost marshal who executes any such sentence, is liable to an indictment as well as to an action for damages: these are propositions so clearly established—so entirely indisputable—that I should not conceive it decorous, in other circumstances, to urge them upon your honor's attention. Wise v. Withers, 3 Cranch [7 U. S.] 331, was an action of trespass, vi et armis, for entering the plaintiff's house, and taking away his goods. The defendant justified as the collector of a fine imposed on the plaintiff by sentence of a court-martial for not serving as a militiaman; to which the plaintiff replied that he was a justice of the peace for Alexandria county, in the District of Columbia, and, as such, exempted by statute from service in the militia. The circuit court sustained a demurrer to this replication, as insufficient, and thereupon gave judgment in favor of the defendant. On writ of error by the plaintiff, in the supreme court of the United States, it was contended for the defendant—First, that a justice of the peace was not one of the officers exempted by statute; and, second, that the court-martial had exclusive authority to hear and determine his claim of exemption. The supreme court overruled both propositions; and as to the second, with which only I have to deal at present, said: "It follows from this opinion that a court-martial has no jurisdiction over a justice of the peace: he could never be legally enrolled. And it is a principle that a decision of such a tribunal, in a case clearly without its jurisdiction, cannot protect the officer who executes it. The court and the officer are all trespassers." Page 337. To the same effect is the language of the supreme court in the Case of Watkins, 3 Pet.

[28 U. S.] 208, 209. Courts-martial may be restrained by writ of prohibition from the courts of common law,—"the general ground of prohibition being an access of jurisdiction," as Lord Loughborough termed it, "where they assume a power to act in matters not within their cognizance." Grant v. Gould, 2 H. Bl. 100. But the most remarkable case is that which resulted in the conviction of Governor Wall for murder, at the Old Bailey sessions, in January, 1802. Before narrating it, in the language of Lord Campbell, I must observe that the court-martial had jurisdiction of the party accused, and of the offense with which he was charged; but, inasmuch as all such courts are of special and limited authority, a defect which would not impair the sentence of a court of general jurisdiction will suffice to annul their sentences, even upon collateral examination. "Joseph Wall, who had served, from early youth, as an officer in the army, and had always been distinguished for gallantry and good conduct, was, during the American war, appointed governor of Goree, on the coast of Africa. With a very insufficient garrison, and with very slender military supplies, he had to defend this island from the French, who planned expeditions against it from their neighboring settlement of Senegal. Governor Wall performed his duty to his country, in the midst of formidable difficulties, with firmness and discretion; and the place intrusted to him was safely preserved from all perils till peace was re-established. He was then about to return home, in the expectation of thanks and promotion, but great discontents existed among the troops forming the garrison, by reason of their pay being in arrear. This grievance they imputed to the governor, and they resolved that he should not leave the island till they were righted. Benjamin Armstrong, a sergeant, their ringleader, was brought by him, irregularly, before a regimental court-martial, and sentenced to receive eight hundred lashes. Although this whipping was administered with much severity, he, in all probability, would have recovered from it, if he had not immediately after drunk a large quantity of ardent spirits; but this intemperance, together with the wounds inflicted upon him by the flagelation, and an unhealthy climate, brought on inflammation and fever, of which he died. Order was restored, and the governor returned to England. However, representations were made to the authorities at home, respecting irregularity and alleged cruelty, which had been practiced, and exaggerated accounts of the proceedings were published in the newspapers; stating, among other things, that the governor had murdered Armstrong and several other soldiers by firing them from the mouths of cannon. A warrant was issued against him by the secretary of state; he was arrested by a king's messenger, and he made his escape as they were conveying him from Bath in a chaise-and-four. He immediately went abroad, and

he continued to reside on the continent till the peace of Amiens; when, on the advice of counsel, he came to England, wrote a letter to the secretary of state, announcing his return, and surrendered himself to take his trial." Lives of the Chief Justices (volume 3, pp. 149, 150). Twenty years had thus elapsed: nevertheless, Wall was put on trial before a special commission; and the jury, after deliberating half an hour, returned a verdict of guilty, and sentence of death was immediately pronounced. Execution was respited until Lord Eldon and others of the ministry could examine the case; but, finally, the governor was hanged on a gibbet, in front of the jail of Newgate, and, as Lord Campbell informs us, "amidst the shouts and execrations of the most numerous mob ever assembled in England to witness a public execution." I mention this painful and singular case, not that I approve Wall's execution,—for, although he was rightfully convicted, I think he ought to have been pardoned,—but to show that the sentence of a military tribunal acting irregularly, and, a fortiori, acting upon persons beyond its jurisdiction, cannot avail as a defense to those who pronounce the sentence, or those who execute the sentence, when called to account, in due course of law, notwithstanding the lapse of many years. And thus, if your honor please, it ought to be. Otherwise, military officers would not only, as now, become too powerful to be restrained by the civil magistrates, but would purchase to themselves an immunity for all transgressions. The rights of the people, as enumerated in the several clauses of the constitution which I have read, cannot be affected in any degree by the suspension of the privilege of the writ of habeas corpus. Harsh as that suspension would be, and unnecessary (as I think) except in the states where insurrection and rebellion prevail, it would not authorize any arrest of a citizen by the military power while the ordinary course of justice remains unobstructed, nor even, without a warrant, except in the cases I have already specified, by a civil magistrate. It would not dispense with the necessity of a trial by jury, and upon indictment: it would justify none of the acts of General Burnside in this particular case. De Lolme, in his celebrated essay on the Constitution of England (book 2, c. 17, pt. 2, note), says: "At the times of the invasions of the Pretender, assisted by the forces of hostile nations, the habeas corpus act was indeed suspended * * * But the executive power did not thus, of itself, stretch its own authority: the precaution was deliberated upon and taken by the representatives of the people; and the detaining of individuals, in consequence of the suspension of the act, was limited to a certain fixed time. Notwithstanding the just fears of internal and hidden enemies, which the circumstances of the time might raise, the deviation from the former course of the law was carried no further than the single point we have mentioned. Persons detained by order of the government were to be dealt with in the same manner as those arrested at the suit of private individuals; the proceedings against them were to be carried on no otherwise than in a public place; they were to be tried by their peers, and have all the usual legal means of defense allowed to them,—such as calling of witnesses, peremptory challenge of juries," etc. And such Lord Eldon, while attorney general, and addressing the jury in Hardy's Case, October 28, 1794 [1 East, P. C. 99], declared to be "the true constitutional meaning" of the act of parliament, then in force, whereby the privilege of the writ of habeas corpus had been suspended. * * *

[Argument of Hon. Aaron F. Perry.

[May it please the court: When General Burnside requested me to assist the district attorney on this occasion, he forebore to give me any instructions, except to present such considerations to the judgment of the court as should seem to me right and proper. I have a distinct impression that he has no preference that the questions here presented should be heard before any other jurisdiction or tribunal rather than this; and that he wishes his proceedings to be here discussed by his counsel, chiefly on the broad basis of their merits; that they should be made to rest on the solid ground of the performance of a high and urgent public duty. The main argument which I shall present to the court, will, therefore, be founded on the obligations, duties, and responsibilities of General Burnside as a major general in command of an army of the United States, in the field of military operations, for the purposes of war, and in the presence of the enemy. I shall not place it on any ground of apology, excuse, or palliation, but strictly and confidently on the ground of doing what he had a lawful constitutional right to do; and on the ground of performing a duty imposed upon him as one of the necessities of his official position. I shall make no plea of an exigency in which laws are suspended, and the constitution forgotten, but shall claim that the constitution is equal to the emergency, and has adequately provided for it; that the act complained of here is an act fully warranted by law, and authorized by the constitution. I shall support this claim by references to more than one opinion of the supreme court of the United States, and to other authorities. * * *

[Mr. Pugh has correctly argued that a habeas corpus is in the nature of a writ of error to examine into the legality of an arrest or commitment. If it appear that the arrest or commitment complained of was a legal act, the writ of habeas corpus will not issue; because its whole office is to inquire into the legality of the act, and the court will not do a nugatory and useless thing. A habeas corpus does not meddle with arrests legally made. There are well-known cases where

the civil magistrates and officers of the peace make arrests on sight and without warrant. In such cases the legality depends upon circumstances to make a case where an arrest is allowed by law without a warrant. These circumstances, if they exist, are a warrant, or equivalent to it. So, if war or any other state of affairs exists, which, by recognized principles, authorizes, requires, and justifies an arrest by military force, no habeas corpus can meddle with it. The order which sends an army to make war, is all the warrant it needs for every necessary act of war. It may capture and imprison enemies, and not those in arms only. "The whole," says Vattel on Law of Nations (page 346), "is deduced from one single principle from the object of a just war, for when the end is lawful, he who has a right to pursue that end, has, of course, a right to employ all the means which are necessary for its attainment." One of the undoubted means of war is to take life. As the greater includes the less, the right to take life implies the right to take everything. "All those persons belonging to the opposite party (even the women and children) he may lawfully secure and make prisoners, either with a view to prevent them from taking up arms again, or for the purpose of weakening the enemy." * * * "At present, indeed, this last-mentioned expedient is seldom put in practice by the polished nations of Europe: women and children are suffered to enjoy perfect security, and allowed permission to withdraw wherever they please. But this moderation, this politeness, though undoubtedly commendable, is not in itself absolutely obligatory, and if a general thinks fit to supersede it, he cannot be justly accused of violating the laws of war." Vatt. Law Nat. pp. 346, 352. Persons so captured or arrested are prisoners of war. "For the same reasons which render the observance of those maxims a matter of obligation between state and state, it becomes equally and even more necessary in the unhappy circumstance of two incensed parties lacerating their common country." Id. 425. The application to citizens in revolt of the rules of war is in the interests of mercy. If they should be put upon trial before a jury in such moments of overwhelming excitement, one of two results would follow. If the jury should not be so divided by the passions raging through the whole population as to disagree, and thus bring the law into contempt, their passions would take them to one side or the other. Men might be let loose, and certainly would be, whom the safety of the state required to be restrained, or more probably convicted and executed without sufficient evidence. When society is imperiled by intestine war, the passions rage which occasioned the war, the entrails of the volcano, covered for a while, have at length broken forth. Smoke and ashes obscure the sky. Fiery floods pour along the earth. No good man could be impartial. Who claims to be impartial impeaches himself. Believing his government to be in the right, interest, feeling, lawful duty, compelled him to uphold it with all his power. He has no decent pretext, certainly no lawful excuse, for throwing on others a duty to uphold the government which he shrinks from. It is each man's duty as much as any other's. Its enemies are, and in the nature of the case must be, his enemies; its friends his friends. The law allows him no other position. On the other hand, he who believes the government to be wrong has no choice but to sympathize with its enemies. He must assist them, and will assist them, either openly or by secret and suppressed sympathy. On one side or the other, men go to the jury box under the influence of deep feeling. The law of nations, and rather the laws of war, which in civil commotions authorize the opposing parties to treat each other as prisoners of war, is not, therefore, an aggravation of dangers, but an amelioration of them. Vatt. Law Nat. p. 426, assigns two reasons for it: One, lest the civil war should become more cruel. The other, the danger of committing great injustice by hastily punishing those who are accounted rebels. "The flames of discord and civil war are not favorable to the proceedings of pure and sacred justice." More quiet times are to be waited for. It appears, then, that in time of war the fact of war authorizes and legalizes arrests; and the order for an army to make war is its sufficient warrant for making such arrests as are justified by the laws of war. I am not now inquiring whether the arrest of Clement L. Vallandigham is justifiable by the rules of war. That inquiry will follow in its due course. I am now adverting to the laws of war, and showing that arrests of some kinds are authorized. These principles are, I suppose, undisputed and indisputable. It follows that such arrests are legal; and by showing the existence of circumstances making the arrest legal, a sufficient answer is made to a habeas corpus. The writ is not in such case suspended. It is respected, upheld, enforced, and performs all the office a habeas corpus can in any case perform.

[It is a logical consequence, unavoidably resulting from the premises, that while all wars, insurrectionary or foreign, bring into action the laws of war, they do not, necessarily, suspend the writ of habeas corpus. The legislature may enact a statute making some act a crime which was not so before, and authorizing persons guilty of it to be arrested and held; or authorizing a writ of civil capias, under which the body is seized and held in circumstances not before authorizing such an arrest. These things not only may be done, but are frequently done. No one thinks of them as a suspension or abolishment of habeas corpus. So, in war, the laws of war authorize arrests which were not authorized until those laws were brought into play by the fact of war. In these cases habeas corpus is no more suspended than in the

others. Full force and effect may be given it while enforcing the laws of war. And this is the constitutional view. The power to declare war is broadly given; the power to suspend habeas corpus is given distinctly from the war power, and in addition to it, "when in cases of rebellion or invasion, the public safety may require it." If the operation of the laws of war were a suspension of habeas corpus, everything had been said when congress was authorized to declare war. No further declaration was needed. It is against correct rules of construction to hold that habeas corpus suspension is intended to be merely one of the means of war. They might as well have provided for making war in one paragraph, and then have provided, as a separate and distinct power, authority to kill and capture enemies in battle. War may be made. In addition to making war, habeas corpus may be suspended in certain contingencies.

[Learned counsel, on the other side, has called our attention to the act of congress of March 3, 1863, and to another act of congress, showing that the offence with which petitioner is charged is an offence against the civil law, and punishable under a law of congress; one for which he may be held and tried before the civil tribunals. Neither of these acts interferes with my argument. The first section of the act of March 3, 1863, authorizes the president, in contingencies there named, to suspend the writ of habeas corpus. The learned counsel says he has not suspended it. Undoubtedly, if he had suspended it, there would be an end of this case. I do not claim that it is suspended. My whole argument proceeds on the ground that it is not suspended, but in full force. That act of congress is based upon the idea that arrests had before that time been made, and might again be made, which could only be sustained by a suspension of habeas corpus; in other words, arrests, not sustainable by the laws of war, or by any other law, except the extreme demands of public safety when "in cases of rebellion or invasion the public safety may require." The suspension of habeas corpus is a suspension of a right to inquire into the legality of an arrest; for, if it can be shown that the arrest was lawful, there is no need to suspend the habeas corpus. War had long before been recognized and legalized. Nothing is more certain in law than that military men, in time of war, are legally protected in doing the acts authorized by the laws of war. Such acts are in no sense unlawful. But this act of congress (section 4) provides an indemnity for acts done by the president, or under his authority, which was wholly unnecessary, unless it contemplated acts not defensible under the laws of war. The act neither reprobates nor prohibits. It contemplates the necessity, allows the act, and provides for it. One of two constructions is necessary. It refers only to such arrests as have been made under a suspension of habeas corpus, in which construction it does not apply to this case; or it provides for irregular arrests, without process or with defective process, which might, if habeas corpus was sustained, be discharged under it. But in no event does it contemplate the discharge of an arrest by habeas corpus, unless or until the steps there pointed out shall have been first taken, or the contingency there provided for shall have happened. If learned counsel, therefore, bring themselves under the operation of this act, they defeat their application here, and are remitted to another mode of relief. If this act does not apply, it is outside of the case, and need not be further discussed. If it does apply, it is fatal to this petition. I understand learned counsel to admit that it does not apply here, and in this, I agree with him. It is an undoubted principle of public law, that persons captured or seized under the laws of war are prisoners of war. They may be guilty of civil offenses, punishable by the civil tribunals. Imprisonment under the laws of war does not discharge them from their offenses. They are or may be held until they can be brought to a legal trial in a time of restored tranquillity. Necessity forbids their running at large; humanity forbids to put them on trial at a time so unfavorable to the proceedings of pure and sacred justice. Vatt. Law Nat. 426. The act of March 3, 1863, is expressly limited, in its operation, to prisoners, who are held "otherwise than as prisoners of war." The president's proclamation of September 24, 1862, suspending habeas corpus, and declaring martial law, is not referred to in the act of March 3, 1863, nor published in the regular edition of laws. I have no knowledge that it has been withdrawn or superseded, otherwise than as a matter of inference from the act of congress. If it remains in force, it ends this application. I choose rather not to rely upon it. There is no inference to be drawn from the act of congress against that part of it which proclaims martial law; but in the view I am urging of the principles of public law, such a proclamation can perform no office except to give publicity to a fact before existing. To whatever extent the fact of war brought into play the laws of war, those laws had their full force without a proclamation; to that extent a proclamation was proper, but unnecessary. Beyond that it was nugatory, and could not add one cubit to the stature of war. A proclamation of martial law is often confounded with, and considered equivalent to, a suspension of habeas corpus. But this is inaccurate. If the president had authority to issue such a proclamation, and has not rescinded it, nothing can be more clear than that congress had no power to rescind it. But I do not choose to embarrass the discussion by relying upon a document which there is plausible ground to suppose congress might not have considered in force.

[Having cleared the field of argument from such chances of misapprehension and confusion as prudence required, I recur to the proposition advanced by learned counsel on

the other side, and which I had intended to advance myself, though scarcely necessary to be mentioned. A proceeding of habeas corpus is in the nature of a writ of error, to inquire into the legality of the commitment or arrest. If the application shows the arrest complained of was a lawful one, the court will go no further, it will not put a defendant to show, by his answer, what is already shown by the petition. On this I suppose I have the happiness to agree with learned counsel on the other side. I have also the happiness to agree with him that the right of habeas corpus has not, in this case, been suspended, but is to be treated as in full force, with neither more nor less respect than is habitually paid to it in courts of justice. I claim, then, that the facts before this court, show that the arrest of Clement L. Vallandigham, by Ambrose E. Burnside, a major general in the United States service. commanding in the department of the Ohio, was a legal and justifiable arrest. For the facts showing its legality I rely: 1. On the petition and affidavit of the prisoner. 2. On facts of current public history of which the court is bound to take judicial cognizance. Among the facts of public history I need recall but few. Unfortunately, the country is involved in dangers so many and so critical, that its people neither do nor can divert their thoughts to other topics. There is on foot an organized insurrection, holding by military force a large part of the United States. and controlling the political organization of at least twelve states of the Union. It has put into the field armies of such strength that the armies of the United States have not been able to overcome them. Battles of great magnitude are fought, and prisoners mutually captured and exchanged. In short, we have, for two years, been in a recognized state of civil war, on a scale large and destructive, almost beyond historical comparison. This insurrection claims to have so much power as to be beyond the means of the government to overcome, and to be entitled to be recognized by foreign nations as an independent power. Were it possible to doubt the imminence of the danger and extremity of peril from what we see around us, we should be warned of it by the admonitions of foreign governments holding the relations of friendly governments, and claiming to be impartial. They freely express the opinion that our danger is not merely extreme, but irremedial; that the constitution, and all hopes founded upon it, must perish. This insurrection has, for impulse, feelings and opinions growing out of the past civil history of the country. As a matter of course it cannot be, and as a matter of fact it is not, limited to places, or described by a geographical description. In some parts of the country it dominates society; in other parts it is dominated by the regular civil administration. We hear of no place so dark but that some weak prayers are uttered for the constitution; and of no place so bright but that lurking treason sometimes leaves its trails, or shows, through all disguises, its sinister unrest. The power and wants of the insurrection are not all or chiefly military. It needs not only food, clothing, arms, medicine, but it needs hope and sympathy. It needs moral aid to sustain it against reactionary tendencies. It needs argument to represent its origin and claims to respect favorably before the world. It needs information concerning the strength, disposition, and movements of government force. It needs help to paralyze and divide opinions among those who sustain the government, and needs help to hinder and embarrass its councils. It needs that troops should be withheld from government, and its financial credit shaken. It needs that government should lack confidence in itself, and become discouraged. It needs that an opinion should prevail in the world that the government is incapable of success and unworthy of sympathy. Who can help it in either particular I have named, can help it as effectually as by bearing arms for it. Wherever in the United States a wish is entertained to give such help, and such wish is carried to its appropriate act, there is the place of the insurrection. Since all these helps combine to make up the strength of the insurrection, war is necessarily made upon them all when made upon the insurrection. Since each one of the insurrectionary forces holds in check or neutralizes a corresponding government force, and since government is in such extremity as not safely to allow any part of its forces to withdraw from the struggle, it has no recourse but to strike at whatever part of the insurrection it shall find exposed. All this is implied in war, and in this war with especial cogency. "If war be actually levied, —that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose,—all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors." [Ex parte Bollman] 4 Cranch [8 U. S.] 126.

[The constitution being paralyzed and suspended to the extent described, we may notice the situation and condition of the state of Ohio, where the petition states the arrest to have been made. Geographically it is midway between east and west, bordered on the south by Virginia and Kentucky, both states occupied by contending armies, and over which the tide of war advances and recedes according as its fortunes incline to one side or the other. On the north is Lake Erie, over which England and America hold a divided sway. In the event of a war with England, on the very verge of which we have sometimes seemed, a contest for supremacy on that great lake would be inevitable. Such a war is one of the hopes of the insurrection,

and has been schemed for with amazing audacity. A military occupation of either line of railroad running through Ohio, from the river to the lake would sever the Northwestern from the Northeastern states. The population of the state is made up of all the conflicting elements now lighting the blaze of civil war in the country. The feelings of all are represented here. None of the extremes and none of the means are wanting. That these elements should be carrying on a bloody strife in the immediate neighborhood, and no strife be kindled here, is improbable in theory and untrue in fact. The insurrection in Ohio is dominated by the federal authorities, and operates in disguise, but it meets and receives constant attention. The arguments for insurrection made in South Carolina are openly repeated in Ohio. The charges there made against the government and those who administer it, as a provocation for rebellion, are openly made here, and with not much difference in the degree of animosity. The South Carolina orators, it is true, draw a different conclusion from their arguments and charges from that which is drawn here from the same arguments and charges. There, for the reasons stated, they declare eternal hostility to the Union; here, eternal fidelity to it. The means to accomplish these diverse results, however, are the same. In South Carolina they propose to overthrow Lincoln and his minions, in order to destroy the Union; here it is proposed, in order to save the Union. There and here each foot steps in the other's track; the toes all point in the same way, but they claim to be traveling in opposite directions. It is not very long since the marshal of this district was obliged to call for military force to suppress a revolt in Noble county in this state; still later was a military force necessary to save Dayton from the ravages of a similar revolt. In numerous instances in Indiana military force has been necessary. These are all fingers of the same hand. Your honor does not forget how recently the records of this court were removed, in order to save them from the contingencies of an invasion by insurrectionary forces; nor how recently, by voluntary labor, the people of this city raised embankments and forts protected from the insurrection. Nor is your honor uninformed that these defenses are kept, day and night, in a state of preparation, armed and supported. This court is sitting, as it were, in garrison. We are deliberating under the protection of the guns of Newport and Covington. At various parts of the state are camps. The streets of our cities are patroled by military guards. Has our government nothing to do that it should vex itself and waste its means by these precautions, if not known to be necessary? An inference is unavoidably drawn of the importance of a given field of operations, by the officers placed in charge of it. General Wright, who was first sent to command

this department, was a man eminent for military science and clear abilities. His undemonstrative habits and retiring manners prevented the high popular appreciation which he deserved. The next commander sent us is General Burnside, of Hatteras Inlet, of Roanoke Island, of Newbern, of South Mountain, of Antietam, of Fredericksburg; a general not inferior in ability, not second to any other in the affections of his countrymen. With him comes that famous army corps, young in organization, but already old in sacrifices and in glory. Next in command, for Ohio, they send us the very Bayard of American volunteers, whose cool heroism at South Mountain was looked upon as an ample response to the high expectations formed of him from his accomplishments and previous services, and who crowned them all at Antietam creek, by performing there, with Ohio troops, trained under his own eye, a feat of arms fit to be compared with the far-famed passage of the Bridge of Lodi. If the government can afford such generals for the safe places, what can it afford to the dangerous places? Why are these men here? Have they, at any time, since the war began, sought any other but the place of danger? They are here,—they are sent here for war: to lay the same military hand upon this insurrection wherever they can find it, in small force or large force, before them or behind them, which they have laid upon it elsewhere. They are not here to cry peace, when there is no peace; not here to trifle with danger, or to be trifled with by it. They are patriot generals, commanding forces in the field in the presence of the enemy, constrained by their love of country, and in the fear of God only, to strike. Are they to fold their arms and sleep while the incitements to insurrection multiply around them, and until words shall find their way to appropriate acts? Are they to wait until the wires shall be cut, railroad tracks torn up, and this great base of supplies, this great thoroughfare for the transit of troops, this great centre and focus of conflicting elements, is in a blaze, before they can act? Must they wait until apprehended mischief shall become irremediable before they can attempt a remedy? Jefferson Davis would answer "Yes!" Traitors and abettors of treason would everywhere answer "Yes!" I seem to hear a solemn accord of voices rising from the graves of the founders of the constitution, saying "No!" And I seem to hear the response of loyal and true friends of liberty everywhere swelling to a multitudinous and imperative "Amen!" * * *

[The petition exhibits and sets forth a copy of the charge under which he was arrested. It shows us exactly the ground of his arrest. By referring to the charge and specifications, we have before us the case. It is not a little remarkable that no part of the charge or specification is denied. It stands for the purpose of this inquiry, as admitted.

[Mr. Perry read the charge and specifications as published in another place.-

[It appears from this that he publicly addressed a large meeting of citizens. He was not expressing in secrecy and seclusion his private feelings or misgivings, but seeking publicity and influence. The occasion and circumstances show the purpose to have been to produce an effect on the public mind, to mould public feeling, to shape public action. In what direction? The charge says by expressing his sympathies for those in arms against the government of the United States. by declaring disloyal sentiments and opinions. He declared the war to be wicked and cruel, and unnecessary, and a war not waged for the preservation of the Union: a war for crushing out liberty and erecting a despotism. What is this but saying that those who fight against the United States are in the right, and that it would be cowardly and dishonorable not to fight against the United States? In what more plain or cogent language could he urge his audience themselves to take up arms against their government? If those who heard him could not be incited to fight against a government by persuading them it was making an unjust and cruel war to crush out liberty, how else could he expect to incite them? If he did not hope to persuade them to join their sympathies and efforts with the enemies of the United States, by convincing them that these enemies are in the right, fighting and suffering to prevent the overthrow of liberty, standing up against wickedness and cruelty, what must he have thought of his audience? What else but the legitimate result of his argument can we impute fairly as the object of his hopes? To whatever extent they believe him, they must be poor, dumb dogs not to rally, and rally at once, for the overthrow of their own government, and for the support of those who make war upon it. But he did not leave it to be inferred. He declared it to be a war for the enslavement of the whites and the freedom of the blacks. Which of the two was in his opinion, the greater outrage, he does not appear to have stated. It is one of the unmistakable marks of the insurrection, by which it can always be identified, that its declarations for liberty are for a selfish and brutal liberty, which includes the liberty of injuring and disregarding others. If his white audience were not willing to be enslaved, that is to say, not willing to endure the last and most degrading outrage possible to be inflicted on human nature, they must, so far as they believe him, resist their own government. If he himself believed what he said, he must take up arms to resist the government or stand a confessed poltroon. A public man, who believes that his government is guilty of the crimes he imputed, and will not take up arms against it, is guilty of unspeakable baseness. If his audience believed what he told them, they must have looked upon advice not to take up arms as insincere or contemptible. No public

man, no private man, can make such charges, and decently claim not to mean war. All insurrections have their pretexts. The man who furnishes these is more guilty than the man who believes them and acts on them. If the statements of Vallandigham were true, the pretexts were ample, not merely as pretexts, but as justification of insurrection. They were more: they were incitements which it would be disgraceful to resist, and which human nature generally has no power to resist. The place where such things are done, is the place of insurrection, or there is not and cannot be a place of insurrection anywhere. If these laboratories of treason are to be kept in full blast, they will manufacture traitors faster than our armies can kill them. This cruel process finds no shelter under the plea of political discussion. Whatever might be said about ballots and elections, the legal inference is that it is intended to produce the results which would naturally flow from it. If the president, with all the army and navy, and his "minions," is at work to overthrow liberty and enslave the whites, every good man must fear to see that army victorious; and hail its disasters with joy. Every good man must strike to save himself from slavery now, while he can. The elections are far off, and may be too late. It cannot be claimed that the motive was to influence elections, because the argument does not fit that motive. It fits to insurrection, and that only. He pronounced general orders No. 38 to be a base usurpation, and invited his hearers to resist it. How resist it? How could they resist it, unless by doing what the order forbade to be done? What was there to be complained of, except by persons wishing to do, or to have done by others, the acts by that order prohibited? He invited them to resist the order. The order thus to be resisted prohibited the following acts, viz.: Acts for the benefit of the enemies of our country, such as carrying of secret mails, writing letters sent by secret mails; secret recruiting of soldiers for the enemy inside our lines; entering into agreements to pass our lines for the purpose of joining the enemy; the being concealed within our lines while in the service of the enemy; being improperly within our lines by persons who could give private information to the enemy; the harboring, protecting, concealing, feeding, clothing, or in any way aiding the enemies of our country; the habit of declaring sympathies for the enemy; treason. These are the things prohibited in order No. 38, which Mr. Vallandigham invited his audience to resist. "The sooner," he told them, "the people inform the minions of usurped power that they will not submit to such restrictions on their liberties, the better." "The minions" here referred to were the commanding general of the department, and others charged with official duties under their own government. The "liberties" not allowed to be restricted, were liberties to aid the enemies of the United

States. He declared his own purpose to do what he could to defeat the attempt now being made to build up a monarchy upon the ruins of our free government. This resistance could mean nothing but resistance to his own government, which he had before declared to be making attempts to enslave the whites. These appeals to that large public meeting are charged to have been made "for the purpose of weakening the power of his own government in his efforts to suppress an unlawful rebellion," all of which opinions and sentiments "he .well knew did aid, comfort, and encourage those in arms against the government, and could but induce in his hearers a distrust of their own government, and sympathy for those in arms against it, and a disposition to resist the laws of the land." Not one syllable of all this is denied, and yet the arrest is complained of as unconstitutional. It must be so apparent as to need no further demonstration, that an arrest of some kind had become necessary for the preservation of public decency. Either General Burnside and his soldiers should have been arrested, or Vallandigham. The only open question is, which was the proper party, and whether a mistake was made as to the man. If Vallandigham was right, General Burnside and every other officer of the army or navy, every member of the cabinet, even the president himself, should be forthwith put under arrest. The federal congress, which voted supplies for the army engaged in such a foray on the rights and interests of mankind, ought to be promptly dispersed. On the other hand, if the president and the government of United States are not all criminals, if our generals and soldiers are not all minions and pimps of a wicked scheme to enslave the people, Vallandigham ought to have been arrested. The acts which General Burnside was sent here to perform, and the acts of Vallandigham, considered as separate acts, or as lines of action, could not possibly go on together. They were, in their essence and nature, incompatible things, and mutually destructive of each other. If General Burnside might have arrested Jefferson Davis, and held him a prisoner, why not Clement L. Vallandigham? If we suppose the constitution was intended to authorize two such incompatible and mutually destructive lines of action at the same time, we impute an incredible absurdity. If it authorizes the drafting of one part of the population, the organizing of armies, and marching to battle, to suppress insurrection, it cannot at the same time authorize the other part of the population to thwart, defeat, and annul their efforts. On the other hand, if it authorize a portion of the people to attack and resist, and discredit the government, it cannot require the other portion to make war to defeat them. If the object of the constitution was to provide for its own destruction and protect its enemies, the arrest of Vallandigham was a mistake: Burnside was the man. But if the object was to provide for the safety of the constitution, and protect its friends, no mistake has been made, Vallandigham is the man to be arrested. It never could have been intended to allow them both to take the field at the same time.

[It is claimed that, since Vallandigham was not a military man, this arrest should have been made by the civil authorities. I understand the argument of learned counsel to be placed on this ground. Beyond or in addition to the ordinary arrests by civil process, none other are allowed under the constitution, except such as are authorized by military law. Military law, he shows us, consists chiefly in the rules and articles of war, and applies only to persons engaged in the military service of the government. The objection, therefore. is not one which relates to time, place, or circumstance. It denies authority to make such arrests at any time, in any place, or under any circumstances. I am not aware that language can state it more broadly than it was stated by learned counsel. Any arrest or capture made by the army of persons not in the military service, or so connected with it as to be subject to the rules of military law. is, he argues, an unlawful arrest. All such arrests must be discharged on habeas corpus, . unless it happens that habeas corpus has been suspended. A state of war, civil or other, does not, of itself, he thinks, suspend habeas corpus. It is a part of his theory that habeas corpus has not yet been suspended. The unavoidable result of this argument is, if it be the law, that no prisoner has been taken during the war, who could not have had his discharge on habeas corpus. The prisoners taken by General Burnside at Roanoke Island, and, by General Grant at Fort Donelson, were dischargeable on habeas corpus. General Banks can make no such arrests in Louisiana; Rosecrans none in Tennessee; Grant none in Mississippi; Hooker none in Virginia; Hunter none in South Carolina. Most of the prisoners seized by these generals are citizens of the United States, not engaged in the military or naval service thereof, nor called into actual service as a part of the militia. They could copy the form of the present petition, and conscientiously make oath to every material fact stated in it. It may be said that in those cases the prisoners taken were taken in the act of war. flagrante delicto. But if there was no authority to take them, under any circumstances, the fact supposed can make no difference. In order to rest a distinction on the fact of flagrant war, where it exists, it must be admitted that in some cases the authority does exist, which being admitted, the whole proposition goes into collapse and disappears. The inquiry then comes down to an inquiry as to time, place, and circumstance, which is a very distinct and different inquiry. In truth, however, much of the supposed difference in circumstances does not exist. As generals commanding different armies of the

United States, or in the field for purposes of war, and engaged in actual war, the authority conferred on them by the constitution must be the same. One may be limited by special instructions, another not; but without reference to such limitation, their general authority and duties as generals must be equal. The exigencies of war may press sometimes more heavily on one, sometimes on another. But if this is allowed to make a difference in the general authority exercised, the question is reduced to a question of circumstances, which learned counsel by no means admits. Nor does his proposition allow of an exception, if it happen anywhere that the civil administration, and the judiciary as a part of it, be forcibly obstructed and overthrown. This again would reduce it to a question of circumstances. His argument is that this kind of arrest is absolutely forbidden by the constitution; and being so forbidden, of course, no circumstance can make it lawful. The denial is far-reaching and fundamental. It follows, as a necessary corollary from the proposition, that, if at any time, in any part of the United States, an insurrection can make so much head as to obstruct or overthrow civil administration, it will have gained impunity. If those engaged in it may not be arrested by the army sent against it, they may not be shot. If they cannot be persuaded, nothing can be done. The application of restraint is imprisonment; and unless military imprisonment be allowed, no imprisonment can take place. For in the case supposed, the civil administration is no longer practicable. It may be said that in such instances habeas corpus must be suspended. This does not meet the argument. We are inquiring what arrests may be lawfully made. Suspension of habeas corpus makes no arrest lawful which was before unlawful. It merely suspends one remedy for unlawful arrests. It does not necessarily suspend other remedies, such as actions for false imprisonment and trespass. These are usually provided for by acts of indemnity which are not needed for lawful arrests. In England, these acts of indemnity may be passed by parliament after the war is over; for there is no constitutional prohibition against ex post facto laws. But here an indemnity act must pass before the imprisonment, to be available as an indemnity. The question now under consideration is, what acts are lawful and need no indemnity? What need can there be to suspend habeas corpus, when the civil tribunals, which alone should issue such writs, are already overthrown? The question is, whether every act of battle or of war by our soldiers against an insurrectionary force, is a civil trespass, and needs an act of indemnity? For if our soldiers may kill their enemies, they may capture them. Reduced to its last analysis, it is a question whether it is lawful, by force, to put down an unlawful and forcible opposition to the civil authorities; whether it is an unconstitutional act to enforce the constitution. If the gentleman's proposition be true, must it not be also true that every forcible attempt to overthrow the constitution has the guarantee of that instrument to protect it from harm and insure its success? It is attacked by force, and its friends may not strike without committing trespass.

[Let us examine the grounds on which he founds his proposition. He cites several well-known provisions of the constitution: "The trial of crimes, except in cases of impeachment shall be by jury; and such trial shall be held in the state where the said crime shall have been committed." * * *. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." * * * "No person shall be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service, in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled, in any criminal case, to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation" [Const. Amend. art. 5]. And some others. These are parts of the constitution, very valuable parts, but not the only ones. If the constitution had provided no means of enforcing the rights here mentioned, it would have been very ineffectual to secure them. Its guarantees of these rights might or might not have been worth the paper on which they were written. The argument of learned counsel leaves the constitution precisely where the framers of it would have left it, if they had put in it no other causes but these. I ask him what is to be done if it happen that by civil war the courts are overthrown, juries dispersed, and, in the state where the crime was committed, all civil administration is rendered impossible? I ask him what is to be done if it happen that throughout any large portion of the United States, the constitution, and all the officers under it, all its recognized legal processes and tribunals, be forcibly overcome and defied; and if those proclaiming the protection of the constitution, by unlawful violence there, not allowed to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures? What if the enemies of the constitution, in arms against its authority, do attack and seize its friends without probable cause, without charges, upon oath, and without warrant? What if they do deprive them of life, liberty, or property without

due process of law, and take private property for public use without due compensation? In a word, what if the enemies of the constitution suppress, expel, or demolish every vestige of constitutional administration, and substitute therefor war,—war by large armies, war by small bands, war by individual assassinations, hatreds, revenges, physical force, war everywhere, so that not one shred or patch of the constitution remains in that whole region? The question to be answered here is, what is to be done in such a state of affairs? I have listened to the argument of my learned friend with respectful attention. I have wandered with him over many fine fields of declamation, all about liberty and the constitution, but I find no answer. Unfortunately the condition of the country urgently requires an answer. I find that answer in other parts of the constitution. The instrument would have been nugatory, and idle and perhaps cheerful composition, but wholly unworthy of its framers, if it could furnish no answer. If it could furnish no answer, we should find ourselves involved in a situation unprovided for, never contemplated as possible, and one which would be a law unto itself. Being without law for the situation, we should rightfully act upon the necessity before us. But my argument is that the constitution does provide an answer,—a well-expressed and adequate answer. That answer, in substance, is, to meet war with war. I refuse to be dazzled by glittering fragments of a broken constitution, or to follow their illusory lights into a bottomless bog of anarchy. On behalf of the people I demand the whole constitution. On that rock we found our liberty, and the gates of hell shall not prevail against it. It is not necessary to repeat here the numerous passages of the constitution intended to establish justice and secure liberty. They do not purport to create, but to guard and secure. Justice existed before, but the concern of the framers of the constitution was to "establish" it. Domestic tranquility was an object of general desire, yet government was needed to "insure" it. The common defense might be, indeed, had been, conducted by them successfully without a constitution, but they deemed it expedient to "provide" for it. Liberty had been, by them, successfully asserted, but they felt the necessity of a government to "secure" its blessings. Therefore, they did· "ordain and establish this constitution of the United States of America." Its framers understood perfectly that, without it, liberty might exist, but it would have no establishment or security. They would have wasted their many weary years with profitless endeavor to behold at last the object of desire "speed away on cherub pinions,—the guide of homeless winds and playmate of the waves." How, then, did they secure liberty? In the order of securities we find, first, certain declaratory clauses. It is one step toward establishing

and securing rights to agree upon them and declare them. The citizens of each state shall be entitled to all the privileges and immunities of the several states. Private property shall not be taken for public use without due compensation. No person shall be deprived of life, liberty, or property, without due process of law; and other clauses before quoted. It is observable that in these declarations are embraced rights of a different grade,—rights called absolute and indefeasible, and rights merely conventional or secondary. But they are all declared with the same solemnity, and secured by the same guarantees. Materials of different degrees of solidity and costliness were fitted to their respective places in the edifice. The whole structure was necessary for the purpose contemplated, and all its parts and details were necessary to the structure. They do not tell us which of them could be taken away without danger to all. It was necessary to go further and provide for the enforcement of these declarations. The first step was to provide for electing a chief executive officer, to preside over and enforce the laws. Without him the whole machinery would fail. Except in the manner there provided, · there can be no president elected, but an election of president implies other things. When elected, he is to perform duties and exercise his faculties. Another practical security is provided by ordaining the election of a legislative body, and prescribing its functions, and declaring "that this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." But, further than this, the constitution provides for courts, judges, and marshals, to adjudicate and enforce the laws. It does not stop there. In all ages of the world men have been found not obedient to the judicial decisions; sometimes numerous and strong enough to overthrow and defy all the processes of civil administration. The constitution does not fail to provide for such an emergency. It crowns the guarantees before offered by providing for an adequate physical force to overcome all opposition. It speaks of a well-regulated militia as necessary for the security of a free state. It provides authority to "raise and support armies, to provide and maintain a navy, and to declare war." It provides for organizing, arming, and disciplining the militia; for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions. It makes the president "commander-in-chief of the army and navy of the United States, and of the militia of the several states when called into the actual service of the United States." Thus placing at his disposal the

entire resources of the country, it requires of him, before entering upon his office, to invoke the sanction of Almighty God, and clothe himself with an oath: "I do solemnly swear (or affirm) that I will faithfully execute the office of president of the United States, and will, to the best of my ability, preserve, protect, and defend the constitution of the United States." The president is no longer a free man in the chimerical sense of freedom which we hear so much of. But he is not less free than other citizens who are all bound to support the constitution. It is not one of the liberties secured by the constitution,—to select some particular right there guaranteed, to maintain it as distinct from and in opposition to the rest, or to hold fast to that one and let go the rest. Each holds his rights upon one ineradicable condition,—that he shall, to the extent of his ability, maintain and defend every part of the constitution. He can not throw off his allegiance, defy the government, make war upon it, and, at the same time, claim its protection. When he lifts his arm against the constitution, the arm may be cut off, without giving him a right to complain of cruel and unusual punishments. When he lifts his voice against the liberties of his countrymen, his voice may be silenced in the interests of freedom of speech. When he arms himself to assail the defenders of the constitution, those arms may be taken from him, in the interest of the general right to bear arms. When he makes of his house a shelter for traitors, and barricades it from the approach of patriots, it may be broken open and searched in the general interest of freedom from unreasonable searches and seizures.

[In the civil administration different remedies are applied, each after its kind. A writ of capias seizes the body, but it does not violate the constitutional guarantees of personal liberty; an attachment lays hold of goods, but does not violate property rights; a replevin breaks open houses, but does not conflict with the right to be protected from unreasonable searches and seizures. The common law furnishes redress in some instances; equity in others; maritime law in others. Each of these is so far exclusive as, when properly appealed to, not to be interfered with by any other; and, while in progress, to be governed exclusively by its own rules. War is the last resort, but when properly appealed to, its processes are due and reasonable processes, and, like the rest, must be allowed to work out results exclusively by its own rules. "The body of a nation cannot, then, abandon a province, a town, or even a single individual who is part of it, unless compelled to it by necessity, or indispensably obliged to it by the strongest reasons, founded on the public safety. Since, then, a nation is obliged to preserve itself, it has a right to everything necessary for its preservation. For the law of nations gives us a right to everything without which we cannot fulfill

our obligations; otherwise, it would oblige us to do impossibilities, or rather, would contradict itself in prescribing us a duty, and, at the same time, debarring us of the only means of fulfilling it." * * * "A nation or state has a right to everything that can help to ward off imminent danger, and keep at a distance whatever is capable of causing its ruin, and that from the very same reasons that establish its right to the things necessary to its preservation." Vatt. Law Nat. 5, 6. The right of nations here described has been fully preserved to the United States by their constitution, so far as the question under debate is affected. The power to make war is given without limitations. So far as war may be a means of preservation, or for warding off imminent danger, and keeping at a distance whatever is capable of causing its ruin, the nation is safe. The rights of war are as sacredly guaranteed as trial by jury, or personal liberty, or any other right whatever. The president cannot claim to have preserved, protected, and defended the constitution, to the best of his ability, until he shall have used all the ability given him by the utmost rights of war. He who declares he is willing to support the war, provided it creates no disturbance, only declares he is willing to support it, provided it shall be so conducted as to be really something else, and not war. The constitution does not define the meaning of habeas corpus, or trial by jury, or liberty, or war. They were to be ascertained elsewhere. I have before shown a definition of civil liberty. One of its conditions is an abridgement of natural liberty. Liberty was not abridged of the right to call in war to her defense, but she could not be endowed with a capacity for impossibilities. She could not require of human nature that which would be impossible to God himself,—repose and commotion, peace and war, at the same time. War could do little for Liberty, if she should hang forever sobbing on his neck, pinioning his arms, and holding him back from being War indeed. No! in this solemn time of domestic sorrow and of public peril, it is little better than sacrilege thus to potter with the meaning of words. By liberty was intended such liberty as was possible to mankind. By war was intended not a hollow pretext of war, but a lifting high of the red right hand of avenging justice. A thorough, condign, effectual laying hold of enemies, a summary breaking-up of their hiding places, and a terrifying deathly pursuit, until they shall cease to exist, or cease to be enemies. In Scott's Military Dictionary, a recent work, which, he says, was not prepared in view of existing disturbances, he states the following rule (page 273): "With regard to the requisition of military aid by the civil magistrate, the rule seems to be that when once the magistrate has charged the military officer with the duty of suppressing a riot, the execution of that duty is wholly confided to the judgment and skill of the mili-

tary officer, who thenceforward acts independently of the magistrate until the service required is fully performed. The magistrate cannot dictate to the officer the mode of executing the duty; and an officer would desert his duty if he submitted to receive any such orders from the magistrate. Neither is it necessary for the magistrate to accompany the officer in the execution of his duty. The learning on these points may be gathered from the charge of Mr. Justice Littledale, to the jury, in the trial of the mayor of Bristol, for breach of duty in not suppressing the riots in that city in 1831."

[I have spoken of military law, which is claimed, by learned counsel on the other side, to be a law for military men. This law is often mistaken for or confounded with martial law, but the terms are very far from convertible. Martial law is often defined as no law at all; but this definition is rather an objurgation against than a description of it. I venture to define martial law to be the rule of action adopted by all nations, and at all periods of the world, by which, in times of war, to guard against dangers that often arise, and by reason of the necessity of it, such discretion is given to the military commander, measured by the requirements of the situation, as shall insure to his force the best chances of success. It is that established practice, that common law of nations, by which, under the compulsion of right reason, when they have called an army into the field for war, and confided to it the safety of the commonwealth, they allow it, without hindrance or interruption, to perform its work. Counsel for petitioner reads to us many authorities to show that military law applies only to military men. Beyond this his argument is comprised either in a broad denial that martial law means anything more than is intended by military law; or, if it does, an equally broad denial that it does or can exist in Great Britain or the United States. His limitation of the military law, so called, appears to me rather more narrow than the authorities justify; but for the purposes of this argument, I have no controversy with him there. Let him take for granted all that I understand him to claim, as to the rule concerning military law. The questions remain whether martial law, or the laws of war, or the rights of war—phrases interchangeably used by the supreme court of the United States in discussing the theme, and by writers—mean more than military law; and if they mean more, whether they can exist in Great Britain or the United States. On both these questions counsel for petitioner takes the negative. If I can show him to be wrong here, I shall have defeated his whole argument. For, although his argument is not confined to these inquiries, all other parts of it depend upon them. I have already cited Vattel to how that the same rules or laws of war apply, or ought to apply, to civil as to foreign war. The only doubt is, whether

persons in insurrection against their own government, can rightfully claim the same treatment applied in mitigation of the rigors of war to foreign enemies. The most merciful rule is the one to which Vattel inclines, for reasons of expediency and humanity. It is the rule applied by our own government in this war. It is quite unnecessary to cite authorities to show that in foreign war the authority of a general is not limited to the military force under his command. During the Peninsular war, Wellington governed Spain and Portugal, and afterward a part of France, in the exercise of well-known and commonly-acknowledged rights of war. In our war with Mexico, General Scott promulgated and enforced a plan for the government of Mexico. Some debate was raised at home whether the constitution conferred so much power on a general. It was acquiesced in and approved. There could be no doubt of the authority to make war, and this was a necessary incident. Under the same rule, Rosecrans controlled civil administration in Tennessee, and Banks in Louisiana, and Curtis did in Missouri. Doubtless persons captured in flagrant acts of treason may be hung. As the greater includes the less, the right to hang implies the right to inflict the lesser evil. They are, therefore, allowed to be treated as prisoners of war. I am now speaking of the existence of rights of war, laws of war, or martial law, and showing them not to be limited to military men, and to be much more comprehensive than military law,—indeed, entirely distinct and different from it. I am now making the application to Vallandigham. That is a question of circumstances. I am replying to the argument which denies the existence or application of such a law under any circumstances.

[To maintain his denials counsel cites many English authorities,—among them Sir Matthew Hale,—and he claims, as the result of those authorities, that martial law has been definitively abandoned and prohibited in England. These authorities do, some of them, show that certain gross abuses, which were practiced by the Stuarts in England, under the pretext and name of martial law, but which found as little justification under martial law as under any other, have been prohibited. Perhaps he could show, with smaller research, that measures had been taken to prevent a repetition of the infamous and bloody assizes of Jefferies; but this would not go very far to discredit trial by jury. Trial by jury yet exists in England; and martial law is applied there as often as occasion requires. If anything may be fairly assailed by holding it responsible for abuses, the judiciary would be one of the first institutions of government to fall. Looking over the history of past ages, it is apparent that military men would have some difficulty in establishing a claim to a leadership in the abuses inflicted on mankind. Most of the historical struggles for liberty

have resulted from a real and natural antagonism between peoples and their rulers; rulers claiming, by some heritable superiority, to govern, and people feeling the government mainly in its oppressions. Whether judges or military men are most responsible for the cruelties inflicted in such struggles may be doubted. From a somewhat patient reading of law books, I am, however, prepared to admit that judges have felt much less alarm and indignation at stretches of power practiced by themselves, than they have felt at the assumption of undue power by military men. If there were no history except what we find in law books, judges would have a decided advantage over generals. There are, also, specimens of popular forensic eloquence, originally delivered as the voice of the people against despotic governments (some of them quite out of hearing), which never lose their attractions. We rather like to hear them launched against our old government; that is to say, ourselves. The difficulty of playing both people and tyrant at the same time is scarcely appreciable in these popular amusements.

[I am relieved from stating my own conclusions concerning the numerous English authorities cited, by finding an examination of them, and an opinion concerning them, by Mr. Attorney General Cushing. 8 Op. Attys. Gen. U. S. p. 365. The attorney general, after remarking upon English authorities, sums up: "In fine, the common-law authorities and commentators afford no clue to what martial law, as understood in England, really is; but much light is thrown upon the subject by debates in parliament, and by facts in the executive action of government." This is a report to his own government by one of the most learned and laborious attorneys general the United States ever had. He quotes Sir Matthew Hale also: "Martial law is not in truth and reality, a law, but something indulged rather than allowed as a law: the necessity of government, order, discipline in the army, is that only which gives these laws a countenance." Hale, Com. Law, p. 39. Mr. Attorney General says: "This proposition is a mere composite blunder, a total misapprehension of the matter. It confounds martial law and law military; it ascribes to the former the uses of the latter; it erroneously assumes that the government of a body of troops is a necessity more than that of a body of civilians, or citizens. It confounds and confuses all the relations of the subject, and is an apt illustration of the incompleteness of the notions of the common-law jurists of England in regard to matters not comprehended in that limited branch of legal science." "Even at a later day, in England, when some glimmerings of light on the subject began to appear, the nature of the martial-law remained without accurate appreciation in Westminster Hall." He cites the case of Grant v. Gould, 2 H. B. 98, decided by Lord Loughborough, who said: "The es-

sence of martial law consists in its being a jurisdiction over all military persons, in all circumstances." And because military men are triable for many offenses, and have their personal rights, for the most part, regulated by law, "Therefore," he says, "it is totally inaccurate to state martial law as having any place whatever in the realm of Great Britain." Mr. Attorney General says, "This is totally inaccurate," and explains why. Mr. Attorney General then quotes 11 Steph. Comm. p. 602, note. "Martial law," says Stephens, "may be defined as the law, whatever it may be, which is imposed by military power; and has no place in the institutions of this country (England), unless the articles of war, established under the acts just mentioned, be considered as of that character." The attorney general proceeds: "Here again is pitiable confusion; for the articles of war are not a law 'imposed by the military power,' nor is martial law confined in its origin to the military power as the source of its existence." The confusion among English lawyers, remarked by the attorney general, will account, probably, for some inconsistencies of expression among English statesmen on this subject, though the action of English statesmen is sufficiently clear and consistent. The question whether martial law has "a place in the realm of Great Britain," as denied by Lord Loughborough, or "a place in the institutions of England," as denied by Mr. Stephens, is purely a question of historical fact, and history is against them. Nor is the question open to doubt. Martial law, such as I claim, has been unquestionably adopted and enforced in Great Britain and her provinces as often as any occasion has been felt for it. I may here dismiss the English authorities.

Mr. Attorney General Cushing, in his opinion, makes a most learned examination of the topic, and says: "Looking into the legislation of other countries, we shall find all the legal relations of this subject thoroughly explained, so as to furnish to us ideas at least, if not analogies, by means of which to appreciate some of its legal relations in the United States." [8 Op. Attys. Gen. U. S. p. 370.] These legal relations appear to be better defined in France than elsewhere. Three conditions or states are there provided for: 1. Peace. In the state of peace, all military men are subject to the law military, leaving the civil authority untouched, in its own sphere, to govern all persons, whether civil or military, in class. 2. The state of war. When it exists, the military authority may have to take precedence of the civil authority, which, nevertheless, is not deprived of its ordinary attributes, but, in order to exercise them, must, of necessity, enter into concert with the military commander. 3. The state of siege. When it exists, all the local authority passes to the military commander, who exercises it in his own person, or delegates it, if he please, to the civil magistrates,

to be exercised by them under his orders. The civil law is suspended for the time being, or, at least, made subordinate, and its place is taken by martial law, under the supreme, if not direct administration of the military power. "The state of siege may exist in a city, or in a district of country, either by reason of the same being actually besieged or invested by a hostile force, or by reason of domestic insurrection." Of these different stages, Mr. Cushing concludes, the state of siege is equivalent to the proclamation of martial law in England and the United States. I remark upon this, that these distinctions, after all, between a state of war and a state of siege, are not very valuable. Martial law is a thing of necessity, and is limited by the necessity, so that the less urgent the necessity, the less extensive the power. It places in the hands of the general a discretion, as discretion is placed sometimes in the hands of judges and chancellors. It is said that martial law is no law; and it is said that equity is the length of the chancellor's foot. But the chancellor, like the general, is required to exercise a "sound discretion," a "reasonable discretion," a "wise discretion, in view of all the circumstances." The New American Cyclopedia says: "Martial law is often confounded with military law; but these terms are by no means convertible." Speaking of martial law, it says: "It proceeds directly from the military power which has now become supreme. Yet, remotely and indirectly, martial law expresses the will of the people." "Martial law has often been confounded with military law, but the two are very different. Military law, with us, consists of the 'rules and articles of war,' and other statutory provisions for the government of military persons, to which may be added the unwritten or common law of the 'usage and custom of military service.' It exists equally in peace and in war, and is as fixed and definite in its provisions as the admiralty, ecclesiastical, or any other branch of law, and is equally with them, a part of the general law of the land. But, in the words of Chancellor Kent, 'martial law is quite a distinct thing.' It exists only in time of war, and originates in military necessity. It derives no authority from the civil law (using the term in its more general sense), nor assistance from the civil tribunals, for it overrules, suspends, and replaces both. It is, from its very nature, an arbitrary power, and 'extends to all the inhabitants (whether civil or military) of the district where it is in force.' It has been used in all countries, and by all governments, and it is as necessary to the sovereignty of a state as the power to declare and make war. The right to declare, apply, and enforce martial law, is one of the sovereign powers, and resides in the governing authority of the state, and depends upon the constitution of the state, whether restrictions and rules are to be adopted for its application, or whether it is to be exercised according to the exigencies which call it into existence. But even when left unrestricted by constitutional or statutory law, like the power of a civil court to punish contempts, it must be exercised with due moderation and justice; and, as 'paramount necessity' alone can call it into existence, so must its exercise be limited to such times and places as this necessity may require; and, moreover, it must be governed by the rules of general public law, as applied to a state of war. It, therefore, cannot be despotically or arbitrarily exercised, any more than any other belligerent right can be so exercised." Atty. Gen. Cushing, 8 Op. Attys. Gen. U. S. p. 365 et seq.; Wolfius, Jus Gentium, § 863; Gro. De Jure B. lib. 2, cap. 8; Kluber, Droit des Gens, § 255; O'Bri. Mil. Law, p. 28. Halleck, Int. Law, 373. "Martial law, then, is that military rule and authority which exists in time of war, and is conferred by the laws of war in relation to persons and things, under and within the scope of active military operations in carrying on the war, and which extinguishes or suspends civil rights, and the remedies founded upon them, for the time being, so far as it may appear to be necessary in order to the full accomplishment of the purpose of the war,—the party who exercises it being liable in an action for any abuse of the authority thus conferred. It is the application of military government—the government of force—to persons and property within the scope of it, according to the laws and usages of war, to the exclusion of the municipal government, in all respects where the latter would impair the efficiency of military law or military action." Benet, Courts-Martial, 14. "We remark, in conclusion, that the right to declare, apply, and exercise martial law is one of the rights of sovereignty, and is as essential to the existence of a state as is the right to declare or carry on war. It is one of the incidents of war; and, like the power to take human life in battle, results directly and immediately from the fact that war legally exists. It is a power inherent in every government, and must be regarded and recognized by all other governments; but the question of the authority of any particular functionary to exercise this power, is a matter to be determined by local and not by international law. Like a declaration of a siege or blockade, the power of the officer who makes it is to be presumed until disavowed, and neutrals who attempt to act in derogation of that authority, do so at their peril." Halleck, Int. Law, 380. "The English common-law authorities and commentators generally confound martial with military law, and, consequently, throw very little light upon the subject, considered as a domestic fact; and, in parliamentary debates, it has usually been discussed as a fact, rather than as forming any part of their system of jurisprudence. Nevertheless, there are numerous instances in which martial law has been declared and enforced, in time of

rebellion and insurrection, not only in India and British colonial possessions, but also in England and Ireland. It seems that no act of parliament is required to precede such declaration, although it is usually followed by an act of indemnity, when the disturbances which call it forth are at an end, in order to give constitutional existence to the fact of martial law." Id. 374.

[I will now ask attention to two cases discussed in the supreme court of the United States, which give the sanction of that court to the doctrine that I am endeavoring to sustain.

[The constitution provides that private property shall not be taken for public use without due compensation. Yet a general, going to war, could not post his sentinels without committing what would be, in peace, a trespass. Every mile of his march, with ordinary military precautions, every encampment, would be a violation of law. In Mitchell v. Harmony, 13 How. [54 U. S.] 115, the plaintiff below had sued an officer of the army of the United States for taking his property during the war with Mexico. It was taken on error to the supreme court of the United States, on exceptions to the charge of the circuit judge to the jury. Chief Justice Taney said (page 133): "Upon these two grounds of defense, the circuit court instructed the jury that defendant might lawfully take possession of the goods of the plaintiff, to prevent them from falling into the hands of the public enemy; but, in order to justify the seizure, the danger must be immediate and impending, and not remote or contingent. And that he might also take them for public uses, and impress them into the public service, in case of an immediate and pressing danger or urgent necessity existing at the time, but not otherwise." The charge, as thus stated, was sustained. Again, on page 134, the chief justice said: "There are, without doubt, occasions in which private property may lawfully be taken possession of or destroyed, to prevent it from falling into the hands of the public enemy; and also where a military officer, charged with a particular duty, may impress private property into the public service, or take it for public use. Unquestionably, in such cases, the government is bound to make full compensation to the owner; but the officer is not a trespasser." * * * "It is the emergency that gives the right, and the emergency must be shown to exist before the taking can be justified. In deciding upon this necessity, however, the state of the facts, as they appeared to the officer at the time he acted, must govern the decision; for he must necessarily act upon the information of others as well as his own observation." Mr. Justice Daniel delivered a dissenting opinion on other points. But on this point he said (page 139): "The principle itself, if properly applied, of the right to take property to prevent it from falling into the hands of the enemy, is undisputed." And again (same

page): "I have no doubt of the right of a military officer, in a case of extreme necessity, for the safety of the government or army, to take private property for the public service." Again (page 140): "The safety of the country is paramount, and the rights of the individual must yield in case of extreme necessity." Observe that this is not placed on the ground that, in extreme necessity, the constitution is suspended, and the laws properly broken; but it is held to be a lawful act. They do not look upon it as trespass, excusable from great urgency, but they declare it not to be a trespass. The officer is clothed with a lawful right to do it. But this property right is guarded by the same sanctions in the constitution with the right of personal liberty. Inasmuch as a person may give the enemy more help, or expose our own army to greater dangers, than property could, the reason is more cogent when applied to persons.

[During the celebrated Dorr rebellion, the legislature of Rhode Island passed an act declaring the state under martial law. One Martin Luther being charged with aiding and abetting the rebellion, his house was broken open and entered, and he was arrested, or, in the language of the petition in this case, he was "seized by overpowering numbers." He brought an action against the parties who made the arrest, in trespass quare clausum fregit. They justified under the statute declaring martial law. It appears that there was not, in that case, more than in this, "any warrant issued upon probable cause, supported by oath or affirmation." In that action martial law, as a topic, came under discussion in the supreme court of the United States. Luther v. Borden, 7 How. [48 U. S.] 1. Chief Justice Taney delivered the opinion of the court, from which I shall presently read. But, before doing so, I propose to read from the dissenting opinion of Mr. Justice Woodbury, and to invite the attention of learned counsel on the other side to his descriptions of martial law, and the distinction he made between what is called military law and martial law.][6]

[Mr. Perry here commented at length upon the opinion of Mr. Justice Woodbury, criticizing severely his definitions and distinctions.]

[7] [I may now turn to the opinion of the court as delivered by Chief Justice Taney (page 45): "The remaining question," says the chief justice, "is whether the defendants, acting under military orders, issued under the authority of the government, were justified in breaking and entering the plaintiff's house. In relation to the act of the legislature declaring martial law, it is not necessary, in the case before us, to inquire to what extent, or under what circumstances, that power may be exercised by a state. Unquestionably a military government, established as the.

---

[6] From pamphlet report by Rickey & Carroll, Cincinnati, Ohio, 1863.

[7] From pamphlet report by Rickey & Carroll, Cincinnati, Ohio, 1863.

permanent government of a state, would not be a republican government, and it would be the duty of congress to overthrow it. But the law of Rhode Island evidently contemplated no such government. It was intended merely for the crisis, and to meet the peril in which the existing government was placed by the armed resistance to its authority. It was so understood and construed by the state authorities, and, unquestionably, a state may use its military power to put down an armed insurrection too strong to be controlled by the civil authority. The power is essential to the existence of every government, essential to the preservation of order and free institutions, and is as necessary to the states of this Union as to any other government. The state itself must determine what degree of force the crisis demands. And if the government of Rhode Island deemed the armed opposition so formidable, and so ramified throughout the state, as to require the use of its military force, and the declaration of martial law, we see no ground upon which this court can question its authority. It was a state of war; and the established government resorted to the rights and usages of war to maintain itself, and to overcome the unlawful opposition. And, in that state of things, the officers engaged in its military service might lawfully arrest any one who, from the information before them, they had reasonable grounds to believe was engaged in the insurrection, and might order a house to be forcibly entered and searched, when there were reasonable grounds for supposing he might be there concealed. Without power to do this, martial law and the military array of the government would be mere parade, and rather encourage attack than repel it. No more force, however, can be used than is necessary to accomplish the object. And if the power is used for purposes of oppression, or any injury willfully done to person or property, the party by whom, or by whose order, it is committed, would undoubtedly be answerable." "We forbear to remark upon the cases referred to in the argument, in relation to the commissions anciently issued by the kings of England to commissioners to proceed against certain descriptions of persons, in certain places, by the law martial. These commissions were issued by the king at his pleasure, without the concurrence or authority of parliament, and were often abused for the most despotic and oppressive purposes. They were used before the regal power of England was well defined, and were finally abolished and prohibited by the petition of right, in the reign of Charles the First. But they bear no analogy in any respect to the declaration of martial law by the legislative authority of the state, made for the purposes of self-defense, when assailed by an armed force; and the cases and commentaries concerning these commissions can not, therefore, influence the construction of the Rhode Island law, nor furnish any test of the lawfulness of the authority exercised by the government." This decision does not determine in what branch of the government resides authority to declare martial law. But it recognizes martial law as a legitimate means of preserving the government in emergencies calling for it. It shows that the ground taken by counsel on the other side, that no such authority is lodged in any branch of the government, is untenable. On page 44 the court replies to the same kind of argument we have heard here, of the danger of intrusting so much power to the president: "It is said that this power of the president is dangerous to liberty, and may be abused. All power may be abused if placed in unworthy hands. But it would be difficult, we think, to point out any other hands in which this power would be more safe, at the same time, equally effectual. When citizens of the same state are in arms against each other, and the constituted authorities unable to execute the laws, the interposition must be prompt, or it is of little value. The ordinary course of proceedings in courts of justice would be utterly unfit for the crisis. And the elevated office of the president, chosen as he is by the people of the United States, and the high responsibility he could not fail to feel when acting in a case of so much moment, appear to furnish as strong safeguards against willful abuse of power as human prudence and foresight could well provide. At all events, it is conferred upon him by the constitution and laws of the United States, and must, therefore, be respected and enforced in its judicial tribunals." 7 How. [48 U. S.] 44.

["Moreover, when a military force is called out to repel invasion or suppress a rebellion, it is not placed under the direction of the judiciary, but under that of the executive. Suppose the military force, legally and constitutionally called into service for the purposes indicated, should find it necessary, in the course of its military operations, to occupy a field or garden, or destroy trees, or houses, belonging to some private person: can a court, by injunction, restrain them from committing such waste? It can do so in time of peace, and, if its powers are to continue in time of war, the judiciary, and not the executive, will command the army and navy. The taking or destroying of private property, in such cases, is a military act, and act of war, and must be governed by the laws of war; it is not provided for by the laws of peace. In the same way, a person taken and held by the military forces, whether before, or in, or after a battle, or without any battle at all, is virtually a prisoner of war. No matter what his alleged offense, whether he is a rebel, a traitor, a spy, or an enemy in arms, he is to be held and punished according to the laws of war, for these have been substituted for the laws of peace. And for a person so taken and held by the military authority, a writ of

habeas corpus can have no effect, because, in the words of the United States supreme court, 'the ordinary course of justice would be utterly unfit for such a crisis.' " Halleck, Int. Law. 378. The same writer states circumstances in the history of this country, which your honor will find it easy to verify. From this statement it appears that the practice, now complained of as strange and unprecedented, was commenced under the administration of Washington. Jefferson and Jackson are also implicated. When Vallandigham shoots his poisoned arrows at President Lincoln, if there should prove to be strength enough in the bow, the same aim will pierce a succession of illustrious defenders of liberty. Here is the statement: "During the administration of President Washington, in the Pennsylvania 'Whisky Insurrection' of 1794 and 1795, the military authorities engaged in suppressing it disregarded the writs which were issued by the courts for the release of the prisoners who had been captured as insurgents. General Wilkinson, under the authority of President Jefferson, during the Burr conspiracy of 1806, suspended the privilege of this writ, as against the superior court of New Orleans. General Jackson assumed the right to refuse obedience to the writ of habeas corpus, first in New Orleans, in 1814, as against the authority of Judge Hall, when the British army was approaching that city; and afterward, in Florida, as against the authority of Judge Fromentin." May it please your Honor! I have spoken some words of praise of the character and services of General Burnside. I can now be silent. The patriot who, in these times, can get himself abused for following in the footsteps of Washington, Jefferson, and Jackson, has triumphed over all need of my poor commendation. The wrath of his country's enemies has been made to praise him

[The authorities relied upon to show that the laws of war, or martial law, are not any more allowed in Great Britain, I have shown to be in error. The statements, though made by parties whom we might expect to be informed, and which have probably misled counsel on the other side, are shown by Mr. Cushing, attorney general under the late President Pierce, to have resulted from misapprehension and confusion of ideas. But this showing depends not on the authority alone of his name, strong as it may be. The errors referred to are so demonstrable to reason, and so utterly at variance with history, it is quite unnecessary to go into a further exposition concerning them. In the dissenting opinion of Judge Woodbury, which I have freely adverted to, he was misled into a similar statement; but he let into it a sufficient number of exceptions to correspond with all the occasions there have been in Great Britain for martial law within the last hundred years. He insisted, however, that they had no constitution, and such acts were only done by parliament in virtue of its unlimited pow-

er. I must again say that the question is not, who may do it? but, can it be done? For the purpose of my argument, it is sufficient if done by parliament, but the fact is otherwise. The quotation from Hansard's Debates shows that once, at least, it has been done by the executive. I have no doubt the same is true in other instances. The important matter is, however, it has been done, both in Great Britain and this country, every time there has been occasion for it. It is a rule of action in both countries. The misconception of terms and confusion of ideas among common lawyers, on this topic, are not confined to England. A much clearer perception is shown by American writers on the main question involved; but even Mr. Cushing and Mr. Halleck fall into error in some particulars. The relations of suspension of habeas corpus to martial law are less well defined. They explain these to us in a jumble of words, which need more explanation than the facts sought to be explained. It has been the good fortune of Great Britain and the United States to experience so few occasions for the laws of war within their own borders, and those occasions have been of duration so brief, that a prompt and unflinching recognition and use of martial law, when the occasions have happened, is all that I need show. Peace turns attention to thoughts of peace. The judges then take their turn, and, danger being over, they sometimes bite their thumbs at the generals in a very affecting manner. We are told that acts of indemnity are passed in order to cover the illegality of the laws of war, as if a law could be illegal! When lawyers and judges fall to using rigmarole, it is not common for politicians and pamphleteers to allow themselves to be outdone. In the passage quoted from Hansard, Lord Castlereagh is made to say: "I maintain that it is a constitutional mode for the executive government to exercise martial law in the first instance, and to come to parliament for indemnity afterward. * * * They did it on the principle that they were authorized by the king's prerogative, provided they did not transgress the necessity of the case." This call for indemnity is often said to signify that the act was unlawful. What indemnity could be needed for a lawful act? So, then, it would appear to be a constitutional mode to do the unconstitutional thing, intending presently to apologize for it. Mr. Grey (afterward Earl Grey) was not impressed with the clearness of this explanation. He says: "It was better that the executive government should resort to what had been called (he thought not legally) its prerogative of proclaiming martial law. That was no prerogative of the crown, but, rather, an act of power sanctioned by necessity, martial law being a suspension of the king's peace." Here, then, is a blaze of light. It was better to resort to that which did not exist, to wit, the prerogative. It was an act of power "sanctioned" by necessity, "martial

law being a suspension of the king's peace."
This luminous expounder had arrived at the
conclusion that in war peace must be con-
sidered as suspended. It did not, however,
occur to him that it is war itself which sus-
pends peace, and not the laws of war, which
of necessity exist when war exists.

[Our own writers follow in the same train.
Mr. Attorney General Cushing, in the opin-
ion before quoted says: "We have in Great
Britain several recent examples of acts to
give constitutional existence to the fact of
martial law." Mr. Halleck says: "It seems
that no act of parliament is required to pre-
cede such declaration, although it is usually
followed by an act of indemnity, when the
disturbances which called it forth are at an
end, in order to give constitutional existence
to the fact of martial law." They are ex-
plaining the laws of England, and on this
part of the topic relax their vigilance, repeat-
ing merely the incongruous failures which
they find. Passing over the idea that par-
liament can make a thing constitutional
which is not,—an absurdity,—they are not
boggled at the declaration that an act already
gone by and ended can be made to have been
constitutional, which was at the time not so.
On the theory thus furnished by Englishmen,
and incautiously followed by some of our best
writers, indemnity acts, if truly expressing
their meaning, would read as follows:
"Whereas, certain acts have been done which
are known to have been unconstitutional and
illegal, therefore they were and are constitu-
tional, legal acts." This is carrying the pow-
er of parliament to a pitch compared with
which Omnipotence is feeble. If I may ven-
ture to suggest the explanation they were
manifestly groping for, it is in the fact al-
luded to by Earl Grey: the king's peace is
suspended. This suspension of peace being
usually accompanied by more or fewer pro-
clamatory documents, and these documents
being the only part taken in war by judges
and legislators, they have mistaken the docu-
ments for the war. They have omitted to
remember that a failure of documents would
not change the fact of war. The war, and
not the documents, suspends peace. Of this
the writers are sufficiently aware in other
parts of their discussion. Mr. Attorney Gen-
eral Cushing says: "When martial law is
proclaimed under circumstances of assumed
necessity, the proclamation must be regarded
as the statement of an existing fact, rather
than the legal creation of that fact." In this
statement Mr. Halleck concurs. Indeed,
nothing can be more obvious. Yet most of
the antipathy and all the arguments I have
met with, directed against martial law, are
arguments against enforcing it during peace.
In other words, they are arguments against
inflicting the rigors of war under false pre-
texts. A part of the confusion is occasioned
by speaking of martial law as if it were dis-
tinct and different from the laws of war, or
rights of war. No one doubts that, when

war exists, it is a thing of such a paramount
and supreme nature that its laws must pre-
vail. The existence of war is not a suspen-
sion of habeas corpus; but, for all arrests au-
thorized by the laws of war, the answer that
war exists, and that the arrest was made in
accordance with its rules, is a lawful and
sufficient answer to a habeas corpus. Gen-
eral Burnside has expressed it very well:
"We are in a state of civil war, and an emer-
gency is upon us which requires the opera-
tion of some power that moves more quickly
than the civil. There never was a war car-
ried on successfully without the exercise of
that power."

. [Indemnity acts are sufficiently accounted
for without supposing them to be necessary
as a legal justification for acts of war. They
are commonly enacted in civil wars, in which
the application of the rigors of war is start-
ling to people long accustomed to peace and
civil administration. A concurrence of all
branches of government in any public ac-
knowledgment of its necessity, either before
or after the fact, cannot fail to produce a
valuable effect on the public mind. Such acts
may, also, in England answer a good legal
purpose. They may close the courts to vicious
and experimental litigation, by which persons
engaged in the public service in time of war,
might, on the return of peace, be ruined or
compelled to flee their country. Counsel on
the other side, I understood him to say, by in-
struction of his client, has, at some length,
called our attention to the number and va-
riety of civil actions, to which, on his theory,
General Burnside has exposed himself, as
well as all who acted under his orders. On
his theory, no act of indemnity can shield our
soldiers. The right he claims is a constitu-
tional right, which legislation cannot affect.
On his theory, every act of war by our sol-
diers is a trespass, and no act of indemnity
can reach them. Hard as the fortunes of
soldiers may be in war, on his theory, peace
will bring them no repose. Our poor country,
defended by their valor, enriched by their
blood, however grateful it may be, can only
welcome them home to the embrace of bailiffs.
We may ring bells, kindle bonfires, and pour
out our hearts in thankfulness to God for re-
turning peace, but the noble boys who won it
for us must skulk in hiding places, to dream
only of writs and constables and the law's
delays; certain that their danger in peace is
in proportion to their valor in war, and that
he only can be hopeful who can prove him-
self to have been useless. This is not an ex-
aggeration, but a necessary, logical result of
the doctrine advanced here on behalf of Mr.
Vallandigham. The proposition is that the
right to personal liberty, freedom of speech,
etc., are absolute, inalienable rights, guar-
anteed inflexibly by the constitution, and not
to be suspended in any emergency, nor made
to yield to any public necessity. I repeat that
the question argued by counsel on the other
side is not a question under what circum-

stances these rights may be abridged, but he denies the legal possibility of such abridgment. These rights extend to all citizens,—to persons subject to military duty as well as the rest. Yet the same constitution which guarantees these inalienable rights authorizes the making of war and the calling out of the militia. Pressed by this fact, counsel do not seek to deny that the liberty of the soldier is, for the time of his service, abridged. This is too palpable for denial. He seeks, therefore, to get round it by reading from an English decision to the effect that the soldier gives up his liberty by contract. This poor evasion does not apply to persons who are drafted against their will; but it is itself a denial that these rights are inalienable, for it speaks of alienating, by contract, an inalienable right. The conclusion is inevitable. These rights, so carefully enumerated in the constitution, and so often referred to by learned counsel, are liable to be abridged under particular circumstances. The constitution contemplates and provides for such abridgment. This abridgment is especially provided for in time of war. And since no limits are fixed to the means to be used in war, everything may be done which the necessities of war require. The laws of war are, for the time, as much a part of the constitution as the laws of civil procedure are in time of peace.

[My argument is founded on the idea that the laws of war are a necessary incident of a state of war, and, therefore, depend for existence only on the fact of war. It is quite unnecessary to refer to proclamations or advertisements of the fact. Order No. 38 is a proclamation, if it were a question of proclamations. Every branch of government, state and federal, has made numerous annunciations of this war. Counsel calls our attention to certain proclamations of the president relating to emancipation of slaves, which define, for that purpose, the insurrectionary districts; and counsel insists that these must be held as limiting martial law to those districts. Those proclamations do not include Missouri, Kentucky, Tennessee, Western Virginia, or portions of Eastern Virginia, or Norfolk, or Portsmouth. If the laws of war depend on these proclamations, they are excluded from the places where the war has been most active. They did not purpose to define the limits of war, but the limits of emancipation. If my argument is sound, neither the presence nor absence of proclamations can materially affect the question. It is a question of the existence of war. It may be said that this argument, if correct, reduces us to a state of dependence on military power. Far otherwise. It is not a state to be argued into or argued out of. If, when threatened by generals and armies who are traitors and enemies, we are obliged to depend upon generals and armies who are patriots and friends, nothing can be gained by denying the fact, or by keeping up a false pretext of being in

some other condition. The danger, whatever it may be, is not very much diminished by going into hysterics; nor is it greatly changed in its character by the names applied. It is sometimes called "no law," "an abrogation of law," "a suspension of law," because for a time the ordinary civil administration is suspended or subordinated to a great public necessity. But the law provided for such occasions is in force. It is appealed to, to protect us when other laws fail. The laws of war have their appropriate checks and limitations. The general in command of an army, in the field of his operations, for purposes of war, is expected to act with promptness, and sometimes with secrecy. He is not expected to write out and deliver his opinions, or to wait for briefs. This may be his misfortune; it certainly is not his fault. His action in this sense may be called "arbitrary," and his administration "despotic." But, after all, he is limited and restrained. If he push beyond the rights of war, the laws of war do not protect him. In applying those laws, he is further restrained by a sense of propriety and duty. He acts in peril of the disapprobation of higher authority, who may displace, or, in some cases, impeach, him; in peril of the disapprobation of the Supreme Being, and of his countrymen; in peril of that sure infamy which awaits all who unnecessarily aggravate the evils of war. It is not easy to conceive a situation appealing to higher sanctions than that of a general commanding in war. "At all events," says General Burnside, "I will have the consciousness before God of having done my duty to my country."

[May it please your honor: I have pursued this branch of the argument at some length. If the view of the constitution here presented be, as it appears to me, well grounded in reason, and sustained by authority, the main proposition on which the petitioner rests his application is overthrown, and, with it, the claim to a writ of habeas corpus. I did not understand counsel to argue that, in the case of Vallandigham, there were circumstances to render this arrest illegal or unnecessary, provided such arrests can in any case be justified. I did distinctly understand him to disclaim the idea that the constitution permits a military arrest to be made, under any circumstances, of a person not engaged in the military or naval service of the United States, nor in the militia of any state called into actual service; and to rest his case on that broad denial. The whole petition is framed on this idea, for none of the charges are denied. Upon first impression, your honor may have inclined to the belief that petitioner had assumed an unnecessary burden, and might have more easily made a case by putting General Burnside to show the propriety of this arrest; admitting the general right to make such arrests as were indicated by the necessities of the service, but denying any ground for this arrest. But your honor will find that no mistake has been

made by learned counsel on the other side, in this particular. The circumstances shown justify the arrest, if any arrest of the kind can be justified. If General Burnside might have arrested him for making the speech face to face with his soldiers, the distance from them at which it was uttered can make little difference. He might make it in camp; and unless he could be arrested, there would be no way to prevent it. The right of publication, of sending by mail and telegraph, is of the same grade with freedom of speech. If utterance of the speech could not be checked, its transmission by mail and telegraph could not be. And I so understand the argument of the counsel of Vallandigham. It appears to claim, and go the whole length of claiming that it can do the army no harm to read such addresses; nor, of course, to hear them. It is necessary the argument should not stop short of that, in order to meet the question, and it does not. Yet this is not the whole extent to which it must go to avail the petitioner. It must go to the extent of showing that this court is authorized to determine that such addresses may be heard by the army, the opinion of the commanding general to the contrary notwithstanding. It goes and must go the extent of transferring all responsibility for what is called the morale and discipline of the army from its commanding general to this court. Is it not certain that, if these addresses shall persuade nobody, their authors will be disappointed? Is it not certain that any soldier persuaded to believe that his government is striving to overthrow liberty, and for that purpose is waging a wicked and cruel war, can no longer, in good conscience, remain in the service? The argument leads to one of two conclusions. We are to be persuaded by the men who make the speeches that the speeches will not produce the effect they intend,—a persuasion in which their acts contradict their words,—or we are to consent to the demoralization of the army. The constitution authorizes and even requires the army to be formed, but at that stage of the transaction interposes an imperative prohibition against the usual means of making it effective. It is said, however, that the charges against Vallandigham are triable in the civil tribunals. So are a large proportion of all the charges which can be brought against any one engaged in an insurrection. No Rebel soldier has been captured in this war, no guerrilla, who was not triable in the civil tribunals. The argument in this, as in other particulars, necessarily denies the applicability of the laws of war to a state of war. * * *

[May it please your honor: I must bring this argument to a close. Are we in a state of war or not? Did the constitution, when it authorized war to be made, without limitations, mean war, or something else? The judicial tribunals provided for in the constitution, throughout twelve states of the Union, have been utterly overthrown. In several other states they are maintaining a feeble and uncertain hold of their jurisdiction. None of them can now secure to parties on trial the testimony from large portions of the country, to which they are entitled by the constitution and laws. The records of none of them can be used in the districts dominated by the insurrection. Counsel tells us that, except the Union provided for in the constitution, there is no legal Union. Yet that Union is, temporarily I hope, but for the present, suspended and annulled. This court can have no existence except under that Union, and that Union, now, in the judgment of those who have been intrusted by the constitution with the duty of preserving it, depends upon the success of its armies. The civil administration can no longer preserve it. The courts which yet hold their places, with or without military support, may perform most useful functions. Their jurisdiction and labors were never more wanted than now. But they were not intended to command armies. When generals and armies were sent here, they were sent to make war according to the laws of war. I have no authority from General Burnside to inquire, and I have hesitated to inquire, but, after all, will venture to inquire, whether an interference by this court with the duties of military command must not tend to disturb that harmony between different branches of government, which, at this time, is most especially to be desired? * * *

[Argument of Hon. Flamen Ball.

[May it please the court: In rising to address your honor on behalf of General Burnside, I cannot refrain from expressing the feeling which I entertain in regard to the great importance of this application; for the result of your decision, whatever it may be, must be looked upon with the greatest interest, not only by the applicant, in whose behalf it has been invoked, but by the people of our country, whose national rights are, nay, whose very existence as a great nationality is, imperiled by a gigantic rebellion against the constitution and the laws of the United States,—a rebellion, I take leave to say, originating in a deeply-laid and maturely-planned conspiracy for the overthrow of the constitution, fostered and encouraged by official perjury and official plunder, and prosecuted, without just cause, with cruel and relentless hate, and with remorseless energy, against a government whose sway over the people for more than seventy years has been exercised with the utmost benignity; carefully guarding the rights of all, and jealously protecting the liberties of all. The darkest pages of the history of the world furnish no parallel to the scene now presented in the United States. The quiet paths of domestic peace, which, until lately, were trodden by the industrious pursuits of honest labor, have been suddenly invaded by an armed rebellion, whose sole object is the overthrow of the in-

stitutions of the republic, established by the valor, the patriotism, and the wisdom of our ancestors, and the erection, upon their ruins, of an absolute despotism. I yield to no man in reverence for the sacredness and inviolability of that great guarantee of personal liberty, the writ of habeas corpus, which has been applied for in this case; for, next to the principles and precepts of religion, the value and importance of that writ, as the safeguard of the humblest citizen, were inculcated in my mind in youth, and have become, as it were, a part of my very existence; but while I fully recognize the right of every citizen, who may be restrained of his personal liberty, to have the cause of that restraint judicially inquired into, I must also recognize the great fact that, by reason of this rebellion, the very existence of our whole country, as a nation, is in jeopardy; and that, while on the one hand the personal rights of the citizen are to be protected (unless by reason of crime he may have forfeited those rights), we must all remember that our country has rights, and that, in this great crisis in her history, those rights must be asserted and maintained. Among those rights the right of self-preservation is paramount. If, by reason of the continuance of the civil war now so wickedly waged against the government, the abstract rights of the citizen should be brought into question, I think it may not be regarded as claiming too much for me to insist that the private and personal rights of the individual, when their exercise by him conflict with, and tend to overthrow, the great national right of self-existence, must give way to the rights of the nation. It has been well remarked by De Lolme, in his treatise on the Constitution of England, that: "There have been times of public disturbance when the habeas corpus act was indeed suspended, which may serve as a proof that, in proportion as a government is in danger, it becomes necessary to abridge the liberty of the subject; but the executive power did not thus of itself stretch its own authority; the precaution was deliberated upon and taken by the representatives of the people; and the detaining of individuals, in consequence of the suspension of the act, was limited to a certain fixed time." It is evident that the power of suspending the writ was vested solely in parliament, because the people of England, taught by the severe lessons of experience, in the invasions and encroachments upon their liberties by the executive tyranny of ancient times, were jealous of the kingly prerogative, and were determined to limit and restrain it, in all cases where the right of the subject to the enjoyment of personal freedom might be drawn in question. Hence it became a received and well-settled principle of constitutional law, that the sovereignty of the British constitution is lodged in parliament, in whose collective capacity of the crown, the lords, and the commons, the "omnipotence" of parliament resides; therefore, the power to suspend this great writ is conceded to rest solely within the discretion of parliament. The right to the writ exists at common law. It is not conferred by statute; for the several statutes of Car. I., Car. II., Wm. & M., Geo. III., and other enactments on that subject, do not confer the right, but are simply declaratory of that which had existed beyond the memory of man, or are directory to the courts and judges, in respect of the practice to be pursued by them, in cases where the writ is demandable. The suspension of this writ may become necessary when the state is in real danger; and, when such an emergency shall arise, parliament may authorize the crown to suspend the writ for a limited time, and to imprison suspected persons, without giving any reasons for so doing. "An experiment," says Blackstone, "which ought only to be tried, and which we believe has never been tried, but in cases of extreme emergency; and in these the nation parts with a portion of its liberty for awhile, in order to preserve the whole forever." With us the case is different. The written constitution is the supreme law of the land; and, if governmental omnipotence resides anywhere, it resides there. No act of either the executive, the legislative, or the judicial branches of the government, conflicting with the provisions of that instrument, is valid. But that instrument nowhere, in express terms, confers upon the citizen the right to the writ of habeas corpus. It guarantees to him many civil rights, which are specifically enumerated; but the right to this writ is not one of them. It impliedly concedes that the privilege of the writ exists as a common-law right, when it provides that "the privilege of the writ of habeas corpus shall not be suspended unless, when in cases of rebellion or invasion, the public safety may require it." But it does not prohibit the president from suspending it: it merely provides that it shall not be suspended unless, when in cases of rebellion or invasion, the public safety may require it. For aught that appears in the constitution, the right to exercise the discretionary power of suspension is vested in the president; and this inference is much strengthened by the fact, that the great lawyers who framed that instrument were all of them learned in the common law, and in all the statutes of the British parliament. Themselves born and educated as British subjects, and familiar with every struggle ever made for freedom, and every triumph for liberty ever achieved by the people of England over kingly usurpation, they inherited the natural jealousy of Englishmen of executive encroachments; and, had they intended to deprive the president of the power of suspending this writ in cases of great public emergency, as they well knew was the case with respect to the power of the crown, and to vest the power of suspension solely with the congress, they would have so provided in the constitution. It is fair, then, to conclude that the power vests

in the president; and, in the exercise of that power, as the chief civil magistrate, he may, in his discretion, when the safety of the republic requires it, suspend the writ generally over the whole country, or in a particular department, or in respect of a particular person. This view is strengthened by the late act of congress (March 3, 1863), which expressly provides, that the president may, during this rebellion, "Whenever, in his judgment, the public safety may require it, suspend the privilege of the writ of habeas corpus, in any case, throughout the United States, or any part thereof." And thus the question as to which branch of the government is intrusted with the power of suspension seems to be settled by congress in favor of the president. If, then, the power of suspension is vested in the president, he may exercise that power, in a great crisis like the present, by any appropriate agent he may select for that purpose; and if, as is now the case, the civil authority vested in the marshals, as conservators of the public peace, is insufficient to sustain the government, and enforce the execution of the laws, he may, as he has done, command the aid of the military arm of the nation.

[The able argument of my learned colleague has relieved me from the necessity of discussing at great length the various questions which arise in this case, and I shall, therefore, confine myself to the discussion of such points as, in my judgment, most intimately relate to the subject.

[Upon the original application, the learned counsel for the relator claimed that the case came within the purview of the act of congress relating to the writ of habeas corpus, approved March 3, 1863; that the allowance of the writ was a matter of strict right on the part of the applicant; and that on the return of the writ, with the production of the body of the applicant, the cause of caption and detention could then be inquired into. But such is not the practice of this court. At the October term, 1862, the court held, on the application for a writ of habeas corpus made on behalf of one Bethuel W. Rupert [unreported], then held as a prisoner under an order of the secretary of war, that the writ was not allowable as of course, but that the court would decide upon the hearing of the application, and grant or withhold the writ in its discretion. That practice is still unchanged, and it must be regarded as the law of this court. It is not a new rule of practice, but has been the rule of practice of other courts, and I will briefly refer to some of the cases. In 1759, a motion, based upon affidavit, was made before the court of king's bench, for a habeas corpus, to be directed to one Rigby, keeper of the town jail of Liverpool, to bring up the body of one Barnard Schiever, a subject of a neutral power, who had been taken on board of an enemy's ship, but forced, as it was alleged, into the enemy's service. His counsel urged

that it would be very hard upon this man to be kept in prison until exchanged by cartel, and then sent back to France, where he would be forced into their service again. But the court, Lord Mansfield presiding, thought this man, upon his own showing, clearly a prisoner of war, and lawfully detained as such, and denied the motion. 2 Burrows, 765. Again: In the Case of Hobhouse, 3 Barn. & Ald. 420, the court, Abbott, C. J., and Bayley, Holroyd, and Best, Justices, were unanimous in establishing the rule of practice that the writ of habeas corpus, at common law, although a writ of right, is not grantable of course, but only on motion in term time, stating a probable cause for the application, and verified by affidavit. I also refer to 2 W. Bl. 1324, and to 2 Chit. 207. In the Case of Husted, before the supreme court of New York, an application was made for a habeas corpus, on the ground that he was detained in custody by a captain in the army of the United States, who claimed him as a soldier, enlisted under the authority of the United States. But the court denied the application on the ground that, if the facts stated were returned on the habeas corpus, it would be conclusive against his discharge. 1 Johns. Cas. 136. So, in the Case of Yates, who had been committed by the court of chancery for a contempt, a motion, grounded on sundry affidavits, was made for the allowance of a habeas corpus as of course. But Mr. Chief Justice Kent said that, as this was a matter of importance, the court would take until the next day to consider whether it was proper to grant the motion, and another motion to let the applicant to bail was refused. 4 Johns 318. In the recent Case of Sims, the fugitive slave, which came up before the supreme court of Massachusetts, Chief Justice Shaw held that, before a writ of habeas corpus is granted, sufficient probable cause must be shown; but when it appears, upon the party's own showing, that there is no sufficient ground, prima facie, for his discharge, the court will not issue the writ. 7 Cush. 285. In the supreme court of the United States, it is the settled practice to hear argument, either on the motion for the allowance of the writ, or upon the return of a rule to show cause why the writ should not issue. In the Case of Kearney, 7 Wheat. [20 U. S.] 38, who sought release from a commitment for a contempt, the court heard the parties on the motion, and Mr. Justice Story, delivering the opinion, denied the writ. In the Case of Watkins, 3 Pet. [28 U. S.] 193, who was imprisoned by the condemnation of the circuit court of the United States for the District of Columbia, the court, Mr. Chief Justice Marshall presiding, on the motion of the applicant for the allowance of a writ, and counsel not agreeing as to the time of hearing the motion, awarded a rule to show cause why the writ should not issue, and assigned the next motion day as the time for hearing the argument. It was accordingly heard, on the

return of the rule, and the motion for the writ was denied. A similar practice has been pursued in other cases. Com. v. Robinson, 1 Serg. & R. 353; Ex parte Campbell, 20 Ala. 89; Hurd, Hab. Corp. 222; Ex parte Bushnell, 8 Ohio St. 599. The practice pursued by the court in this case, in requiring notice of the motion to be served on General Burnside, is substantially the same as that pursued by Mr. Chief Justice Marshall in Watkins's Case [supra]. The allowance of the writ rests within the discretion of the court or judge before whom the application is made. It does not address itself to the whim or caprice of the court or judge, nor does it involve the exercise of an arbitrary discretion; but it is addressed to the sound judicial discretion of the court,—a discretion illuminated by the lights of judicial precedence and authority, of judicial wisdom, experience, and observation, and by a judicial review of all the facts and circumstances of the particular case. Discretion (says Lord Coke, 2 Inst. 56) is to discern between right and wrong; and, therefore, whoever hath power to act at discretion is bound by the rule of reason and law. It is the right, then, nay, it is the duty, of the court to hear argument upon the motion, so that the whole merits of the application may be ascertained, and a wise discretion exercised.

[The first legislation of congress upon the subject of habeas corpus was the act of September 24, 1789, which conferred upon the courts of the United States, and the respective justices and judges of those courts, the power to grant the writ agreeably to the principles and usages of law; but the power to award the writ ad subjiciendum, and to inquire into the cause of commitment, did not extend to prisoners in jail, unless where they were in custody under or by color of the authority of the United States. Afterward, and when, by reason of the state legislation of South Carolina, officers of the United States, charged with executing the laws of the United States, were imprisoned, by state authority, for the alleged offense against state sovereignty, of obeying the laws of the United States in preference to the laws of the state of South Carolina, the act of March 2, 1833 [4 Stat. 634], commonly called the "Force Bill," was enacted, whereby the jurisdiction of the federal courts and judges was extended, to grant writs of habeas corpus in all cases of prisoners in jail, who had been committed for any act done, or omitted to be done, in pursuance of a law of the United States, or any order, process, or decree of any judge or court thereof. Thus the legislation stood until 1842, when an apprehended difficulty with England superinduced the passage of the act of August 29, 1842 [5 Stat. 539]. The court well remembers the case of People v. McLeod, 25 Wend. 483. In 1837, he, a British subject, was one of a military expedition sent by the Canadian provincial authorities to destroy an American vessel, the steamboat Caroline, then lying at the port of Schlosser, in American waters, and laden with stores and supplies for the rebels congregated at Navy Island. The boat was destroyed, and an American citizen, standing on the shore, was killed. Afterward, McLeod came to New York, and boasted that he participated in that outrage. He was arrested and indicted for murder. A writ of habeas corpus was applied for and obtained in his behalf, from the supreme court; but the court, Cowen, J., presiding, refused his discharge on the ground that such a case as his was not provided for by law. The queen of Great Britain avowed the act of McLeod, and demanded his release, which demand, after much controversy, was acquiesced in by Mr. Webster, then secretary of state. That act extended the jurisdiction of the justices and judges of the United States to the granting of writs of habeas corpus in all cases of a prisoner or prisoners in jail or confinement when he or they, being subjects of a foreign state and domiciled therein, shall be in custody under any authority or law of the United States, or any one of them, on account of any act done or omitted under any alleged right, title, authority, privilege, protection, or exemption, set up or claimed, under the commission, or order, or sanction, of any foreign state or sovereignty, the validity and effect whereof depend upon the law of nations, or under color thereof.

[The only remaining legislation on this subject is the act of March 3, 1863. This act had its birth in consequence of the present rebellion, and its provisions will become inoperative when the insurrection shall have been suppressed. It is evidently intended, so far as may be consistent with the public safety, to provide for a speedy trial of all persons who may be summarily arrested by or under the authority of the president, and to prescribe a limit to the imprisonment consequent upon such arrests. Its object is twofold: By sections 1, 2, and 3, it authorizes the president, whenever, in his judgment, the public safety may require it, to suspend the privilege of the writ of habeas corpus during the present rebellion; and it exempts all officers, civil and military, from liability, in answer to any writ of habeas corpus, to return with it the body of any person retained by the authority of the president, and suspends all proceedings under the writ before the court or judge issuing it, so long as said suspension shall remain in force and said rebellion continue. It also provides that persons held as state prisoners by order or authority of the president or of the secretaries of state and of war, may, in certain cases, be discharged or let to bail upon the terms provided by the act. By sections 4, 5, 6, and 7, it provides that any order of the president, or under his authority, made at any time during the existence of said rebellion, shall be a defense in all courts in any action, civil or criminal, pending or to be commenced, "for any search, seizure, arrest.

or imprisonment made, done, or committed, or acts omitted to be done, under and by virtue of such order, or under color of any law of congress;" and it further provides for the removal from the state courts to the federal courts of all suits and prosecutions which have been or shall be commenced against any officer, civil or military or against any person for any arrest or imprisonment made, or other trespasses or wrongs done, or any act omitted to be done at any time during the present rebellion, by virtue or under color of any authority derived from, or exercised by or under the president of the United States, or any act of congress. If the first three sections of the act referred to are prospective in their operations, then it is clear that inasmuch as no proclamation suspending the writ of habeas corpus has been issued by the president since the passage of the act, the application of Mr. Vallandigham does not come within any of its provisions. On the other hand, if those sections be retrospective, as well as prospective in their operation, and his case falls within the act, then he is expressly excluded from the privilege of the writ, and if it should issue to Major General Burnside, he will be bound to make the return provided for by the act, and this proceeding would be suspended so long as the rebellion shall continue. It is evident that the last four sections of the act are intended to embrace all cases of arrest under the authority of the president, past as well as future; but as these are solely remedial in their nature, and have no bearing on the motion now before the court, it is unnecessary to discuss them further than to suggest that, if it shall become the duty of the secretary of war to report to the judge of this court the name of Mr. Vallandigham as a state prisoner, held under his authority, and the next grand jury should terminate its session without finding an indictment against him, it would then become his right to apply to the judge for an order that he may be brought before him, that his case may be examined into, and that he may be discharged or let to bail, according to the circumstances of the case.

[In my judgment, however, the application now presented falls solely within the provisions of the act of September 24, 1789. He is in custody "under or by color of the authority of the United States," and, if he be entitled to any relief, it must be under the act last named. By the creation of the department of the Ohio, the president invested Major General Burnside, the commander thereof, with all the powers necessary to perform his whole duty. That department comprises the states of Kentucky, Ohio, Indiana, Illinois, and Michigan, of which, as stated by General Burnside, one state is at this moment invaded, and three others have been threatened by the enemy. It is a period of domestic war, and all the energies, powers, and resources of the nation are necessarily called into exercise for the maintenance of the constitution and laws of the country, for the restoration of peace, and for the preservation of the liberties of the whole people. The civil arm of the government has proved powerless to effect this object, and it has been necessary for the president to call forth the army and navy, in order that he may, as his official oath requires him to do, "preserve, protect, and defend the constitution of the United States." To that end, it became necessary to subdivide the country into military departments, in order that his great duty of preserving, protecting, and defending the constitution might be faithfully and effectively performed. Of no other officer under the constitution is such an oath required, and it is manifest that in requiring that oath of the chief executive authority, and thus reposing in his hands alone that great and solemn trust, it was intended, by the framers of the constitution, that he should possess, and in his discretion exercise, all the powers necessary to enable him to execute the trust, and to transmit to his successors, through all coming time, a great national unity, to all intents and purposes the same, unabridged and unimpaired, as it had been transmitted to him by his predecessors. All the wealth and all the military and naval power of the nation were at his service to enable him to perform that duty, and it was expressly provided by congress, by the act of February 28, 1795 [1 Stat. 424], that "whenever the laws of the United States shall be opposed, or the execution thereof obstructed, in any state, by combinations too powerful to be suppressed by the ordinary force of judicial proceedings, or by the powers vested in the marshals by this act, it shall be lawful for the president of the United States to call forth the militia of such state, or of any other state or states, as may be necessary to suppress such combinations, and to cause the laws to be duly executed." The president is the sole and exclusive and final judge whether the exigency contemplated by the constitution and by the act of congress has arisen, and this has been the construction put upon this act by the supreme court of the United States in the case of Martin v. Mott, 12 Wheat. [25 U. S.] 19. In this case Mott, a private militiaman, was called into service in the war of 1812, by the governor of New York, upon a requisition of the president of the United States, but did not go out. In 1814, Mott was summoned before a court-martial, and tried for the offense of neglecting the call of the governor, was convicted and sentenced to pay a fine, or, in case of nonpayment, to imprisonment for twelve months. The sentence of the court was approved by the president, and Martin, a deputy marshal, collected the fine. Mott sued Martin for so doing, and the case, having passed through the state courts of New York, was finally decided by the court of errors in favor of Mott, and Martin then obtained his writ of error to the supreme court of the United States, where the judgment of the court of

errors was reversed. Mr. Chief Justice Marshall who delivered the opinion of the court, after affirming the constitutionality of that act of congress, expressly says of the president: "He is, necessarily, constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts." On the breaking out of this rebellion he did so act. In his proclamation of April 15, 1861 [12 Stat. 1258], he says: "Whereas, the laws of the United States have been, for some time past, and now are opposed, and the execution thereof obstructed, in the states of South Carolina, Georgia, Alabama, Florida, Mississippi, Louisiana, and Texas, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by law; now, therefore, I, Abraham Lincoln, president of the United States, in virtue of the power in me vested by the constitution and the laws, have thought fit to call forth, and hereby do call forth, the militia of the several states of the Union, to the aggregate number of seventy-five thousand, in order to suppress said combinations, and to cause the laws to be duly executed. The details for this object will be immediately communicated to the state authorities through the war department. I appeal to all loyal citizens to favor, facilitate, and aid this effort to maintain the honor, the integrity, and the existence of our National Union, and the perpetuity of popular government; and to redress wrongs already long enough endured. I deem it proper to say that the first service assigned to the forces hereby called forth will, probably, be to repossess the forts, places, and property which have been seized from the Union; and in every event, the utmost care will be observed, consistently with the objects aforesaid, to avoid any devastation, any destruction of, or interference with, property, or any disturbance of peaceful citizens in any part of the country." The proclamation closes with a command to the persons so combining to disperse within twenty days, and with an order to convene the congress on the fourth day of the following July. The congress convened accordingly, and, in order to sustain the president in the performance of his great duty, provided for an increase of the regular army and of the navy, and also placed at his disposal an additional force of five hundred thousand volunteers. Thus the war for the preservation of the National Union was fully inaugurated. and the president as the civil executive, and as commander in chief of the army and navy, was fully clothed with all the necessary, legal, and physical power to accomplish the object of his proclamation.

[The creation of the department of the Ohio, and the appointment of a major general to command it, were part of the necessary means employed, in the discretion of the president, to accomplish the end in view; and the official acts of the major general,

performed under the direct authority of the president, must be regarded as the acts of the president himself. In the case of Martin v. Mott, just referred to, the chief justice says: "If he does so act, and decides to call forth the militia, his orders for this purpose are in strict conformity with the provision of the law; and it would seem to follow, as a necessary consequence, that every act done by a subordinate officer, in obedience to such orders, is equally justifiable. The law contemplates that, under such circumstances, orders shall be given to carry the power into effect; and it cannot, therefore, be a correct inference that any other person has a just right to disobey them. The law does not provide for any appeal from the judgment of the president, or for any right in subordinate officers to review his decision, and, in effect, defeat it. Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of those facts; and, in the present case, we are all of opinion that such is the true construction of the act of 1795." This doctrine of the chief justice is the same recognized in the law of nature as applied to the law of nations. Vattel [Law Nat.] says (bk. 3, c. 2, § 19): "Every military officer, from the ensign to the general, enjoys the rights and authority assigned him by the sovereign; and the will of the sovereign, in this respect, is known by his express declarations, contained either in the commissions he confers, or in the military code, or is, by fair deduction, inferred from the nature of the functions assigned to each officer: for every man who is intrusted with an employment is presumed to be invested with all the powers necessary to enable him to fill his station with propriety, and successfully discharge the functions of his office." It would be a very difficult task, if, indeed, I could succeed in doing it, to enumerate all the duties which General Burnside is called upon to perform by reason of the command thus conferred upon him. Charged with the care of an extensive department, comprising five states, one of which is already invaded by the enemy, and three others have been threatened; controlling a large army now in the field; obliged to issue requisitions for food, clothing, medicines, and all other munitions and habiliments of war; liable to have his plans made known and thwarted by spies communicating with the enemy, and the power of his army weakened by the falsehoods published and circulated within his lines by rebel emissaries and rebel sympathizers seeking to sow seeds of distrust and disaffection in the minds of his soldiers, it became necessary to establish a rigorous police system throughout his department, and in so doing he promulgated "general order No. 38." This order is intended to embrace as well those in civil life who may offend against its provisions by declaring sympathy

for the enemy in words or speeches, and discouraging the soldiers now on duty, and those who may be hereafter called upon to perform military service, as those who, by carrying secret mails, and recruiting soldiers for the enemy, commit overt acts of treason by giving aid and comfort to the rebels. It was not necessary to issue such an order to his soldiers, for they are all honestly engaged in performing their high duties in the field; and the rules and articles of war,. with which they are familiar, provide for the punishment of all persons in the military service for all offenses committed by them. But the civilian, not being strictly under military control, need not, unless he chooses, subject himself to any of the penalties provided for by the order. In the case of Mr. Vallandigham, he saw proper, at a public meeting held in Ohio, and in a public speech, to express his sympathies with the rebels in arms against their country, to declare disloyal sentiments and opinions, and, so far as he could, to weaken the power of the government in its efforts to suppress the Rebellion. For this offense, in open violation of that general order which he then referred to and denounced, he was arrested, brought before a military commission, tried and convicted. He now seeks relief from that sentence, whatever it may be, and asserting, by his counsel, the great privilege of the writ of habeas corpus, demands of this court his discharge. The violation of this order by him was not the result of accident; it was deliberately, and, for aught I can see, purposely violated, in order either to defy the military power of the president, or to bring about a conflict between the military and the civil power of the government. It may be that he desired to show to the people that liberty of speech meant a license to say whatsoever he pleased. without regard to times, persons, or circumstances. It is claimed for him, by his learned counsel, that he is guilty of nothing but the use of words; that the utterance of words is not treason; and that an overt act must be shown to have been committed to constitute the crime of treason. But may not words be actionable? Is not the utterance of words often held to be a misdemeanor? Words of slander are actionable; words which provoke a breach of the peace are punishable; words used to entice a soldier to desert are indictable; so are words used in resisting an officer attempting to serve legal process. General Burnside saw that, to a considerable degree, his earnest efforts to perform the trust reposed in him in his department were seriously impeded, not only by the presence of spies, recruiting officers. and writers of letters, and the carrying of secret mails to the rebels. but by the promulgation of disloyal sentiments and opinions, and the expression of sympathy for the rebels within his lines. He saw that the expression of such sentiments and opinions had a tendency to bring the constitutional government of the country

into contempt, and consequently weaken his authority and abridge his usefulness, and to that extent sustain and encourage the enemy and protract the war. He had no alternative but either to act as he did, or to abandon his department. He needed no written law to direct him in his course, for the law of self-preservation, which is the law of nature, is higher than any written law, or written constitution. Clothed as he was with power commensurate with the great duties he was called upon to perform in this extraordinary exigency of the nation, whatsoever in the conduct of any person seriously impeded him in the performance of that duty, it was his right, nay, it was his high duty, to remove. The nature and extent of his power, as a military commander, is very forcibly stated by Mr. Adams, in his speech in congress, delivered in 1842. He says: "I lay this down as the law of nations. I say that military authority takes, for the time, the place of all municipal institutions, and slavery among the rest; and that, under that state of things, so far from its being true that the states where slavery exists have the exclusive management of the subject, not only the president of the United States, but the commander of the army, has power to order the universal emancipation of the slaves." This being true in regard to the institution of slavery, which exists by force of positive law, it must be held to be the law in respect of all other institutions which, during the great public emergency which has been forced upon the country, conflict with or impair the power of the government in its military operations. A similar principle was afterward promulgated by that distinguished political leader and sincere patriot, Senator Dickinson. He said: "There is a power upon which the constitution stands, that lies beneath the 'constitution and rises above the constitution, and is in and under the constitution: it is the great law of self-preservation,—for communities, nations, and states, as well as individuals. It is older than this government. It is as old as civilization. It had no rise in the constitution. It arises in the very necessity of the existence of civil government." The natural right to acquire and possess property. to pursue or not pursue a particular vocation, to bear or not to bear arms, to speak and write freely our sentiments and opinions on all subjects. must give way whenever the exercise of those rights by the individual endangers the public safety, and conflicts with the paramount right of national self-preservation. The nation can well afford to suspend the enjoyment by the individual of these rights, for a season, in order that, by preserving its own existence, it may secure them unabridged to the whole people forever.

[It has been asserted in argument that there is no war in Ohio; that the law martial does not exist here, and that martial law is no law at all. But is not Ohio at war? If our state, with its two and a half millions of free-

men, is not one of the United States, then Ohio is not at war; but, if otherwise, and the silver light of Ohio's star still radiates from the azure field of the national flag, then Ohio is at war, and has contributed, and will ever contribute, her full proportion of men, money, and munitions of war towards sustaining the existence of the nation of which it forms a part. It is true that the foot of no hostile foe in arms has ever trodden our soil, or invaded our peaceful homes; but thousands of those homes have already yielded their fathers and sons to the service of their country, many of whom are gone never to return; and it will be but a poor solace to the bereaved wives and mothers of the slain to say to them, "Your husbands and sons have fallen in battle, while fighting to uphold the constitution and laws of their country; but Ohio is not at war." Ohio is at war because the United States are at war; and, as a part of a military department of the United States, the citizens of the state of Ohio are liable to the operation of the laws of war, as administered ex necessitate rei, by courts-martial or military commissions. These courts, and the rules by which they are governed, have their origin in high antiquity. The ancient court of chivalry was the fountain of martial law, and, in some form or other, courts-martial have always been recognized in England. Formerly, martial law was exercised at the discretion of the crown, and too frequently it was made subservient to bad purposes, and hence it very justly became obnoxious to the people; and not only the propriety, but the legality, of its being executed in times of peace, has been absolutely denied. Hence it is laid down by Lord Coke (3 Inst. 52) "that if a lieutenant or other, that hath commission of martial law, doth, in time of peace, hang or otherwise execute any man by color of martial law, this is murder, for it is against Magna Charta." Hence, also, Lord Hale, in his History of the Common Law, declares martial law to be, in reality, no law, "but something indulged rather than allowed as law: that the necessity of order and discipline is the only thing which can give it countenance, and therefore it ought not to be permitted in time of peace, when the king's courts are open for all persons to receive justice according to the laws of the land; and if a court-martial put a man to death, in time of peace, the officers are guilty of murder." But it is now well settled in England that courts-martial are courts of special and limited jurisdiction, and are bound by the same rules and principles of evidence as the courts of common law, and their decisions have often been examined and reviewed on habeas corpus by the courts of the common law. Rex v. Suddis, 1 East, 306; Crosby's Case, 3 Wils. 199; Barnes' Case, 2 Rolle, 157. So, also, in the United States, proceedings of courts-martial have frequently been reviewed by the civil courts, as well, collaterally, upon writs of habeas corpus, as directly upon writs of error. I refer to a few of the cases: Vanderheyden v. Young, 11 Johns. 150; Houston v. Moore, 5 Wheat. [18 U. S.] 1; Martin v. Mott, 12 Wheat. [25 U. S.] 19. It is true that martial law has not been proclaimed in Ohio; but the formal proclamation of martial law is not necessary in order to give efficiency to the public official orders of the major general commanding the department, or to confer jurisdiction upon the military courts and commissions organized by him for the purpose of trying offenders against said orders. The power of the major general to exercise the functions of his office, and the duty of the citizen to refrain from interfering with the exercise of those functions in time of war, exist without any proclamation of martial law. The power of the one, and the duty of the other, arise from the situation in which the country is placed by the civil war now waged against the constitution; and the power of the president, and of the officers whom he has selected to execute that power, is a power which, to use the language of Senator Dickinson, is a power upon which the constitution stands, that lies beneath the constitution, and rises above the constitution, and is in and under the constitution. It is the supreme law of national self-preservation. It is the exercise of that right conferred by the Creator upon man, the assertion of which in an individual no one will dispute, but which exists with more potency with many men, united in a political society, and constituting a great nation. "Since, then," says Vattel, "a nation is obliged to preserve itself, it has a right to everything necessary for its preservation. For the law of nature gives us a right to everything without which we cannot fulfill our obligations; otherwise it would oblige us to do impossibilities, or, rather, would contradict itself in prescribing us a duty, and at the same time debarring us of the only means of fulfilling it." This is the right which has been denominated by Grotius as the internal law of nations, and it applies to nations as well as to individuals. Vattel also says: "As men are subject to the laws of nature,—and as their union in civil society cannot have exempted them from the obligation to observe those laws, since by that union they do not cease to be men,—the entire nation, whose common will is but the result of the united wills of the citizen, remains subject to the laws of nature, and is bound to respect them in all her proceedings. And since right arises from obligation, as we have just observed, the nation possesses also the same right which nature has conferred upon men in order to enable them to perform their duties." [Vatt. Law Nat. LVI.]

[The eloquent advocate of Mr. Vallandigham, controverting the assertion of General Burnside, that "there is no fear of the people losing their liberties," has expressed the fear that our liberties cannot survive a patient submission to arbitrary power. Certainly not,

when, in a time of profound peace, when all the civil machinery of the government is everywhere in perfect and harmonious operation, unchecked and undisturbed by the discordant actions of armed rebellion and of civil war, then a tame and continued submission to the encroachments of any arbitrary power must inevitably lead to the overthrow of the liberties of the people, and to the establishment of a despotism. But the case is entirely different in a time of war, and of such a war, the like of which neither this nor any other country has ever witnessed. Now no temporary sacrifice ought to be too great, in order to preserve the unity of the nation; but when the blessings of peace shall return, and the national life shall be no longer threatened, all the power of the country will be devoted to the suppression of every attempt, let it come from whatsoever quarter it may, to invade the liberty of any, even the meanest, citizen.

[I now leave this important question with the court, feeling confident that the discretionary power which has been invested in your honor will be wisely exercised. In the investigation of the questions which have arisen in this case, this court will consider, not only the allegations of the relator as set forth in his application, but will take judicial notice of the state of the country, torn and distracted by this wicked rebellion. And the court will also notice judicially all the efforts of the executive, and of those acting under his authority, which are made for the suppression of the rebellion, and the preservation and the perpetuation of constitutional liberty; and I doubt not your honor will endeavor not only not to derogate from executive authority by bringing about a conflict between one branch of the government and another, but, by co-operating as far as possible with the other departments, seek to secure unity of action in all the departments, and a speedy restoration of our country to its former dignity, grandeur, and power, as a great and a united nation. I feel sure, also, that there is no judge now on the bench of the courts of the United States whose patriotic heart does not fill with indignation at the wrongs inflicted on our country by the armed traitors now levying war upon the constitution and laws, and by those unarmed, but quite as dangerous, enemies, who sympathize with and encourage domestic treason. I therefore commit this case to the court, with the firm belief that, by your decision, the hands of the federal executive and of the army and navy will be sustained and strengthened in this great struggle; that the hopes of the patriot in the perpetuity of union will be encouraged; that the attempts of rebel sympathizers to stimulate the rebellion and dishearten our army will be discouraged and frustrated; and that all disloyal citizens, as well those who indirectly, as those who directly, furnish aid, comfort, and encouragement to the enemy, will find that a sure and speedy punishment awaits them at the hands of the military authorities, from whose action they can hope to find no shelter in the technical forms and rules of the courts of the civil law. I trust that the time may soon arrive when the din of arms shall cease, and that our beloved country, purified by the severe trial through which she is passing, shall be once more restored to the delightful avocations of peace, and again stand forth among the nations of the earth, a great, united, and free people, purged of every element of despotism, opening wide her portals for the reception of the oppressed of every nation and of every clime, and exhibiting to the admiration of civilization throughout the world, through all coming time, the example of a pure, a just, a free and united republic.] [8]

LEAVITT, District Judge. This case is before the court on the petition of Clement L. Vallandigham, a citizen of Ohio, alleging that he was unlawfully arrested, at his home in Dayton, in this state, on the night of the 5th of May, instant, by a detachment of soldiers of the army of the United States, acting under the orders of Ambrose E. Burnside, a major general in the army of the United States, and brought, against his will, to the city of Cincinnati, where he has been subjected to a trial before a military commission, and is still detained in custody, and restrained of his liberty. The petitioner also avers that he is not in the land or naval service of the United States, and has not been called into active service in the militia of any state, and that his arrest, detention, and trial, as set forth in his petition, are illegal, and in violation of the constitution of the United States. The prayer is that a writ of habeas corpus may issue, requiring General Burnside to produce the body of the petitioner before this court with the cause of his caption and detention. Accompanying the petition is a statement of the charges and specifications on which he alleges he was tried before the military commission. For the purposes of this decision it is not necessary to notice these charges specially, but it may be stated in brief that they impute to the prisoner the utterance of sundry disloyal opinions and statements in a public speech, at the town of Mt. Vernon, in the state of Ohio, on the 1st of May, instant, with the knowledge "that they did aid and comfort and encourage those in arms against the government, and could but induce, in his hearers, a distrust in their own government, and sympathy for those in arms against it, and a disposition to resist the laws of the land." The petitioner does not state what the judgment of the military commission is, nor is the court informed whether he has been condemned or acquitted on the charges exhibited against him.

---

[8] From pamphlet report by Rickey & Carroll, Cincinnati, Ohio, 1863.

It is proper to remark here, that, on the presentation of the petition, the court stated, to the counsel for Mr. Vallandigham, that, according to the usages of the court, as well as of other courts of high authority, the writ was not grantable of course, and would only be allowed on a sufficient showing ·that it. ought to issue. The court is entirely satisfied of the correctness of the course thus indicated. The subject was fully examined by the learned Justice Swayne when present, the presiding judge of this court, on a petition for habeas· corpus, presented at the last October term; a case to which further reference will be made. I shall now only note the authorities on this point, which seem to be entirely conclusive.. In the case of Ex parte Watkins, 3 Pet. [28 U. S.] 193, which was an application to the supreme court for a writ of habeas corpus, Chief Justice Marshall entertained no doubt as to the power of the ·court to issue the writ, and stated that the only question was, whether it was a case in which the power ought to be exercised. He says, in reference to that case, "the cause of imprisonment is shown as fully by the petitioner as could appear on the return of the writ, consequently, the writ ought not to be awarded, if the court is satisfied the prisoner would be remanded to prison." The same principle is clearly and ably stated by Chief Justice Shaw in the case of Ex parte Sims, (before the supreme court of Massachusetts), 7 Cush. 285. See, also, Hurd, Hab. Corp. 223, et seq. I have no doubt of the power of this court to issue the writ applied for. It is clearly conferred by the 14th section of the· judiciary act of 1789 [1 Stat. 81]; but the ruling of this court in the case just referred to, and the authorities just cited, justify the refusal of the writ, if satisfied the petitioner would not be discharged upon a hearing after its return. The court therefore directed General Burnside to be notified of the pendency of the petition to the end that he might appear by counsel or otherwise, to oppose the granting of the writ. That distinguished general has accordingly presented a respectful communication to the court, stating, generally and argumentatively, the reasons of the arrest of Mr. Vallandigham, and has also authorized able counsel to represent him in resistance of the application for the writ. And the case has been argued at great length, and with great ability, on the motion for its allowance.

It is proper to remark, further, that when the petition was presented, the court made a distinct reference to the decision of this court in the Case of Rupert [unreported], at October term, 1862, before noticed, as an authoritative precedent of its action on this application. On full reflection, I do not see how it is possible for me, sitting alone, in the circuit court, to ignore the decision, made upon full consideration by Justice Swayne, with the concurrence of myself, and which,

as referable to all cases· involving the same principle, must be regarded as the law of this court until reversed by a higher court. The Case of Rupert was substantially the same as that of the present petitioner. He set out in his petition what he alleged to be an unlawful arrest by the order of a military officer, on a charge imputing to him acts of disloyalty to the government, and sympathy with the Rebellion against it, and an unlawful detention and imprisonment as the result of such order. The application, however, in the Case of Rupert, differed from the one now before the court, in this: that affidavits were exhibited tending to disprove the charge of disloyal conduct imputed to him; and also in this: that there was no pretense or showing by Rupert that there had been any investigation or· trial by any court of the charges against him. The petition in this case is addressed to the judges of the circuit court, and not to a single judge of that court. It occurs, from the absence of Mr. Justice Swayne, that the district judge is now holding the circuit court, as he is authorized to do by law. But, thus sitting, would it not be in violation of all settled rules of judicial practice, as well as of courtesy, for the district judge to reverse a decision of ·the circuit court, made when both judges were on the bench? It is well known that the district judge, though authorized to sit with the circuit judge in the circuit court, does not occupy the same official position, and that the latter judge, ·when present, is, ex officio, the presiding judge. . It is obvious that confusion and uncertainty, which would greatly impair the respect due to the adjudication of the circuit courts of the United States, would result from the assumption of such an exercise of power by the district judge. It would not only be disrespectful to the superior judge, ·but would evince in the district judge an utter want of appreciation of his true official connection with the circuit court. Now, in passing upon the application of Rupert, Mr. ·Justice Swayne, in an opinion of some length, though not written, distinctly held that this court would not grant the writ of habeas corpus, where it appeared that the detention or imprisonment was under military authority. It is true, that Rupert was a man in humble position, unknown beyond the narrow circle in which he moved, while the present petitioner ·has a· widespread fame as a prominent politician and statesman. But no one will insist that there should be any difference in the principles applicable to the two cases. If any distinction were allowable, it would be against him· of admitted intelligence and distinguished talents.

I might, with entire confidence, place the grounds of action I propose in · the present case upon the decision of the learned judge in that just referred to. Even if I entertained doubts of the soundness of his views, I see no principle upon which I could be justified

in treating the decision as void of authority. But the counsel of Mr. Vallandigham was not restricted in the argument of his motion to this point, but was allowed the widest latitude in the discussion of the principles involved. It seemed due to him that the court should hear what could be urged against the legality of the arrest, and in favor of the interposition of the court in behalf of the petitioner. And I have been greatly interested in the forcible argument which has been submitted, though unable to concur with the speaker in all his conclusions. If it were my desire to do so, I have not now the physical strength to notice or discuss at length the grounds on which the learned counsel has attempted to prove the illegality of General Burnside's order for the arrest of Mr. Vallandigham, and the duty of the court to grant the writ applied for. The basis of the whole argument rests on the assumption that Mr. Vallandigham, not being in the military or naval service of the government, and not, therefore, subject to the rules and articles of war, was not liable to arrest under or by military power. And the various provisions of the constitution, intended to guard the citizen against unlawful arrests and imprisonments, have been cited and urged upon the attention of the court as having a direct bearing on the point. It is hardly necessary to quote these excellent guarantees of the rights and liberties of an American citizen, as they are familiar to every reader of the constitution. And it may be conceded that if, by a just construction of the constitutional powers of the government, in the solemn emergency now existing, they are applicable to and must control the question of the legality of the arrest of the petitioner, it cannot be sustained, for the obvious reason that no warrant was issued "upon probable cause, supported by oath or affirmation," as is required in ordinary arrests for alleged crimes. But are there not other considerations of a controlling character, applicable to the question? Is not the court imperatively bound to regard the present state of the country; and, in the light which it throws upon the subject, to decide upon the expediency of interfering with the exercise of the military power as invoked in the pending application? The court cannot shut its eyes to the grave fact that war exists, involving the most imminent public danger, and threatening the subversion and destruction of the constitution itself. In my judgment, when the life of the republic is imperiled, he mistakes his duty and obligation as a patriot who is not willing to concede to the constitution such a capacity of adaptation to circumstances as may be necessary to meet a great emergency, and save the nation from hopeless ruin. Self-preservation is a paramount law, which a nation, as well as an individual, may find it necessary to invoke. Nothing is hazarded in saying that the great and far-seeing men who framed the constitution of the United States, supposed they were laying the foundation of our national government on an immovable basis. They did not contemplate the existence of the state of things with which the nation is now unhappily confronted, the heavy pressure of which is felt by every true patriot. They did not recognize the right of secession by one state, or any number of states, for the obvious reason that it would have been in direct conflict with the purpose in view in the adoption of the constitution, and an incorporation of an element in the frame of the government which would inevitably result in its destruction. In their glowing visions of futurity there was no foreshadowing of a period when the people of a large geographical section would be guilty of the madness and the crime of arraying themselves in rebellion against a government under whose mild and benignant sway there was so much of hope and promise for the coming ages. We need not be surprised therefore, that, in the organic law which they gave us, they made no specific provision for such a lamentable occurrence. They did, however, distinctly contemplate the possibility of foreign war, and vested in congress the power to declare its existence, and "to raise and support armies," and "provide and maintain a navy." They also made provision for the suppression of insurrection and rebellion. They were aware that the grant of these powers implied all other powers necessary to give them full effect. They also declared that the president of the United States "shall be commander-in-chief of the army and navy and of the militia of the several states when called into actual service," and they placed upon him the solemn obligation "to take care that the laws be faithfully executed." In reference to a local rebellion, in which the laws of the Union were obstructed, the act of the 28th of February, 1795, was passed, providing, in substance, that whenever, in any state, the civil authorities of the Union were unable to enforce the laws, the president shall be empowered to call out such military force as might be necessary for the emergency. Fortunately for the country this law was in force when several states of the Union repudiated their allegiance to the national government, and placed themselves in armed rebellion against it. It was sufficiently comprehensive in its terms to meet such an occurrence, although it was not a case within the contemplation of congress when the law was enacted. It was under this statute that the president issued his proclamation of the 15th of April, 1861. From that time the country has been in a state of war, the history and progress of which are familiar to all. More than two years have elapsed, during which the treasure of the nation has been lavishly contributed, and blood has freely flowed, and this formidable rebellion is not yet subdued. The energies of the loyal people of the Union are to be put to

further trials, and, in all probability, the enemy is yet to be encountered on many a bloody field.

It is not to be disguised, then, that our country is in imminent peril and that the crisis demands of every American citizen a hearty support of all proper means for the restoration of the Union and the return of an honorable peace. Those placed by the people at the head of the government, it may well be presumed, are earnestly and sincerely devoted to its preservation and perpetuity. The president may not be the man of our choice, and the measures of his administration may not be such as all can fully approve. But these are minor considerations, and can absolve no man from the paramount obligation of lending his aid for the salvation of his country. All should feel that no evil they can be called on to endure, as the result of war, is comparable with the subversion of our chosen government, and the horrors which must follow from such a catastrophe.

I have referred thus briefly to the present crisis of the country as having a bearing on the question before the court. It is clearly not a time when any one connected with the judicial department of the government should allow himself, except from the most stringent obligations of duty, to embarrass or thwart the executive in his efforts to deliver the country from the dangers which press so heavily upon it. Now, the question which I am called upon to decide is, whether General Burnside, as an agent of the executive department of the government, has transgressed his authority in ordering the arrest of Mr. Vallandigham. If the theory of his counsel is sustainable, that there can be no legal arrest except by warrant, based on an affidavit of probable cause, the conclusion would be clear that the arrest was illegal. But I do not think I am bound to regard the inquiry as occupying this narrow base. General Burnside, by the order of the president, has been designated and appointed to take the military supervision of the department of the Ohio, composed of the states of Kentucky, Ohio, Indiana, Illinois, and Michigan. The precise extent of his authority, in this responsible position, is not known to the court. It may, however, be properly assumed, as a fair presumption, that the president has clothed him with all the powers necessary to the efficient discharge of his duties, in the station to which he has been called. He is the representative and agent of the president, within the limits of his department. In time of war, the president is not above the constitution, but derives his power expressly from the provision of that instrument, declaring that he shall be commander in chief of the army and navy. The constitution does not specify the powers he may rightfully exercise in this character, nor are they defined by legislation. No one denies, however, that the president, in this character,

is invested with very high powers, which it is well known have been called into exercise on various occasions during the present rebellion. A memorable instance is seen in the emancipation proclamation, issued by the president as commander in chief, and which he justifies as a military necessity. It is perhaps not easy to define what acts are properly within this designation, but they must undoubtedly be limited to such as are necessary to the protection and preservation of the government and the constitution, which the president has sworn to support and defend. And in deciding what he may rightfully do under this power where there is no express legislative declaration, the president is guided solely by his own judgment and discretion, and is only amenable for an abuse of his authority by impeachment, prosecuted according to the requirements of the constitution. The occasion which justifies the exercise of this power exists only from the necessity of the case; and when the necessity exists, there is a clear justification of the act.

If this view of the power of the president is correct, it undoubtedly implies the right to arrest persons who, by their mischievous acts of disloyalty, impede or endanger the military operations of the government. And, if the necessity exists, I see no reason why the power does not attach to the officer or general in command of a military department. The only reason why the appointment is made is that the president cannot discharge the duties in person. He, therefore, constitutes an agent to represent him, clothed with the necessary power for the efficient supervision of the military interests of the government throughout the department, and it is not necessary that martial law should be proclaimed or exist, to enable the general in command to perform the duties assigned him. Martial law is well defined by an able jurist to be "the will of a military commander, operating without any restraint, save his judgment, upon the lives, upon the persons, upon the entire social and individual condition of all over whom this law extends." It cannot be claimed that this law was in operation in General Burnside's department when Mr. Vallandigham was arrested. Nor is it necessary that it should have been in force to justify the arrest. The power vested by virtue of the authority conferred by the appointment of the president. Under that appointment, General Burnside assumed command of this department. That he was a man eminently fitted for the position, there is no room for a doubt. He had achieved, during his brief military career, a national reputation as a wise, discreet, patriotic, and brave general. He not only enjoyed the confidence and respect of the president and secretary of war, but of the whole country. He has nobly laid his party preferences and predilections upon the altar of his country, and consecrated his life to her service. It was

known that the widely-extended department, with the military supervision of which he was charged, was one of great importance, and demanded great vigilance and ability in the administration of his military concerns. Kentucky was a border state, in which there was a large element of disaffection toward the national government, and sympathy with those in rebellion against it. Formidable invasions have been attempted, and are now threatened. Four of the states have a river border, and are in perpetual danger of invasion. The enforcement of the late conscription law was foreseen as a positive necessity. In Ohio, Indiana, and Illinois, a class of mischievous politicians had succeeded in poisoning the minds of a portion of the community with the rankest feelings of disloyalty. Artful men, disguising their latent treason under hollow pretentions of devotion to the Union, were striving to disseminate their pestilent heresies among the masses of the people. The evil was one of alarming magnitude, and threatened seriously to impede the military operations of the government, and greatly to protract the suppression of the rebellion. General Burnside was not slow to perceive the dangerous consequences of these disloyal efforts, and resolved, if possible, to suppress them. In the exercise of his discretion, he issued the order—No. 38—which has been brought to the notice of the court. I shall not comment on that order or say anything in vindication of its expediency. I refer to it only because General Burnside, in his manly and patriotic communication to the court, has stated fully his motives and reasons for issuing it; and also, that it was for its supposed violation that he ordered the arrest of Mr. Vallandigham. He has done this under his responsibility as the commanding general of this department, and in accordance with what he supposed to be the power vested in him by the appointment of the president. It was virtually the act of the executive department under the power vested in the president by the constitution; and I am unable to perceive on what principle a judicial tribunal can be invoked to annul or reverse it. In the judgment of the commanding general, the emergency required it, and whether he acted wisely or discreetly is not properly a subject for judicial review.

It is worthy of remark here that this arrest was not made by General Burnside under any claim or pretension that he had authority to dispose of or punish the party arrested, according to his own will, without trial and proof of the facts alleged as the ground for the arrest, but with a view to an investigation by a military court, or commission. Such an investigation has taken place, the result of which has not been made known to this court. Whether the military commission for the trial of the charges against Mr. Vallandigham was legally constituted, and had jurisdiction of the case, is not a question be-

fore this court. There is clearly no authority in this court, on the pending motion, to revise or reverse the proceedings of the military commission, if they were before the court. The sole question is whether the arrest was legal; and, as before remarked, its legality depended on the necessity which existed for making it; and of that necessity, for the reason stated, this court cannot judicially determine. General Burnside is unquestionably amenable to the executive department for his conduct. If he has acted arbitrarily and upon insufficient reasons, it is within the power, and would be the duty of the president, not only to annul his acts, but to visit him with decisive marks of his disapprobation. To the president, as commander in chief of the army, he must answer for his official conduct. But, under our constitution, which studiously seeks to keep the executive, legislative, and judicial departments of the government from all interference and conflict with each other, it would be an unwarrantable exercise of the judicial power to decide that a co-ordinate branch of the government, acting under its high responsibilities, had violated the constitution, in its letter or its spirit, by authorizing the arrest in question. Especially in these troublous times, when the national life is in peril, and when union and harmony among the different branches of the government are so imperatively demanded, such interference would find no excuse or vindication. Each department of the government must, to some extent, act on a presumption that a co-ordinate branch knows its powers and duties, and will not transcend them. If the doctrine is to obtain, that every one charged with, and guilty of, acts of mischievous disloyalty, not within the scope of the criminal laws of the land, in custody under the military authority, is to be set free by courts or judges on habeas corpus, and that there is no power by which he may be temporarily placed where he cannot perpetrate mischief, it requires no argument to prove that the most alarming conflicts must follow, and the action of the government be most seriously impaired. I dare not, in my judicial position, assume the fearful responsibility implied in the sanction of such a doctrine.

And here, without subjecting myself to the charge of trenching upon the domain of political discussion, I may be indulged in the remark that there is too much of the pestilential leaven of disloyalty in the community. There is a class of men in the loyal states who seem to have no just appreciation of the deep criminality of those who are in arms, avowedly for the overthrow of the government, and the establishment of a Southern Confederacy. They have not, I fear, risen to any right estimate of their duties and obligations, as American citizens, to a government which has strewn its blessings with a profuse hand, and is felt only in the benefits it bestows. I may venture the assertion that the

page of history will be searched in vain for an example of a rebellion so wholly destitute of excuse or vindication, and so dark with crime, as that which our bleeding country is now called upon to confront, and for the suppression of which all her energies are demanded. Its cause is to be found in the unhallowed ambition of political aspirants and agitators, who boldly avow as their aim, not the establishment of a government for the better security of human rights, but one in which all political power is to be concentrated in an odious and despotic oligarchy. It is, indeed, consolatory to know that in most sections of the North those who sympathize with the rebellion are not so numerous or formidable as the apprehension of some would seem to indicate. It may be assumed, I trust, that in most of the Northern states reliable and unswerving patriotism is the rule, and disloyalty and treason the exception. But there should be no division of sentiment upon this momentous question. Men should know, and lay the truth to heart, that there is a course of conduct not involving overt treason or any offence, technically defined by statute, and not, therefore, subject to punishment as such, which, nevertheless, implies moral guilt and a gross offence against their country. Those who live under the protection and enjoy the blessings of our benignant government must learn that they cannot stab its vitals with impunity. If they cherish hatred and hostility to it, and desire its subversion, let them withdraw from its jurisdiction, and seek the fellowship and protection of those with whom they are in sympathy. If they remain with us, while they are not of us, they must be subject to such a course of dealing as the great law of self-preservation prescribes and will enforce. And let them not complain, if the stringent doctrine of military necessity should find them to be the legitimate subjects of its action. I have no fears that the recognition of this doctrine will lead to an arbitrary invasion of the personal security or personal liberty of the citizen. It is rare, indeed, that a charge of disloyalty will be made upon insufficient grounds. But, if there should be an occasional mistake, such an occurrence is not to be put in competition with the preservation of the life of the nation. And I confess I am but little moved by the eloquent appeals of those who, while they indignantly denounce violations of personal liberty, look with no horror upon a despotism as unmitigated as the world has ever witnessed.

But I cannot pursue this subject further. I have been compelled by circumstances to present my views in the briefest way. I am aware there are points made by the learned counsel representing Mr. Vallandigham, to which I have not adverted. I have had neither time nor strength for a more elaborate consideration of the questions involved in this application. For the reasons which I have attempted to set forth, I am led clearly to the conclusion that I cannot judicially pronounce the order of General Burnside for the arrest of Mr. Vallandigham as a nullity, and must, therefore, hold that no sufficient ground has been exhibited for granting the writ applied for. In reaching this result I have not found it necessary to refer to the authorities which have been cited, and which are not controverted, for the obvious reason that they do not apply to the theory of this case, as understood and affirmed by the court. And I may properly add here that I am fortified in my conclusion by the fact just brought to my notice, that the legislature of Ohio, at its late session, has passed two statutes, in which the validity and legality of arrests in this state under military authority are distinctly sanctioned. This is a clear indication of the opinion of that body that the rights and liberties of the people are not put in jeopardy by the exercise of the power in question, and is, moreover, a concession that the present state of the country requires and justifies its exercise. It is an intimation that the people of our patriotic state will sanction such a construction of the constitution as, without a clear violation of its letter, will adapt it to the existing emergency.

There is one other consideration to which I may, perhaps, properly refer, not as a reason for refusing the writ applied for, but for the purpose of saying that, if granted, there is no probability that it would be available in relieving Mr. Vallandigham from his present position. It is, at least, morally certain it would not be obeyed. And I confess I am somewhat reluctant to authorize a process, knowing it would not be respected, and that the court is powerless to enforce obedience. Yet, if satisfied there were sufficient grounds for the allowance of the writ, the consideration to which I have adverted would not be conclusive against it. For these reasons I am constrained to refuse the writ.

NOTE 1 [from pamphlet report by Rickey & Carroll, Cincinnati, Ohio, 1863]. The findings and sentence of the military commission which were in the hands of General Burnside at the time of the habeas corpus proceedings were as follows:

#### Finding and Sentence.

"The commission, after mature deliberation on the evidence adduced, and the statement of the accused, find the accused, Clement L. Vallandigham, a citizen of the state of Ohio, as follows: Of the specification (except the words, 'that propositions by which the Northern states could be won back, and the South guaranteed their rights under the constitution, had been rejected the day before the battle of Fredericksburg, by Lincoln and his minions,' meaning thereby the president of the United States, and those under him in authority, and the words, 'asserting that he firmly believed, as he asserted six months ago, that the men in power are attempting to establish a despotism in this country, more cruel and more oppressive than ever existed before'), guilty. And as to these words, not guilty. Of the charge, guilty. And the commission do, therefore, sentence him, the said Clement L. Vallandigham, a citizen of the state of Ohio, to be placed in close confinement in some fortress of the United States, to be desig-

nated by the commanding officer of this department, there to be kept during the continuance of the war.

"II. The proceedings, findings and sentence in the foregoing case are approved and confirmed, and it is directed that the place of confinement of the prisoner, Clement L. Vallandigham, in accordance with said sentence, be Fort Warren, Boston Harbor.

"By command of Major General Burnside.
"Lewis Richmond,
"Asst. Adjutant General.
"Official: W. P. Anderson,
"Assist. Adjutant General."

The sentence of the military commission as above set forth was never executed. The disposition made of the prisoner will appear by the following order issued by the president of the United States, which was fully carried out according to its terms.

Order of the President.

"U. S. Military Telegraph. (Cipher) May 19, 1863. (By telegraph from Washington, 9.40 p. m., 1863.) To Major-General Burnside, Commanding department of the Ohio—Sir: The president directs that, without delay, you send C. L. Vallandigham, under secure guard, to the headquarters of General Rosecrans, to be put by him beyond our military lines, and that in case of his return within our lines he be arrested and kept in close custody for the term specified in his sentence.

"By order of the president.
"Ed. M. Canby,
"Brig. Gen., and A. A. G.
"Please acknowledge receipt of this, and time when received, by request of
"Brig. Gen. Canby."

[NOTE 2. The counsel for Mr. Vallandigham sought to have the proceedings of the military commission reviewed by the supreme court of the United States, and, for that purpose, filed a petition in that court for a writ of certiorari to be directed to the judge advocate general of the army, to send up the proceedings of that commission. The application was argued on January 22, 1864, and was denied, in accordance with an opinion delivered February 15, 1864, by Mr. Justice Wayne, who held that a military commission is not a court, within the meaning of the fourteenth section of the judiciary act of 1789, and that the supreme court had no jurisdiction to issue the writ of certiorari in such a case. See 1 Wall. (68 U. S.) 243.]